## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MARK ANDREW ZARALLO, JR. and COGENT RENEWABLES, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| | § | CIVIL ACTION NO. 4:23-CV-00683-SDJ |
| JOSHUA P. MCCOY, CHADWICK D. MITCHELL, MCCOY EQUITY HOLDINGS, LLC, DYNAMIC GROUP, LLC, DSI ENERGY SOLUTIONS, LLC, POWER STRATEGIES, LLC, MCCOY GROUP SERVICES, LLC, and SOUTHLAND STAFFING, LLC, | § § § § § § § § | |
| Defendants. | § § § § § | FIRST AMENDED COMPLAINT  JURY DEMAND |

## <u>PLAINTIFFS' FIRST AMENDED COMPLAINT</u>

Plaintiffs Cogent Renewables, LLC ("Cogent") and Mark Andrew Zarallo, Jr. ("Zarallo"), bring this action against defendants Joshua P. McCoy ("McCoy"), Chadwick D. Mitchell ("Mitchell"), McCoy Equity Holdings, LLC ("MEH"), Dynamic Group, LLC ("Dynamic Group"), DSI Energy Solutions, LLC ("DSI"), Power Strategies, LLC ("Power Strategies"), McCoy Group Services, LLC ("MGS"), and Southland Staffing, LLC ("Southland"). In support thereof, Plaintiffs allege as follows:

## <u>INTRODUCTION</u>

1.      Plaintiff Drew Zarallo ("Zarallo") founded Cogent in early 2021 with a single objective: to become a brand-name engineering, procurement and construction ("EPC") company

in the renewable energy space, one that would be synonymous with reliability and competence.

2.      Zarallo was lured into a business relationship with McCoy by McCoy in July 2021. McCoy represented that he would fund Cogent as necessary until cash flow was self-sustaining. He further represented that he could leverage his organization's financial wherewithal to provide Cogent with substantial bonding capacity and other financial support so that Cogent could obtain its objective of becoming a leading EPC company in renewable energy.

3.      In return for fulfilling these promises, McCoy demanded, and Zarallo agreed to, McCoy taking a 70 percent stake in Cogent. Zarallo retained the remaining 30 percent.

4.      It is now clear that McCoy's intent was never to grow and invest in Cogent but instead quite the opposite: McCoy's intent was to exploit Cogent over the next two years, which he did by: causing Cogent to provide effectively free services to McCoy's wholly owned companies, including DSI and Power Strategies; misappropriating $2.5 million in proceeds from a loan made by United Community Bank to Cogent to pay DSI's debt; fabricating personal "loans" to Cogent on which he could charge exorbitant interest and later attempt to satisfy the previously unrecorded "loans" with Cogent's receivables; draining Cogent's cash using shell "staffing companies" that did not provide Cogent any staffing or services but charged Cogent a 15 markup on millions of dollars of weekly payroll transfers; causing Cogent to make unearned payments to former public officials and misappropriating Zarallo's name in doing so to make Zarallo and Cogent the "fall guys" for such payments; failing to provide Cogent with bonding capacity as expressly promised to Zarallo prior to Zarallo transferring MEH 70 units in Cogent, leading to lost business opportunities; and leaving Cogent's financial records in a state of utter disarray which prevented Cogent from securing numerous profitable business opportunities through the present.

2

5.     Had McCoy and MEH treated Cogent with the care and loyalty that he owed it as a fiduciary, rather than exploiting it as both a pawn and a victim of his broader scheme, Cogent—which despite McCoy's best efforts has survived the onslaught—would have been many times more successful than it is today.  Instead, the assets of Cogent have been misdirected and defalcated, resulting in the enrichment of the Defendants herein.

## PARTIES

6.     Plaintiff Mark Andrew Zarallo, Jr., more commonly known as "Drew," is a natural person and citizen of the State of Texas.

7.     Plaintiff Cogent Renewables, LLC is a Delaware limited liability company with a single member, Plaintiff Mark Andrew Zarallo, Jr., who is a citizen of the State of Texas. Cogent has at all relevant times operated out of offices in Gunter and Frisco, Texas.

8.     Defendant Joshua P. McCoy is a natural person and is a citizen of the State of Florida.

9.     Defendant Chadwick D. Mitchell is a natural person and is a citizen of the State of Louisiana.

10.     Defendant MEH is a Louisiana limited liability company with a single member, Defendant Joshua McCoy. McCoy Equity Holdings, LLC operates out of its headquarters at 3045 Westfork Drive, Baton Rouge, LA 70816.

11.     Defendant Dynamic Group is a Louisiana limited liability company which, on information and belief, has a single member, Defendant Joshua McCoy who, on information and belief, is a citizen of the State of Florida. Dynamic Group, LLC operates out of its headquarters at 3045 Westfork Drive, Baton Rouge, LA 70816.

12.    Defendant DSI is a Louisiana limited liability company with a single member, Defendant McCoy Equity Holdings, LLC. McCoy Equity Holdings, LLC's single member is Defendant Joshua P. McCoy, a citizen of the State of Florida. DSI Energy Solutions, LLC operates out of its headquarters at 3045 Westfork Drive, Baton Rouge, LA 70816.

13.    Defendant Power Strategies is a Louisiana limited liability company with two members: MEH and Envirofyx, LLC. On information and belief, Envirofyx, LLC is a Louisiana limited liability company with a single member, Jeffery Richardson, a natural person and citizen of Louisiana. MEH has a single member, McCoy, a citizen of Louisiana.

14.    Defendant MGS is a Louisiana limited liability company that, on information and belief, has a single member, Defendant McCoy Equity Holdings, LLC. McCoy Group Services, LLC, operates out of its headquarters at 3045 Westfork Drive, Baton Rouge, LA 70816.

15.    Defendant Southland is a Louisiana limited liability company that, on information and belief, has a single member, Defendant McCoy Equity Holdings, LLC. Southland Staffing, LLC, operates out of its headquarters at 3045 Westfork Drive, Baton Rouge, LA 70816

## SUBJECT-MATTER JURISDICTION

16.    This Court has original jurisdiction over the case pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states and the amount in controversy exceeds $75,000. The amount in controversy exceeding $75,000 is demonstrated by multiple allegations herein, demonstrating that millions of dollars are in controversy.

## FACTUAL BACKGROUND

**McCoy Lures Zarallo into Giving Him Control of Cogent with Promises of Financial Backing.**

17.     Zarallo is a former Noncommissioned Officer in the U.S. Marine Corps and served in combat tours in Operation Desert Storm.  Zarallo served for 15 years in the renewable energy construction industry as a Construction Manager, Project Manager and Director of Operations for large developers before founding Cogent.

18.     Zarallo founded Cogent in January 2021 with the objective of becoming a leading EPC in the renewable energy construction industry, primarily solar power. Zarallo leveraged his extensive experience in large international construction companies directing large-scale renewable energy projects, along with his personal integrity and industry connections, to create a company that provides first-in-class service, takes care of its workers, is reliable and can deliver quality results on time.

19.     McCoy is the owner and controller of several Louisiana limited liability companies, with business operations largely focused on construction services involving public contracts and public allocations. McCoy controls each of the entity defendants named herein. McCoy is the sole owner and CEO of MEH, which he characterizes as a private equity firm and also the CEO and sole owner of Dynamic Group, which is the primary company through which he procures government construction projects often related to disaster relief. McCoy personally approved and executed most, if not all, of the transactions that are the subject of this Complaint.

20.     Mitchell serves as both and officer and so-called "Advisor" to MEH and "President" of Dynamic Group and is generally McCoy's right-hand and puts into effect McCoy's directives. McCoy/MEH made all decisions on behalf of DSI as it related to the terms of the arrangement between Cogent and DSI.

21.    Zarallo was first introduced to McCoy in late May 2021. Zarallo and Cogent co-founder Oliver Chua had a first call with McCoy on June 4, 2023, to discuss a potential collaboration. McCoy presented himself as a successful equity investor who could fund Cogent's growth until it became self-sustaining.

22.    Chua and Zarallo discussed with McCoy, among other things, that they and Cogent were based in Texas, and both Zarallo and Chua were in Texas at the time. McCoy asked to see Cogent's business plan, which Zarallo transmitted to McCoy by email on the same day. In response, McCoy replied to both of them by email on the same day, suggesting that by partnering with him he "could see having the opportunity to do more faster than you guys projected" and suggested that this faster growth was possible since "funding and bonding [would not be] a hold back." Zarallo and Chua were present within the Eastern District of Texas when they received this email from McCoy.

23.    On another phone call with McCoy between June 4 and June 10, 2021, McCoy asked Zarallo and Chua to send him their thoughts on terms of an arrangement where he would take a majority stake in Cogent. In response to his request, Zarallo and Chua emailed proposed terms to McCoy on June 10, 2021. McCoy responded on the same day with his acceptance of most terms. Importantly, McCoy agreed that he would be "willing to fund" Cogent, and that what he called his "financial obligation" to Cogent would decrease once "the company can support itself." McCoy also insisted that he would "utilize [his] accounting firm and CPA firm to manage [Cogent's bank] account" and that "[a]ccounting records can be made available at anytime to verify and we can set up approvals on any payments over a certain amount to make sure all are on same page."  McCoy's transmitted this email to Zarallo and Chua while they were within the Eastern District of Texas.

6

24.     On a call between McCoy and Zarallo between June 11 and June 13, 2021, Zarallo indicated to McCoy that they were in agreement and were ready to move forward. On that call, McCoy also represented that in addition to his willingness to fund Cogent until it could "support itself," McCoy would provide the necessary financial backing for Cogent to qualify for project bonding at limits that would permit Cogent to bid for projects with contract values of at least $30 million and aggregate project values of at least $100 million just to start.  This level of bonding capacity was exactly what Zarallo believed was necessary to help Cogent become an EPC in significantly sized solar-power development projects with typical contract values often within these ranges. McCoy specifically told Zarallo to use those numbers as Cogent's present "bonding capacity" in Cogent's Statement of Qualifications ("SOQ"), which is a document Cogent submits to any prospective customer in connection with a prospective bid.

25.     On June 14, 2021, and in response to McCoy's request, Zarallo transmitted a revised Cogent SOQ with the bonding limits McCoy committed to. On review of the SOQ, McCoy emailed Zarallo, asking him to add a footnote stating "*Higher single & aggregate [bonding] limits can be achieved depending on project." Zarallo made that change. McCoy further represented that he hoped to be able to provide $100 million in single-project bonding and $300 million in aggregate bonding by "August/September [2021]."  The June 14 email from McCoy to Zarallo was transmitted to Zarallo while he was within the Eastern District of Texas.

26.     Zarallo's reasonable understanding, formed on the basis of McCoy's representations, was that McCoy was making the foregoing promises and taking on the foregoing funding and bonding obligations on behalf of himself personally. This understanding was reasonable in light of, among other representations, McCoy's reference to the commitments he was making as "my financial obligation."

7

27.    It was immaterial to Zarallo at the time of his negotiations with McCoy through which entity McCoy would satisfy his personal funding and bonding obligations to Zarallo and Cogent. However, it was material to Zarallo and was Zarallo's reasonable understanding, formed on the basis of McCoy's representations, that any and all funding of Cogent caused by McCoy would constitute capital investments in Cogent and not loans to Cogent; specifically, McCoy's "financial obligation" was consideration for his taking a 70 percent equity interest in Cogent.

28.    In reliance upon McCoy's representations and promises, Zarallo transferred 70 of Cogent's 100 membership units to MEH.  Zarallo retained 30 units.[1]

29.    As it turns out, McCoy never intended to invest significant resources into Cogent or to provide it with significant bonding capacity.  Rather, McCoy's intent at the time he made the foregoing promises was that he would use his control over Cogent to exploit Cogent for the benefit of other companies he owned and/or controlled.

30.    Zarallo's transfer of units was not effectuated by a written agreement. However, even before Zarallo and MEH ultimately signed an operating agreement as members of Cogent, McCoy had already caused another of his companies, Dynamic Group, to make initial funding transfers to Cogent in July and August 2021, and both Zarallo and McCoy were already conducting themselves as co-owners of the business.

**The LLC Agreement**

31.    On or around August 16, 2021—after McCoy and Zarallo had agreed on terms of the agreement under which Zarallo transferred 70 units to MEH—MEH and Zarallo became parties to the Amended Limited Liability Company Agreement of Cogent Renewables LLC a Delaware

---

[1] Prior to McCoy and MEH taking an ownership stake in Cogent, Cogent's 100 membership units were divided equally between Zarallo and Chua. In or around June 2021, Chua decided that he wanted to go back to salaried work for major solar developers rather than continue down the path of entrepreneurship, and transferred his units to Zarallo, making Zarallo a 100 percent owner at the time he transferred the units to McCoy.

Limited Liability Company  (the "LLC Agreement"). A true and correct copy of the executed LLC Agreement is annexed to this Complaint as **Exhibit A**.

32.    Section 3.01 of the LLC Agreement names MEH as "Manager" of Cogent.

33.    Section 3.02 designates McCoy and Zarallo as "Officers" of Cogent and incorporates by reference Exhibit C which describes McCoy's "Primary Duties" also as "Manager." Thus, McCoy acted as Officer and, concurrently with MEH, as Manager of Cogent.[2]

34.    Although McCoy signed the LLC Agreement as "member of McCoy Equity Holdings," as Officer of Cogent, Section 3.03 of the LLC Agreement obligated McCoy to "discharge [his] duties [*i.e.*, as "Manager"] in a manner [he] reasonably believe[d] to be in the best interests of the Company, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

**Mccoy/MEH Cause Cogent to Provide Services to MEH's Wholly Owned Company and Competitor of Cogent, DSI, on Commercially Unreasonable Terms, and Then Conceal the Debt.**

35.    On information and belief, one of the primary reasons McCoy/MEH induced Zarallo into selling MEH control of Cogent was to cause Cogent to provide effectively free services to MEH's wholly owned company and competitor of Cogent, DSI.

36.    At the time McCoy was introduced to Zarallo in or around May 2021, DSI was struggling. On one project in particular for development of a solar farm called "Mulligan Solar" in Illinois (the "Mulligan Project"), DSI needed supervision and operational support. McCoy asked Zarallo and his team at Cogent to supplement DSI as sub-contractor on the Mulligan Project, to help oversee things, and generally to help get things back on track.

---

[2] Given that both McCoy and MEH are named "Manager" in the LLC Agreement, and given that MEH operates at the direction of McCoy, the term "McCoy/MEH" will be used for most purposes herein where it is not possible to extricate McCoy from MEH.

37.     Prior to taking control of Cogent, McCoy told Zarallo that he would like Cogent to work on the Mulligan Project for approximately a month to help things get back on track. However, after McCoy and MEH took control of Cogent, McCoy directed Cogent to continue providing services on the Mulligan Project and to submit its invoices, addressed to DSI, on a monthly basis. McCoy/MEH directed Cogent to continue to work on the Mulligan Project without any written agreement and ultimately without fair remuneration. Cogent continued to do so through April 2022.

38.     McCoy and Mitchell directed DSI, and a DSI employee, Dylan Jenks, was the primary construction manager. Neither McCoy, Mitchell nor Jenks had substantial experience running renewable energy projects, and their inexperience ended up being very costly. DSI won its subcontract for the Mulligan Project by dramatically underbidding its work to the prime contractor, Signal Energy Constructors, which led to substantial overruns, litigation with Signal Energy Constructors and, ultimately, DSI's insolvency and being wound down as a going concern..

39.     At all times, McCoy directed DSI's affairs and made all significant decisions on behalf of DSI, including as it related to the arrangement with Cogent on the Mulligan Project.

40.     As more fully set forth in the paragraphs that follow, Cogent submitted $3,530,912.72 in invoices addressed to DSI through April 2022, and a total amount of $2,420,723.85 remains unpaid.

41.     Cogent's work on the Mulligan Project required that Cogent dedicate substantially all of Cogent's and Zarallo's time and resources, without adequate remuneration, to what McCoy referred to as a "DSI project" instead of ensuring that Cogent's and Zarallo's time and resources were dedicated instead to seeking out and obtaining contracts for profitable work on third-party projects.

10

42.     In the renewables construction industry, it is customary that a subcontractor work under a written contract. This is especially true of projects the size and scope of the Mulligan Project.

43.     Once Zarallo understood that McCoy intended for Cogent to continue working on the Mulligan Project without a clear end in sight, on or around September 16, 2021, Zarallo sent Mitchell a draft of a Cost-Plus Construction Contract, which provided for a modest 10-percent profit above cost of the work and requested that this well-below-market contract be used for Cogent's work on the Mulligan Project.  Ultimately, that process stalled because McCoy/MEH would not sign off.

44.     Instead of agreeing to Zarallo's proposed contract for its services, McCoy/MEH requested that Cogent continue working and submitting invoices addressed to DSI without clarity on the terms of expected remuneration, liabilities, or other commercially reasonable and necessary terms. This action was taken for the benefit of McCoy/MEH and DSI, and to the detriment of Cogent.

45.     When McCoy and MEH first requested that Cogent work on the Mulligan Project, the project had already become a quagmire, and the results of DSI's original underbidding and resultant project-overruns were causing DSI to default on payments to contractors and vendors. McCoy/MEH knew at the time they requested that Cogent work on the Mulligan Project and submit invoices to DSI that DSI would pay only a fraction of any invoices Cogent submitted.

46.     Under Section 3.04(a) of the LLC Agreement, Zarallo's consent was required for "any contract for the provision of construction or construction management services as a general contractor or subcontractor." Zarallo consented to the (albeit unwritten) agreement with DSI for the provision of labor and materials on the Mulligan Project with the expectation that Cogent

11

would be paid in full for those services. Had Zarallo known at the time he was causing Cogent to submit invoices to DSI that McCoy had no intention of causing DSI to pay a substantial amount of the invoices, and no intention of allowing Cogent to make a profit, Zarallo could have and would have exercised his right to withhold his consent to the arrangement.

47.     Numerous telephone and email communications were directed at Zarallo to give him false assurances that Cogent would be paid for its work, and which failed to disclose that only a fraction of Cogent's invoices were going to be paid and that Cogent would not be permitted make a profit for its work. Once such email communication was initiated and sent by Mitchell to Zarallo on October 29, 2021, copying McCoy and a manager at DSI (Dylan Jenks), with subject-line "Cogent Invoicing." In that email, among other things, Mitchell reassured Zarallo about McCoy's commitment to Cogent being paid for its work: "At the end of the day … Dynamic and McCoy are backing all of this so we are all on the same team here …." McCoy responded on the same day saying "Couldn't said [sic] all that better myself, Chad [Mitchell]." Mitchell and McCoy knew that this was false. Zarallo relied on these representations in continuing to consent to the arrangement with DSI.  These emails were initiated by Mitchell and McCoy and transmitted to Zarallo while he was within the Eastern District of Texas.

48.     Cogent ultimately submitted invoices totaling $3,530,912.72 for its services on the Mulligan Project through April 2022.

49.     Zarallo's team applied a 10-percent markup on some of the line-items in the invoices related to the Mulligan Project. The 10-percent markup was not applied across the board. Some costs were simply billed at cost. Thus, in total, Cogent's invoiced amounts included a profit margin lower than 10 percent.

50.     The profit margin built into the Mulligan Project invoices was substantially discounted relative to the profit margins Cogent builds into contracts with parties in arms' length transactions and relative to industry standards. Those commercially reasonable and standard profit margins range from 18 to 30 percent.

51.     In or around December 2021, McCoy/MEH instructed Cogent to reissue all invoices to exclude markups and indicated that Cogent would not be allowed to realize any profit from its work on the Mulligan Project. In other words, Cogent was being instructed to go from what McCoy characterized as "not making a lot" on "DSI's project" to making nothing at all. Cogent nonetheless continued to include the already meager markups in the invoices but, as set forth below, ultimately McCoy had the last word by failing to ensure that DSI paid them.

52.     On several occasions during the period of July 2021 through December 2021, McCoy caused deposits to be made into Cogent's bank account with J.P. Morgan Chase, which was controlled by Zarallo's operations team.

53.     Since McCoy had promised, prior to Zarallo transferring units to MEH, to "put the appropriate amount in [Cogent's] checking account" as Cogent progressed towards profitability and to "fund" all of Cogent's expenses needed to "finish out 2021," Zarallo sent McCoy an email on October 9, 2021, with subject-line "Cogent Bank Account" where he outlined the categories of costs that he expected McCoy would fund, including payroll, per diem costs for labor and administrative fees for licenses. All of these budget items were in service of the Mulligan Project, which McCoy referred to as "DSI's project." McCoy, responding from his Dynamic Group email account and said that, with the exception of Zarallo's request for "[Cogent branded] shirts / hats for field crews and office personnel," the remaining budget items "all sound[ed] good."

54.    Although Zarallo expected that McCoy/MEH would cause transfers to be made into Cogent's account, he did not know how McCoy's team would account for these transfers internally. As it turns out, the way McCoy/MEH's team accounted for such transfers is best described as schizophrenic. McCoy/MEH's accountants classified and repeatedly reclassified such transfers apparently to suit McCoy's interests. Indeed, such transfers, most of which originated from Dynamic Group's bank accounts, were classified and reclassified at different times—and even at the same time—as "owner's investments," "due/to from Dynamic Group," "prior retained earnings," and "income from DSI Receivables."

55.    The monies that were transferred into Cogent's checking account on various occasions between August 27, 2021, and December 13, 2021, were characterized in Cogent's accounting records, prepared by McCoy's accountants, as "owner's investment[s]." These "owner's investments" originated from Dynamic Group or DSI, even though neither had an ownership interest in Cogent.

56.    The treatment of these deposits as "owner's investment[s]" was consistent with McCoy's promises regarding his "financial obligation" to fund Cogent. It was not material to Zarallo or Cogent which of McCoy's entities McCoy used to cause such "owner's investment" transfers consistently with his agreement to do so in exchange for a 70 percent interest in Cogent.

57.    Out of the $2,052,863.46 in "owner's investment" transfers, $1,110,188.87 were transfers from a bank account belonging to DSI, and $942,674.59 were transfers from bank accounts belonging to Dynamic Group.  Banking records and accounting records created by McCoy/MEH accountants reflect that all of the foregoing transfers were made from McCoy-controlled accounts in Baton Rouge to Cogent's JP Morgan Chase account in Gunter, Texas.

58.     Near the end of December, two more transfers were made to Cogent's Texas account from Dynamic Group's account, amounting to a total of $96,453.22. And on December 29 and December 30, 2021, McCoy caused additional transfers to be made from Dynamic Group's accounts to a bank account that McCoy/MEH caused to be established for Cogent at Hancock Whitney bank (the "HW Account"). In total, these late-December 2021 transfers amounted to $615,565.99 and were accounted for by McCoy/MEH's accountants **both** as "owner investments" **and also** in an internal account used by Defendants called "Due to/from Dynamic."

59.     At the end of 2021, the total amount of transfers from McCoy-controlled entities to Cogent was $2,668,429.45, all of which covered Cogent's payroll and expenses incurred almost exclusively in service of what McCoy called "DSI's project." Other than the $1,110,188.87 in transfers from DSI which were payments of Cogent's invoices, the remaining transfers of $1,558,240.59 should properly have been accounted as capital contributions to Cogent, consistently with the "financial obligation" McCoy took upon himself in June 2021 to fund Cogent until it could "support itself."

60.     In or around May 2022, McCoy's accountants reclassified $170,000 of the 2021 transfers from Dynamic Group as "Reallocate[d] to specific owner (Josh)." And thus, balance sheets generated by McCoy's accountants contain an entry in the "Equity" table titled "Distribution (Josh)" that, on information and belief, was credited with $176,456 in May 2022. It is unknown to Cogent where the other $6,456 came from.

61.     The $615,656.99 in transfers from Dynamic Group to Cogent in late December 2021 were booked by McCoy's accountants **both** as an "owner investment" and **also** as a liability from Cogent to Dynamic Group under an account called "Due to/from Dynamic." This illogical treatment of the transfer as both debt and equity was addressed in or around April or May of 2022,

when records reflect that the "Due to /from" account used by McCoy's accountants would be "closed" and amounts previously classified under this account would be "reclassified" as "prior retained earnings." The accounting records that noted this change also stated that the "Due to/from account will not be used going forward as all intermcompany [sic] activity will now go through Long-Term loans that accure [sic] interest." Thus, accounting records generated by McCoy's accountants stop treating the $615,597 value as a liability on Cogent's balance sheets starting in May 2022 and at all times thereafter (that is until McCoy later "resurrected" its status as a purported debt in connection with his/MEH's withdrawal from Cogent, as more fully set forth later in this complaint).

62.     The remaining $772,674.59 in Dynamic Group's 2021 "Owner's Investment" transfers were at some point in 2022 "reallocate[d]" by McCoy/MEH's accountants to "income from DSI Receivables," *i.e.*, as payments towards the invoices Cogent submitted to DSI for services on the Mulligan Project. This was improper and not allowed under McCoy's agreement with Zarallo, or under the LLC Agreement. These "owner's investments" should have been treated as equity investments caused by McCoy consistently with his "financial obligations." It was not proper to treat these as income from DSI Receivables. Consistent with McCoy/MEH's retroactive recharacterizations of "owner's investments" as income from DSI, Cogent's tax return for 2021 prepared by MEH/McCoy's accountants, reflects an amount of $1,884,945 as the gross receipts for 2021, which, on information and belief, is comprised primarily of the $1,110,188.87 in income from DSI and $772,674.59 in Dynamic Group's 2021 "Owner's Investment" transfers. Zarallo was not informed of nor did he agree to any of McCoy's accounting choices.

63.     In or around the beginning of 2022, McCoy/MEH directed that all financial transactions start being processed through the HW Account. The HW Account was at all times

prior to MEH and McCoy's eventual withdrawal from Cogent controlled exclusively by McCoy and those acting under his direction, including Mitchell, MEH and Dynamic Group. The HW Account was a subsidiary account to Dynamic Group's master "treasury management" account and was one of more than a dozen different affiliate accounts under Dynamic Group's master account, which includes subsidiary accounts for Defendants DSI, Power Strategies, Southland, MEH and MGS.

64.    McCoy/MEH caused $947,628.75 in inter-affiliate transfers to be made into the HW Account over the period of January 12, 2022, to May 11, 2022. Just as with the other "owner's investments" from 2021, these transfers were made from Dynamic Group's bank account. These funds were primarily used to cover Cogent's payroll and other business expenses as Cogent was winding down on the Mulligan Project and beginning to mobilize on Cogent's first project in Nevada as a subcontractor for Ormat Nevada, Inc, an unaffiliated third party.

65.    Just as with the "owner's investment" transfers made to Cogent's Texas account in 2021, the inter-affiliate transfers to Cogent from January 12, 2022, to May 11, 2022, should have been treated as capital contributions and/or owners' equity.

66.    In the books and records generated and maintained by MEH, the $947,628.75 in transfers were originally booked in the same "Due to/from Dynamic" account as the $615,597 transfers from late 2021. But whereas at or around the same time the "Due to/from" account was "closed" by McCoy's accountants in May 2022 and the $615,597 "liability" was reclassified as equity, the $947,628.75 value was reclassified as income from the Mulligan Project receivables, rather than also being reclassified as equity.

67.    The $947,628.75 value should have been treated as equity at all times. There was no reason to treat the $947,628.75 in transfers differently than the $615,597 in transfers. And

although Zarallo's expectation in exchange for giving McCoy control of Cogent was that McCoy would cause equity investments to be made in Cogent until Cogent could "support itself," Zarallo **did not** agree: (a) to classifying such transfers as loans—which would have required a promissory note and Zarallo's express consent; or (b) to McCoy, MEH, Dynamic Group or anyone else acting under McCoy's control, unilaterally reclassifying such equity investments as repayment of debts owed to Cogent by DSI.

68.    Although these transfers were from Dynamic Group's bank account, McCoy's position is that these were personal transfers from him to Cogent made "through" Dynamic Group. Since all of the Dynamic Group transfers were in satisfaction of his own "financial obligation" to "fund" Cogent until it could "support itself," they were capital contributions (not debt or payment of DSI invoices).

69.    Despite neither Dynamic Group nor McCoy being members of Cogent or parties to the LLC Agreement, the proper way of accounting for these personal transfers from McCoy to Cogent "through" Dynamic Group, would have been to treat them consistently with what McCoy referred to in June 2021 as his "financial obligation" to Cogent. One way to effectuate Zarallo's and McCoy's intent would have been to credit the Dynamic Group transfers to MEH's capital account, which Section 4.03 of the LLC Agreement required to be "established on the books and records of [Cogent]." This would have been consistent with the LLC Agreement's treatment of McCoy's first two transfers to Cogent through Dynamic Group in July and August 2021, totaling $50,000, as MEH's "Initial Capital Contribution" of $50,000. To be clear, however, McCoy's "financial obligation" to fund Cogent did not derive from the LLC Agreement and was entirely separate and independent from MEH's obligations as a member of Cogent and party to the LLC Agreement. As it relates to members of Cogent, Section 4.02 of the LLC Agreement provides that

a member: "may agree (but will not be obligated) to make additional Capital Contributions as is necessary."

70.    In total, Defendants reclassified a total of $1,720,303.34 of 2021 and 2022 Dynamic Group transfers as offsets of receivables from the Mulligan Project. If legally effective (which they were not), these reclassifications would have reduced the amount owed on the Mulligan Project receivables down to $689,799.18.

71.    But by the time McCoy/MEH withdrew from Cogent in July 2023, Defendants had taken the position that a balance of only $352,441 remained on the Mulligan Receivables. It is unknown to Plaintiffs if Defendants purport to have an explanation for the further reduction, but whatever the purported explanation, the further reduction in these receivables was unauthorized and improper.

72.    It is notable that the $352,441 balance is 9.98 percent of the original total of $3,530,912.72 in Mulligan Project invoices. This is not coincidental but rather relates to McCoy's earlier refusal to allow Cogent to apply a well-below-market 10-percent markup on its services. At no point were McCoy, MEH, Dynamic Group or DSI prepared to allow Cogent to make a profit on its work.

73.    Regarding the $352,441 portion of the Mulligan Project receivables that McCoy, MEH and DSI do not dispute is owed, they have taken the position now that this amount is only owed by DSI and not other Defendants—even though McCoy and others acting on his behalf arrived at this dramatically reduced number primarily through offsets of deposits and transfers from **Dynamic Group** and even though Cogent's work on the Mulligan Project was done at the behest of McCoy and MEH as controllers of both Cogent and DSI, and according to Mitchell "Dynamic and McCoy [were] backing all of [the invoices]." Now by conveniently taking cover

19

behind the thin veil of DSI's distinct existence as a limited liability company, the Defendants maintain that DSI is insolvent and just cannot pay.

74.     In other words, McCoy is now crouching behind the shield of DSI's distinct corporate existence as a means of avoiding payment for Cogent's services, despite routinely disregarding such distinctions when it was expedient for him to do so.

75.     Plaintiffs' position is that the correct amount owed on the invoices Cogent submitted to DSI in connection with the Mulligan Project is $2,420,723.85, which is the value obtained by treating DSI's transfers in 2021 as payments towards the $3,530,912.72 total and treating the Dynamic Group transfers in 2021 and 2022 as capital contributions by McCoy and/or MEH.

76.     It is now apparent that McCoy's promises "fund" Cogent was part of a bait-and-switch ploy. McCoy was merely agreeing to "fund" the costs necessary for Cogent to work for McCoy's benefit on the Mulligan Project. Cogent could have received such "funding" as part of an ordinary subcontract with DSI, and such an arrangement would not have required Zarallo to part with 70 percent of Cogent.

77.     Whatever the amounts now due on the Mulligan Project receivables after proper accounting is done and pre-judgment interest applied, McCoy and MEH, as fiduciaries to Cogent, are both separately and independently liable for all amounts due. The arrangement was "entirely unfair" under Delaware law.

78.     Furthermore, McCoy/MEH failed to take reasonable steps to collect the debt at a time when doing so would have enabled Cogent to benefit from the mechanics' lien procedures available under Illinois law. Illinois lien procedures would have enabled Cogent to recover compensation for its services from the owner of the Mulligan Project site or from a surety bond

covering such liens. Not surprisingly, McCoy and MEH put their interests and the interests of their affiliate, DSI, above Cogent's interests in failing to take these obvious and reasonable steps to ensure that Cogent was compensated for its services.

79.    Beyond just compensating Cogent for the unpaid invoices, McCoy and MEH must also compensate Cogent for the full fair-market value of its services on the Mulligan Project, which is substantially more than the $3,530,912.72 in invoices submitted to DSI. McCoy/MEH caused Cogent to service what McCoy called "DSI's project" under conditions where he believed "Cogent isn't making much money." Had the arrangement been founded on commercially reasonable terms, Cogent's invoices would have been substantially higher and would have built in a commercially reasonable profit.

80.    Neither McCoy, MEH nor DSI intended to fully compensate Cogent for its services on the Mulligan Project. McCoy orchestrated it so that Cogent would submit monthly invoices addressed to DSI all while fully aware of DSI's gross underbidding of the Mulligan Project, its financial woes and its precipitous decline towards insolvency. DSI's decline was accelerated by McCoy misappropriating DSI's cash in the same manner that the Defendants misappropriated Cogent's cash, as more fully addressed below. McCoy knew that DSI ultimately would not pay whatever amount remained after accounting setoffs were applied.

**Mccoy/MEH Utilize Southland and MGS Purported Service Providers to Misappropriate Funds from Cogent.**

81.    Once Cogent began taking in cash receipts from third parties unaffiliated with McCoy, the Defendants directed Cogent to begin using the HW Account under McCoy's, MEH's and Dynamic Group's control for all company transactions. As reflected in HW Account statements, from the time Cogent switched to using the HW Account in the beginning of 2022, through McCoy/MEH's withdrawal from Cogent in July 2023, the cash transfers **into** Cogent's

HW Account by McCoy's affiliates were far exceeded by the cash transfers **out** of the HW Account to at least eight different McCoy affiliates—in total amounting to millions of dollars.

82.     Despite promises that Cogent's accounts would be wide open to Zarallo after McCoy took control, McCoy/MEH instead took complete control of Cogent's financials, denying Zarallo meaningful visibility into the company's accounts and finances, providing only the most limited viewable access to Cogent's HW Account and its books and records and leaving Cogent without adequate financial statements to submit to third parties.

83.     To further ensure that only McCoy/MEH had access and/or control over Cogent's cash resources, McCoy/MEH required that all checks be cut and signed by employees of MEH and/or Dynamic Group, which further ensured that the Cogent operations team had little visibility into what funds were paid, what funds were received, and what funds were being improperly transferred out of Cogent. Mitchell wrote Angela Zarallo ("Angela"), Cogent's Corporate Administrator (and Zarallo's wife), in June 2022: "As Joel Salvggio sets into the accountant role for Cogent he will be the only one authorized to cut checks and they will be signed by me. This is the same way we handle all payables for all McCoy entities and it's important that we uphold this process." Salvaggio was an accountant at MEH until June 2023.

84.     One of the primary means by which McCoy/MEH misappropriated funds from Cogent was through the use of Defendants Southland and MGS, both wholly owned by MEH, to charge unjustified markups on Cogent's payroll and thereby misappropriate hundreds of thousands of dollars from Cogent between April 20, 2022, through July 3, 2023.

85.     In or around March or April of 2022, when Cogent's first payments from non-McCoy third parties were expected, McCoy/MEH directed Cogent to terminate its ongoing services with Insperity, a third-party benefits, payroll and HR-administrator.  McCoy/MEH,

through Mitchell, informed Zarallo that a wholly owned McCoy company, Defendant Southland, would be used instead. Mitchell represented to Zarallo that this change would lead to significant cost savings to Cogent by bringing benefits, payroll and HR administration "in-house."

86.    At the time, Insperity was charging Cogent a flat rate of 19.8 percent on all payroll (both for salaried and hourly workers) processed through Insperity, which fees covered numerous services and benefits, including: providing Cogent employees with access to UnitedHealthcare insurance benefits, free preventative healthcare and dental insurance and 401k plans; covering all of Cogent's worker's compensation insurance payments—a substantial component of Cogent's overhead; Insperity's handling of payment processing, payroll tax calculation and withholding, paystubs, W-2s, and Insperity's providing Cogent with a full suite of human resources ("HR") services and a dedicated team of HR specialists.

87.    As it turned out, McCoy/MEH's promise of savings by moving the services Insperity had been providing "in-house" to Southland was another bait-and-switch ploy by McCoy and MEH. McCoy and MEH used Southland, and later MGS, to charge Cogent a 15 percent markup on millions of dollars of Cogent's payroll payments without any corresponding services rendered. After pocketing their 15 percent markup, McCoy and MEH **separately** charged Cogent for access to employee medical benefits, for worker's compensation insurance premiums, for a single HR employee, who was actually a full-time Dynamic Group employee,  and—most notably—for a third-party payroll processing provider, Automatic Payroll Systems, Inc. ("APS"), that charged Cogent its own markup on payroll, and which amounted to **an additional** 10 to 15 percent markup **on top** of Southland's. Put simply, Southland was used to further exploit Cogent and generate pure and unearned profit for the benefit McCoy/MEH.

88.     Under this arrangement, all of Cogent's hourly employees became employees of Southland, which McCoy/MEH call a "staffing company." But Southland (and later MGS) did not provide any staffing or labor to Cogent at any point. In fact, the reverse is true: it was **Cogent** that provided **Southland** with Cogent's employees, which Cogent had recruited, hired and trained, and then Southland used their weekly payroll payments as a base for an unfair 15-percent markup, while charging Cogent for all costs related to these employees.

89.     The way weekly payroll worked under the Southland/MGS regime was that Angela would compile each employee's hours worked, pay rate and other necessary information to process payroll for Cogent's hourly workers (who were now technically Southland/MGS employees). She would then transmit that information to one of two Dynamic Group employees (Joe Ott and/or Rachel Lee). A Dynamic Group employee would then perform the menial data-entry task of inputting the information Angela had organized into APS's online payroll system. This task would take no longer than an hour a week and was suitable for an entry level employee. APS would then handle the payroll processing and charge Cogent for its services.

90.     The HR services (if any) were provided by a single Dynamic Group employee— Rachel Lee—whose services MEH **separately** billed to Cogent. Lee's experience and level of professionalism was subpar relative to the HR specialists provided by Insperity. Moreover, as of February 2023, Lee resigned from Dynamic Group and there was no one who took her place. Despite her resignation and despite HR services no longer being provided to Cogent, Southland and later MGS did not reduce their 15-percent markup rate charged between February and July 2023.

91.     Cogent's worker's compensation insurance benefits were procured separately and were a substantial component of overhead **also not included** within Southland and later MGS's

15 percent markup; this arrangement was in stark contrast to Insperity's, in which the markup Insperity charged also included worker's compensation insurance.

92.    Cogent's share of medical insurance payments were also billed to Cogent separately each month and was also not included in the 15 percent markup from Southland and later MGS.

93.    Thus, the 15 percent markup charged by Southland and then MGS constituted pure and unearned profit to the Defendants.

94.    In or around May 2023, Cogent's workers were now moved from Southland to MGS. MGS did not provide any additional "services." And the only service Cogent was receiving in relation to this arrangement was data entry services being rendered by a low-level Dynamic Group employee. Like Southland, MGS does not have employees of its own. Up until May 2023, MGS had been charging Cogent for employee benefits. On information and belief, the switch from Southland to MGS did not increase the value of the services Cogent was receiving, and MGS's fees were equally exorbitant and unjustified.

95.    Section 3.08 of the LLC Agreement provides that "MEH shall be reimbursed for overhead allocable to the Company or to the business of the Company, which shall include, but not be limited to, the payment for employees of McCoy who perform work for the Company and expenses incurred by McCoy for the Company." MEH was also entitled to reimbursement for any of "MEH's duties" that it would delegate to "any entity or person." The data-entry task of entering information that a Cogent employee compiled into APS was the kind of back-office function Zarallo reasonably expected MEH might provide when they executed the LLC Agreement. Thus, rather than exploiting Cogent in bad faith using Southland and MGS, MEH should only have been

entitled to be reimbursed for the allocable share of the costs related to the data-entry task. That value is a small fraction of the value McCoy/MEH caused Southland to charge Cogent.

96.    Aside from transfers to Southland and MGS, hundreds of non-descript transfers from Cogent's accounts were made over the time McCoy and MEH were controlling Cogent, which are not accounted for and for which McCoy and MEH must provide an accounting.

**The Defendants Begin Using Unrecorded "Loans" as Leverage Against Zarallo.**

97.    On December 22, 2022, Defendant Mitchell created a financial "projection" for Cogent showing, among other things, Cogent's "Projected Net Profit" for 2022 of $993,757. This being the end of 2022, on information and belief, this "projection" was, in fact, what Mitchell believed Cogent's net profit number to be for 2022.

98.    In late December of 2022, Mitchell called Zarallo and told him that, now that there was around $1.0 million in the bank, he and Zarallo needed to talk about the money Cogent now had to pay back to McCoy which Mitchell suggested was a value close to $1.0 million. Mitchell wanted Zarallo to authorize repayment of these "loans." Zarallo was surprised and dismayed by the assertion that Cogent owed a debt to McCoy. In fact, Zarallo told Mitchell that he had "bragged" in good humor to McCoy on several occasions about the fact that Cogent did not owe McCoy any money and that he and McCoy were at "par" in connection with their agreement from June/July of 2021 regarding McCoy's "financial obligation." And, in fact, Zarallo insisted that Cogent was still owed substantial unpaid sums for Cogent's work on the Mulligan Project.

99.    Zarallo also mentioned on the call with Mitchell that the (albeit scant) records he had been provided did not show that there were any loans on Cogent's books. Specifically, Salvaggio had sent Zarallo financial statements in June 2023—one of the only occasions anyone from MEH sent Zarallo financial statements for Cogent—which reflected **zero** unpaid loans in the

liabilities table. Zarallo asked Mitchell for documentation and financial records supporting the existence of such a debt to McCoy, but Mitchell would not provide more substantive information. The conversation between Zarallo and Mitchell became contentious and the two did not come to a resolution.  This phone call was initiated by Mitchell and made to Zarallo while Zarallo was within the Eastern District of Texas.

100.    Not only was Mitchell attempting to deceive Zarallo regarding the existence of purported debts to McCoy in obtaining Zarallo's authorization for repayment of a purported loan, but Mitchell also failed to inform Zarallo during this call that McCoy/MEH were at that time relying on the very fact of Cogent's solvency and stellar financials to procure a loan from United Community Bank ("UCB") that McCoy/MEH intended to embezzle from Cogent.  In fact, as set forth in more detail below, Defendants submitted financial statements to United Community Bank in November 2022, just one month before Mitchell's call to Zarallo, reflecting that Cogent had **zero** short- or long-term liabilities to any person and reflecting that Cogent's only liabilities were accounts payable for ongoing projects.

101.    Similarly, a balance sheet for Cogent generated on or around June 22, 2023, by McCoy/MEH's accountants, showing month-by-month balances for the period of July 2022 through part of June 2023 showed a single "Loan from Dynamic Group" of $12,143 as the only loan listed under Cogent's liabilities for December 2022—a far cry from the approximately $1.0 million that Mitchell was claiming Cogent now owed. Even this "Loan from Dynamic Group" was not disclosed to Zarallo at any point and no promissory note existed documenting its terms.

**Mccoy, MEH and DSI Embezzle and Convert the Proceeds of a Bank Loan to Cogent.**

102.    Cogent's accounts receivable began growing substantially in or around October 2022, when Cogent executed an almost $12.0 million contract for work on a project in Ohio as

subcontractor for Inovateus Solar LLC ("Inovateus") (the "Inovateus Project").

103.    The expansion of Cogent's expected accounts receivable with the Inovateus Project in October 2022 led McCoy and MEH to exploit those assets for their own benefit by taking out a line of credit in Cogent's name, with Cogent as the debtor and Cogent's accounts receivable as collateral, but using the proceeds to pay DSI's debt with UCB.

104.    On or around November 10, 2022, less than a month after Cogent began work on the Inovateus Project, and without Zarallo's knowledge, McCoy and MEH submitted financial statements for Cogent to United Community Bank ("UCB") for purposes of obtaining the contemplated loan. Notably—and entirely inconsistent with Mitchell's statements to Zarallo in December 2022 regarding purported loans from McCoy and other Defendants—the balance sheet submitted to the UCB showed **zero** short- or long-term liabilities other than accounts payable of $164,655. No loans due to McCoy, Dynamic Group or anyone else were recorded on the balance sheet. Against the modest accounts payable were accounts receivable of $1,389,110. Cogent's "Net Worth" was reported as $1,440,621, and its 2022 year-to-date profits as of November 9, 2022, were $576,986. Moreover, Cogent now had active construction projects representing a revenue stream of approximately $17 million to be recognized within less than a year. In short, Cogent was in very good financial condition and McCoy was taking advantage.

105.    Neither McCoy, Mitchell nor anyone else associated with MEH informed Zarallo regarding their initial efforts to secure this loan from UCB. Zarallo became alerted to these efforts when a representative from UCB began asking Angela for documents and information related to Zarallo in January 2023.

106.    During the week of February 13, 2023, Mitchell initiated another phone call to Zarallo while he was within the Eastern District of Texas. Mitchell stated that, despite their

discussion in December suggesting that Cogent was in good financial condition and should then pay back McCoy on purported loans, now Cogent had very little money in the bank. Mitchell demanded that Zarallo start asking contractual counterparties to start making payments early. Additionally, Mitchell used this conversation to begin coercing Zarallo's consent to the loan from UCB. Mitchell stated that since DSI was being wound down as a going concern, Cogent was now being offered the opportunity to benefit from taking over DSI's existing line of credit with UCB, meaning that Cogent would have access to $2.5 million in working capital. Given this representation by Mitchell, Zarallo and Angela began sending UCB documents they were requesting to complete the loan documentation.

107.    McCoy/MEH were the primary cause of the cash crunch that McCoy/MEH and Mitchell now sought to exploit with more loans. Indeed, McCoy/MEH had by this point ensured that Cogent was not been paid for numerous Mulligan Project invoices, had been causing Southland to charge Cogent a markup of 15 percent on weekly payroll transfers, amounting to hundreds of thousands of dollars more, and caused numerous other transfers of funds out of Cogent which are presently unaccounted for.

108.    On March 29, 2023, a UCB employee, Talisha Johnson ("Johnson"), copying UCB's Senior Vice President Heath Mire ("Mire") sent Mitchell an electronic copy of a two-page document titled "Limited Liability Company Resolution to Borrow / Grant Collateral" (the "Loan Resolution"). The two-page document stated a loan amount of $2.5 million on its face with a loan date of March 27, 2023, and a maturity date of March 27, 2024. In the email from Johnson to Mitchell regarding the Loan Resolution, she said "This is the only doc drew will have to sign." Mitchell forwarded this email exchange and the Loan Resolution to Zarallo while Zarallo was at a remote project site in upstate New York. Zarallo forwarded it to Angela to review since he was

working at a project site.

109.    On Angela's review of the Loan Resolution, she noticed that the address associated with Cogent was listed as MEH's Baton Rouge address, which is also the address associated with all of the entity Defendants herein. This address was not a Cogent business address and the Defendants had not previously represented to third parties that their Baton Rouge address was an office of Cogent. Angela noted her concern regarding the address being incorrect to Johnson, and the explanation she received for why MEH's address was being used was that "The address is setup [sic] to go to Joshua to receive payment."

110.    In a phone call between Mitchell and Zarallo on March 29, 2023, while Zarallo was on a remote project site in upstate New York, Mitchell insisted that Zarallo sign the Loan Resolution. Zarallo wanted an opportunity to review all of the loan documents, and not just the Loan Resolution. Mitchell insisted that UCB urgently needed the document signed and that there was no need to review it since it was a "great opportunity" for Cogent to have access to much needed funds. Mitchell became hostile when Zarallo said he wanted to talk directly to McCoy about this and that he needed more time and information. Zarallo said he could not sign a Loan Resolution for this amount of money without understanding the details or having time to review and consider it. Other than the face value of the loan and maturity date, the Loan Resolution did not contain any substantive information regarding the terms of the loan and did not mention its relationship to DSI's line of credit.

111.    The next morning, on March 30, 2023, Mitchell emailed Angela, demanding that she ensure a signed Loan Resolution would be returned to him that day.  This email was initiated by Mitchell and transmitted to Angela while she was within the Eastern District of Texas. After Angela told Mitchell that Zarallo would not sign the documents until he had a chance to review

the documents when he came home the following week, on March 30, 2023, at 11:33 a.m. CST, Mitchell sent an email to Angela, copying Zarallo and McCoy, sent from a Dynamic Group email address and with a signature-block that indicated Mitchell as "President" of Dynamic Group. This email was addressed to Angela and ratcheted up the pressure to have Zarallo sign the documents immediately:

**From:** Chad Mitchell <cmitchell@dynamicgrp.com>
**Sent:** Thursday, March 30, 2023 11:33 AM
**To:** Angela Zarallo <Angela.zarallo@cogentrenewables.com>; Drew Zarallo <drew.zarallo@cogentrenewables.com>; Joshua McCoy <jmccoy@mccoyequity.com>
**Subject:** Bank Docs

Angela,

  As promised, the attached docs consist of the full LOC agreement with UCB. As mentioned before, Drew is not personally responsible for any of this and is just signing to acknowledge that he is aware it is being put in place and agrees that McCoy Equity has authority to put in place on behalf of the company. As discussed earlier, it is imperative that you please send me back the signed doc with Drews actual signature  before 3pm today. As discussed previously, Drew has agreed to this on multiple occasions most recently around 6pm CST yesterday. I in turn have given my word to the bank that it would be taken care of multiple times and assured them before 3pm today and if we don't get it back to them it will give McCoy Equity and Josh a bad look with the bank which none of us want to happen. If we dont get this back to them by 3pm today, the bank will have to reconsider some things as will MCCoy Equity with Cogent. This could also help setup Cogent for the future and we dont want to miss out on that opportunity. Please email signed doc directly to me and I will coordinate with the bank

Best Regards,

--



Chad Mitchell • President
**DYNAMIC GROUP, LLC** • www.dynamicgrp.com
📍 3045 Westfork Drive, Baton Rouge, LA 70816
📞 O: 225-570-6377 • M: 225-250-9938
    cmitchell@dynamicgrp.com

112.    At the point Mitchell's ultimatum and threat were conveyed to Angela and Zarallo, on information and belief, McCoy and MEH had already left Cogent in need of operational cashflow despite it having more than $17 million of construction contracts in progress. Zarallo believed the prospect of having access to a $2.5 million line of credit would at least help meet short-term obligations, and that it could be paid off from receivables over the subsequent months and signed the Loan Resolution.

113.    The copies of the loan documents Zarallo and Angela received from Mitchell on March 30, 2023, including the Loan Resolution that the Bank sent to Zarallo and Angela first on March 29, 2023, are attached to this Complaint as **Exhibit B**.

114.    Zarallo only signed the Loan Resolution. McCoy signed the rest of the loan documents, including a Commercial Security Agreement that gave UCB a security interest in Cogent's accounts receivable as collateral for the loan.

115.    As it turns out, McCoy and MEH diverted the proceeds of the UCB loan to DSI, which was unbeknownst to Zarallo at the time and was only discovered after MEH withdrew from Cogent several months later in July 2023. Specifically, McCoy instructed UCB to make its initial disbursement of $2,489,547.38 of the $2.5 million in loan proceeds by cashier's check payable to DSI.

116.    That the loan proceeds were being disbursed by cashier's check made out to DSI was buried at the very back of the 26-page set of dense, nine-point font loan documents transmitted to Zarallo on March 30. At the time Mitchell was demanding that Zarallo sign the Loan Resolution effectively authorizing McCoy to embezzle Cogent's funds, Mitchell knew (because Zarallo had informed him on a phone call on March 29, 2023) that Zarallo would have no choice but to review the loan documents on his phone and would very easily miss the very specific disbursement instructions buried at the back of the loan package.

117.    McCoy/MEH now claim that Zarallo was aware all along that DSI's debt would be paid off with an "initial draw" from the loan proceeds and that doing so was a condition for UCB's issuing the loan to Cogent. This is false as indicated by later correspondence indicating that Zarallo was not aware of this purported "condition" to the loan. Indeed, it would have been an irrational decision to make as putting Cogent in a $2.5 million hole on a one-year loan, just so

Cogent could attempt to climb out of it over the next year makes no economic sense and Zarallo would never have agreed to such an irrational setup.

118.    Nowhere in the Loan Documents does it state that the loan was being issued under the condition that DSI's debt would be paid off with an initial draw. On the first page of the Commercial Loan Agreement ("Loan Agreement") is a statement of the "Application for and Purpose of the Loan" which states that the Bank was issuing the $2.5 million loan "for the following purpose: a working capital revolving line of credit to replace the existing UCB revolving line of credit for DSI Energy." This appeared to be consistent with the Defendants' representations that Cogent would have access to a line of credit that would replace DSI's line of credit. That was the "great opportunity" Mitchell was referring to.

119.    None of the loan documents in any way revealed that Cogent would immediately be saddled with DSI's debt as a condition for the loan. Given that Zarallo was not a party to McCoy's negotiations with UCB regarding the loan, to provide meaningful disclosure to Zarallo would have required that the loan documents state explicitly that repayment of DSI's debt to UCB was a condition to the loan being issued.

120.    Disrobed of false pretenses, the true nature of the UCB loan transaction is clear: McCoy/MEH exploited Cogent's assets and stellar financials to obtain a $2.5 million loan, the proceeds of which were immediately embezzled and used to pay DSI's debt. Now Cogent is left with the entirety of the debt which UCB has the right to call at any time, with monthly interest payments of over $18,000, and with UCB claiming to have security interests in a substantial majority of Cogent's current receivables, which may be foreclosed upon without judicial process,

as well as a $2.5 million balloon payment due in March 2024.[3] And on top of this, McCoy continued to claim a right to a near-$1.0 million repayment of fabricated "loans," as more set forth in more detail below.

**Mccoy and MEH Exit and Raid Cogent on Their Way Out.**

121.    Had Cogent had access to the proceeds of the UCB loan it would have been able to make all needed vendor and subcontractor payments necessary to carry Cogent over a challenging period of a few months. That is what Zarallo believed the line of credit was for, and Mitchell encouraged this belief.

122.    As it turns out, McCoy was ready to abandon Cogent as soon as he offloaded DSI's debt. That was the plan all along. Indeed, records show that less than two months after embezzling the UCB loan proceeds, Mitchell was already putting the final touches on an exit strategy, many months in the making, that involved more embezzlement and misappropriation from Cogent.

123.    To put McCoy's plan in context, McCoy and/or MEH own three other companies in the renewables construction business that were potential competitors to Cogent: DSI, Power Strategies and Sunco Energy LLC ("Sunco"). By no later than June 2022 McCoy had already decided to abandon DSI which had become deeply insolvent and embroiled in litigation surrounding the Mulligan Project. The only reason McCoy used the UCB loan to pay DSI's debt was that UCB would otherwise have enforced a personal guarantee against McCoy and/or an Assignment of Deposit Account against Dynamic Group to satisfy the debt. McCoy's plan to offload DSI's debt with UCB onto Cogent and thereafter exit from Cogent was devised no later

---

[3] UCB was initially a defendant in this action. UCB plainly aided and abetted and/or conspired with McCoy to accomplish his breach of fiduciary duty and embezzlement. Plaintiffs voluntarily dismissed UCB without prejudice after entering into a forbearance agreement with it regarding enforcement of the loan documents. Either party may withdraw from the forbearance agreement with 30-days' notice.

than November 2022, when McCoy/MEH first sent Cogent's financial statements to UCB in contemplation of the loan.

124.    Despite McCoy's and MEH's fiduciary duties to Cogent and DSI, McCoy's true loyalties at all times were with Sunco and Power Strategies.

125.    Consistently with their exit plan, as soon as the Loan Resolution was signed and embezzlement of the UCB loan proceeds was consummated, McCoy/MEH caused Cogent to stop paying most of Cogent's vendors and contractual counterparties, leading to defaults, work stoppages, and lien procedures. On information and belief, McCoy/MEH did this in order to ensure that the cash that was necessary to pay contractors and vendors would instead be available for McCoy's taking.

126.    Despite not paying vendors or subcontractors, McCoy still caused Southland and MGS to charge a 15-percent markup on all Cogent payroll submitted to Southland and later MGS, on information and belief, amounting to more than $150,000 in unearned fees during the period of April through June 2023.

127.    Additionally, McCoy/MEH caused Cogent to pay $18,222.10 in interest to UCB on the $2.5 million fraudulent loan while Cogent received no benefit from the loan principal.

128.    On or around May 9 or 10, 2023, Zarallo reached out to McCoy by email to ask for a meeting to "get Cogent aligned" with McCoy to increase Cogent's "understanding of [its] financial position" and to increase "visibility and accuracy of cash flows." At this point, Zarallo suspected that McCoy/MEH had been abusing their control over Cogent's accounts to unreasonably inflate Cogent's costs at Cogent's expense.

129.    Zarallo requested that McCoy/MEH provide what he termed "float" money to carry Cogent over the challenging period. Zarallo specifically asked whether Cogent could

"borrow against" the "unpaid invoices from Illinois [i.e., the Mulligan Project invoices]" that were on the MEH-generated "books." Alternatively, Zarallo asked to "utilize any of the [UCB] Line of Credit."

130.    McCoy did not attend the teleconference held on May 10, 2023. Only Mitchell and Green attended from the MEH side. Zarallo was within the Eastern District of Texas during this teleconference. Even when confronted with Zarallo's direct request to use some of the $2.5 million line of credit which, at that point, had been diverted to cover DSI's debt, Mitchell and Green intentionally failed to correct Zarallo's understanding or disclose to Zarallo that the UCB loan proceeds were no longer available. Instead, Mitchell and Green misled Zarallo by representing that the line of credit **would** be made available to Cogent but only after Cogent first received payments on receivables.

131.    Angela emailed then-MEH accountant Joel Salvaggio on May 19, 2023, to confirm what appeared to be a harsh and unreasonable position MEH was taking regarding the UCB line of credit, stating: "To clarify my understanding, the line of credit that was established for Cogent will not be used to assist us in paying our invoices until we get our payments in and caught up. … Is this what is being said?" Salvaggio did not respond to her question.

132.    After this conversation in early- to mid-May 2023, McCoy caused cash to be transferred to Cogent's account from Dynamic Group's account and booked it in Cogent's accounting records as a and "a loan from Dynamic Group." No promissory note was executed and no loan terms discussed with Zarallo prior to the transfers being made.

133.    In internal accounting records prepared by McCoy's accountants, several transfers were each booked as a "Loan from Dynamic," amounting to a total of $491,942.67. This number was artificially inflated because several of these transfers did not occur. Most significantly,

whereas the accounting records show a "Loan from Dynamic" on May 24, 2023, of $118,273.64, Cogent's banking records reflect that no such transfer occurred on that date or on any other date. The records also carried over a previously undisclosed $12,143.23 "Loan" from 2022 into the total owed to Dynamic Group, which was also fabricated.

134.    Banking records reflect that the actual amount of transfers from Dynamic Group to Cogent was $360,133.80.

135.    Not only was the amount of this so-called "Loan from Dynamic" incorrectly valued at $491,942.67 in MEH-generated accounting records, but the transfers **out** of Cogent over the period of May 1, 2023, through July 10, 2023, to Dynamic Group, without even counting the marked-up payroll transfers to MGS, amounted to no less than $656,061.29. If the marked-up payroll transfers to MGS are included, the total amount transferred out of Cogent to Dynamic Group was approximately $756,061.29.

136.    Even regarding the funds that Dynamic Group transferred to Cogent and booked as a loan, this was improper because Defendants exploited Cogent's financial distress—which McCoy and MEH were largely responsible for—to issue an (albeit undocumented) interest-bearing loan, which was not what Zarallo consented to. Zarallo would not have been in a position to request funds from McCoy were it not for McCoy's fraudulent and disloyal conduct and embezzlement of the UCB loan proceeds. The primary cause of Cogent's predicament was the misappropriation of Cogent's funds that McCoy had orchestrated to that point which, on information and belief, began as soon as Cogent began generating revenue from third parties.

137.    Notably, the $360,133.80 in Dynamic Group transfers into Cogent in May 2023 was very close to the $352,000.00 that McCoy's own accountants had on Cogent's books as debt owed by DSI. As set forth above, Cogent disagrees that this is the full amount of the debt related

to the Mulligan Project. However, since Zarallo had specifically requested that the "float" funds be credited against the debt "on the books" from DSI, McCoy had the option of accepting this fair exchange. When it was expedient for McCoy/MEH, they had unilaterally caused transfers from Dynamic Group to be "reallocated" as "income" from the Mulligan Project receivables; that was improper and not consented to by Zarallo at the time. But unlike those improper "reallocations" in 2021 and 2022, Zarallo was specifically asking for any "float" money in May 2023 to be treated as offsets to the DSI receivables "on the books" which would have covered almost all of the $360,133.80 in transfers that McCoy caused to be made.

138.    Alternatively, given that Cogent's cash flow had not yet become consistently positive (due in large part to McCoy's misappropriations and failure to pay the Mulligan Project receivables), McCoy's "financial obligation" to Cogent which was made in exchange for his 70 units had not been discharged. The May 2023 transfers should therefore have been booked as "owner's investments" like prior transfers from Dynamic Group, and treated as equity and/or credits to MEH's Capital Account.

139.    Defendants should be equitably estopped from taking the position that McCoy's transfers to Cogent through Dynamic Group were loans rather equity investments/capital contributions.

140.    These May 2023 purported "loans" were advantageous to McCoy in two ways. First, they would provide a robust return since he unilaterally decided to assign a 13.5 percent interest rate to the loans. And, second, these "loans" were used almost exclusively to be immediately transferred to MGS so that Cogent's workers—who McCoy had caused to formally be MGS employees—would be paid, and so that MGS could take its mark up. Had McCoy not ensured that these employees were paid, MGS would have been in violation of labor laws. Thus,

again, it was McCoy/MEH's self-interest rather than duties as a majority member, Manager and Officer of Cogent that was dictating their course of action.

141.     Leading up to their eventual exit from Cogent, and despite ensuring that MGS employees were paid, McCoy/MEH continued to fail in their obligations to ensure Cogent's contractors and vendors on various projects were paid, causing Cogent to continue to default on its financial obligations and significantly damaging Cogent's reputation and goodwill. McCoy's embezzlement, financial mismanagement and willful disregard for Cogent's operations placed the company in an untenable financial situation, which could have been avoided had he not absconded from his fiduciary duties.

142.     On June 9, 2023, McCoy sent Zarallo a letter with the subject: "McCoy Equity Holdings, LLC's Notice to Withdraw" (the "Withdrawal Notice"). McCoy stated that MEH was withdrawing from Cogent effective 12 p.m. CST on July 9, 2023. The Withdrawal Notice cites Section 10.01(g)(2) of the LLC Agreement which provides that Cogent is required to purchase a withdrawing member's units for Purchase Price that is a multiple of Cogent's EBITDA. Based on a purported "negative EBITDA," for the trailing 12 months, the Withdrawal Notice set the purchase price at zero dollars.  The Withdrawal Notice was transmitted to Zarallo while Zarallo was within the Eastern District of Texas.

143.     Continuing with the McCoy/MEH's pattern of using purported loans as leverage against Zarallo, in the last paragraph of the Withdrawal Notice, McCoy claimed that Cogent would need to repay McCoy on a "series of loans that have been made by McCoy to Cogent," and asked to meet with Zarallo regarding repayment. As it turned out, on the same day the Withdrawal Notice was transmitted, McCoy already caused Cogent to "repay" him $430,000 in loans, which itself

was well more than the $360,133.80 in purported "loans" that McCoy had caused to be made in May.

144.    The reference to outstanding "loans" referenced in the Withdrawal Notice was a pretext for McCoy/MEH causing Cogent to transfer to Dynamic Group all of Cogent's available cash over the next thirty days and causing Cogent to assign to McCoy an approximately $1.4 million receivable belonging to Cogent.

145.    On June 19, 2023, Mitchell sent Zarallo an email with subject-line "Cogent Transition," copying McCoy and others. Among other attachments, Mitchell attached a document titled "Cogent Exit Analysis." He asked Zarallo to discuss this document and other materials over the subsequent day or two.  These documents were transmitted to Zarallo while Zarallo was within the Eastern District of Texas.

146.    According to the metadata for the "Exit Analysis," Mitchell created the document on May 24, 2023, more than two weeks before the Withdrawal Notice was sent to Zarallo.

147.    One of the tabs in the Exit Analysis spreadsheet is titled "Contrib & Loan." A screenshot follows:

| Investment Breakdown | Amount | Remaining Balance | | |
|---|---|---|---|---|
| Josh initial investment | $ 120,000.00 | $ 120,000.00 | DSI A/R | $(352,441.00) |
| Initial Contribution Per Operating Agreement | $ 50,000.00 | $ 50,000.00 | Josh 70% | $(246,708.70) |
| Loans from 2021 | $ 615,565.99 | $ 615,565.99 | Drew 30% | $(105,732.30) |
| Loans from 2022/2023, balance @ 6.2 | $ 491,942.67 | $ 61,942.67 | | |
| **Total Loans & Investment** | **$ 1,277,508.66** | **$ 847,508.66** | | |
| MEH billings 2022 | $ 82,611.57 | PAID | | |
| MEH billings 2023 | $ 88,287.78 | PAID | | |
| **Total McCoy Equity Time Billings** | **$ 170,899.35** | **PAID** | | |
| **Accrued Interest on all loans through 6/9/2023** | **$ 135,180.15** | **$ 135,180.15** | | |
| **Total** | **$ 1,583,588.16** | **$ 982,688.81** | | |
| **Reconciliation** | | | | |
| **Total owed to MCCoy before adjustments** | | **$ 1,583,588.16** | | |
| Drew 30% of DSI AR | | $ (105,732.30) | | |
| **Total owed w/ Drew share of DSI AR** | | **$ 1,477,855.86** | | |
| Credit for initial contribution to remain | | $ (50,000.00) | | |
| Owed to DSI Tool & Trailer Purchase | | $ 35,000.00 | | |
| **Adjusted total owed to McCoy** | | **$ 1,462,855.86** | | |
| Loan Payment 6.9.23 | | $ (430,000.00) | | |
| MEH Billings Payment 6.9.23 | | $ (170,899.35) | | |
| **Remaining Balance Owed** | | **$ 861,956.51** | | |

148.    The spreadsheet lists amounts that were purportedly owed to McCoy on his exit. Those amounts include "Loans from 2021" in an amount of $615,565.00; "Loans from 2022/2023" at $491,942.67; "Josh initial investment" in the amount of $120,000, which McCoy then somehow converts to a loan that must be paid back; and "MEH billings 2022" and "MEH billings 2023" totaling $170,899.35, which refers to inflated MEH invoices addressed more fully below. The total amount of money owed to McCoy, with "accrued interest on all loans since 6/9/2023," according to this "Exit Analysis," was $1,583,588.16.

149.    The Exit Analysis spreadsheet further reflects an entry called "DSI A/R" of $352,441 for the account receivable related to the Mulligan Project which, by the Exit Analysis's tortured accounting, McCoy divided between himself and Zarallo, allowing Cogent to keep 30 percent of the value in exchange for reducing the amount owed to him on exit.

150.    After a so-called "reconciliation" which accounted for transfers already made to Dynamic Group on June 9, 2023, the "Remaining Balance Owed" to McCoy is stated to be $861,956.51.

151.    This "Exit Analysis" was replete with fabrications and distortions. By way of illustration and not limitation, the $615,565 "loan" is not reflected on any of the various balance sheets that the Defendants sent to Zarallo or in balance sheets sent to third parties, including UCB, to rely upon. That so-called "loan" should not have been booked as a loan in the first place and, certainly, once it had been definitively treated as equity by McCoy—including in submissions to UCB—he and his cohorts were not entitled to "resurrect" it as a purported loan.

152.    Regarding the "MEH Billings" referenced in the Exit Analysis, on information and belief, those values bear no relationship to "Time Billings" and were just a mechanism for misappropriating more funds from Cogent.

153.    The invoices for the "MEH Billings" consist of six invoices covering the period of all of 2022 through the first five months of 2023. They all appear to have been created at the same time.

154.    The MEH invoices purport to be for the services of MEH and/or Dynamic Group employees Ramsey Green, Paul DeClouet, Joel Salvaggio, Chad Mitchell and Rachel Lee. The total amount invoiced for 2022 and the first five months of 2023 was $170,889.40. On information and belief, all of these individuals primarily work for Dynamic Group and devote substantially all of their time to Dynamic Group and other McCoy businesses, including Sunco and Power Strategies.

155.    It is not clear what allocation percentage MEH purported to use (the invoices simply say "Quantity 1.00" next to the individual's name), as illustrated by the following screenshots of two invoices:



156.    Despite all of the MEH invoices having different invoice dates, on information and belief, they were all created and backdated on or around the same day in June 2023.

157.    MEH's "Exit Analysis" refers to the entries in the MEH invoices as "Time Billings" but there is no indication in the invoices that the amounts billed for each individual bear any relationship to the amount of time these employees spent on Cogent matters. No billing narratives or time entries were generated in support of these invoices. Nor do these invoices bear any other reasonable relationship to the value of these individuals' services to Cogent. Indeed, Zarallo's operations team was effectively left to fend for itself for most purposes.

158.    MEH was entitled under Section 3.08 of the LLC Agreement to be reimbursed by Cogent for MEH overhead that was "allocable" to Cogent, including for services rendered by MEH employees "who perform[ed] work for Cogent" as well as for "expenses incurred by [MEH] for Cogent." MEH was also entitled to be reimbursed by Cogent for payments made to third parties to which MEH delegated its "duties to [Cogent]." McCoy/MEH inserted this language into the LLC

Agreement and transmitted that draft to Zarallo on July 15, 2021, while Zarallo was within the Eastern District of Texas. When MEH added this language to the LLC Agreement, it had no intent of limiting itself to charging Cogent for expenses that were fairly "allocable" as indicated by both these plainly inflated "MEH Billings," the exploitative arrangement with Southland and MGS, and the fact that such methods of "stripping cash" from McCoy's companies are McCoy/MEH's *modus operandi*.

159.    Another outrageous aspect of the "Exit Analysis" was McCoy's claim to $135,180.15 in "Accrued interest on all loans since 6/9/2023." The "Exit Analysis" does not state what interest rate was assumed. Section 4.06 of the LLC Agreement's provides that the interest rate on loans by a member to Cogent would accrue interest at five percent above the prime rate. It appears McCoy relied on this provision, but used the prime rate as of June 2023, approximately 8.25 percent, resulting in an interest rate on all "loans" of 13.25 percent, which applied even to a purported loan from December 2021 when the prime rate was only 3.25 percent.

160.    And the Exit Analysis conspicuously failed to mention or make any attempt to "reconcile" the $2.5 million in debt that McCoy had caused Cogent to bear through his embezzlement or make any attempt to fairly allocate that debt to McCoy.

161.    In sum, the Exit Analysis concluded that, even after causing Cogent to transfer Dynamic Group $430,000 in "repayment" of the May "loans" and $170,899.35 to cover MEH invoices, the "Remaining Balance Owed" to McCoy was $861,956.51. Zarallo did not consent to any transfers from Cogent in June 2023 to pay these amounts.

162.    Along with the Exit Analysis, Mitchell also transmitted to Zarallo by email on June 19, 2023, another spreadsheet titled "Cogent Balances." The spreadsheet purported to show all of Cogent's current account balances, including the HW Account, another Hancock Whitney

checking account addressed below for a particular project, Cogent's Chase account, and a Hancock Whitney credit card. Conspicuously missing was a reference to Cogent's line of credit with UCB which would have showed a negative balance of $2.5 million.

163.    On June 26, 2023, Zarallo sent a response to McCoy regarding the documents he had received, expressing concern and outrage regarding many of the items in those documents. Among other requests, Zarallo demanded, prior to the withdrawal, that he receive Dynamic's "detailed records showing the accounting of transactions between Dynamic and Cogent from 2021 [through the present]" and "all invoices for McCoy Equity Time Billings." Regarding the the $430,000 purported repayment of loans Zarallo asked "Why were funds misallocated in lieu of staving off liens from creditors or applying it to known unpaid invoices … ?" And, regarding the UCB line of credit, since the "Cogent Balances" spreadsheet from Mitchell did not address this account, Zarallo wrote "Cogent Renewables apparently has a line of credit. This needs to be closed and proof of the closing and balance of zero ($0.00) of the account [sic] shared with the surviving member prior to July 9th."

164.    A teleconference was held on June 27, 2023, to discuss the foregoing issues, among others. McCoy refused Zarallo's request that he be present at the meeting, despite being an Officer and Manager of Cogent. Mitchell, Green and Declouet were present from MEH. Mitchell and others repeated all of the same fabrications and distortions and, when specifically asked regarding the UCB line of credit, failed again to disclose that the proceeds had been embezzled. Zarallo was within the Eastern District of Texas during this teleconference.

165.    All of the foregoing misrepresentations in the Exit Analysis, the Current Balances spreadsheet, and the continued concealment and omission of the $2.5 million embezzlement in written materials and during the June 27, 2023 teleconference, were all made while: (a) MEH's

offer in the Withdrawal Notice for Zarallo to purchase its units in Cogent was still outstanding; and (b) Zarallo had the right to exercise his voting power pursuant to Section 3.04(b) of the LLC Agreement to prevent McCoy from causing Cogent to make payments to himself.

166.    And had McCoy and/or MEH disclosed that McCoy was causing loans to be made to Cogent which were accruing interest at an extremely high rate since 2021, Zarallo would have exercised his rights under the LLC Agreement to prevent them from being made. Zarallo had a right to disclosure of any substantial loan placed on Cogent's books, including by executing a promissory note with specific repayment terms, and the right to withhold his consent from such a transaction. In the event McCoy would have claimed that he could use MEH's majority interest in Cogent to force such loans on Cogent without Zarallo's consent, Zarallo would have exercised his buy-back option under Section 10.01(h) of the LLC Agreement to purchase 20 units back from MEH; that would have had the immediate effect of giving Zarallo and MEH 50 units each.

167.    It was clear after receipt of the "Exit Analysis," the balances spreadsheet and the related teleconference that McCoy was planning to misappropriate any receivables paid by Cogent's customers prior to his exit in satisfaction of the remainder of the purported "debt" Cogent owed him.

168.    Despite Zarallo's request for a justification, at no point did McCoy/MEH offer any analysis or consideration of whether it was in Cogent's best interest to repay McCoy on purported "debts" prior to paying contractors and vendors who, unlike McCoy, were bona fide creditors with rights reflected in written instruments and whose work stoppages, threats of project liens, and termination of necessary equipment-supply agreements were causing Cogent to default on multiple ongoing contracts, which could ultimately devastate Cogent's prospects as a going concern. McCoy simply took it as a given that his newly minted rights to immediate repayment—which

were at that point not reflected in any written instrument—took precedence over Cogent's interests and the interests of Cogent's creditors.

169.    On June 29, 2023, Angela attempted to mitigate the inevitable damage that would be caused of McCoy's misappropriation of Cogent's assets by emailing and calling Cogent's contractual counterparties to inform them of an upcoming change in ownership; that after July 9, 2023, Cogent would switch to using new banking information; and that until that time, the customers should make payments by checks mailed to Cogent's address in Texas, rather than by ACH/wire to the HW Account.

170.    When MEH discovered that Angela had emailed Cogent's customers regarding a change in ownership and payment of receivables, they immediately cut off her access to Cogent's email system and terminated her employment on June 29, 2023.

171.    Based on an email from one of Cogent's customers referring to an email received from Angela on June 30, 2023—when she no longer had access to her email account—it appears someone acting on McCoy/MEH's behalf impersonated Angela, using her email domain at Cogent, to email at least one of Cogent's contractual counterparties on June 30, 2023.

172.    But, despite McCoy's best efforts, Cogent's counterparties did not trust the strange emails coming from MEH—a company they had never dealt with—asking that all communications be directed to them, and thus delayed on making payments to Cogent that McCoy had hoped to usurp.

173.    Since it appeared that McCoy would be unable to divert any more cash before the July 9, 2023 withdrawal deadline, and since he had already drained away any other cash in Cogent's HW Account—McCoy and his cohorts devised a backup plan. On June 30, 2023, the day after Angela was terminated, McCoy sent Zarallo an email calling a members' meeting pursuant

to Section 6.02 of the LLC Agreement. This was the one and only time since becoming a member and Manager of Cogent that McCoy or anyone else from MEH called a members' meeting. The members' meeting was set for Friday, July 7, 2023—the last business day before McCoy's withdrawal—and stated that the members would be called to vote on the following the agenda items:

- Formalizing the classification of all money injected into Cogent Renewables, LLC by Joshua McCoy, McCoy Equity Holdings, LLC and/or Dynamic Group, LLC
- Authorizing a note for Cogent Renewables, LLC to repay Joshua McCoy, McCoy Equity Holdings, LLC and/or Dynamic Group, LLC
- Formal recognition of McCoy Equity Holdings, LLC's request for reimbursement for overhead allocable to Cogent Renewables, LLC as allowed by Section 3.08 of the Operating Agreement
- Assignment(s) of account receivables [sic]
- Settlement of DSI's account receivables [sic] to Cogent Renewables, LLC

174.    McCoy transmitted the foregoing email to Zarallo while Zarallo was within the Eastern District of Texas. As it turns out, the email was another deception by McCoy. Whereas Zarallo believed he could prevent formally prevent most of these actions because they required 100 percent of the members to agree pursuant to Section 3.04 of the LLC Agreement, McCoy/MEH did not actually intend to allow a vote to occur as represented.

175.    At the July 7, 2023, members' meeting, held by teleconference, Zarallo attended as did McCoy, Mitchell, Declouet and McCoy's outside counsel Kyle Keegan ("Keegan"). Keegan spoke on behalf of McCoy. Keegan quickly made clear that, despite the email sent to Zarallo on June 30 stating that there would be a vote, there would in fact not be a vote, and that all of the actions referenced in the meeting agenda were already transpiring and would be executed near close of business on that same day (a Friday). This action by McCoy/MEH was a derogation of Zarallo's voting rights under Section 3.04 of the LLC Agreement. McCoy has since taken the

position that all of these actions only required a simply majority and thus no vote was required; not only is that an incorrect reading of the LLC Agreement, but had McCoy been candid about his intentions rather than indicating a vote would occur, Zarallo could have exercised his buy-back option under Section 10.01(h) and acquired 20 units from MEH, which would have taken immediate effect upon notice to MEH. Since both MEH and Zarallo would have 50 units each, McCoy could not have taken the foregoing actions even under McCoy's theory. Thus, McCoy ensured Zarallo would be disenfranchised by misleading him into believing that he was being asked to take action at the members' meeting when in fact that was false.

176.    After being informed that he would not be entitled to vote on the agenda items, Zarallo was informed that McCoy was purporting to cause Cogent to formally recognize almost a million dollars in debt and to cause Cogent to execute a note in favor of McCoy for "amounts presently due on loans made by Joshua McCoy through his company Dynamic [Group] to Cogent since 2021—only for the current outstanding amounts that have not yet been collected." But McCoy as an Officer of Cogent was "not permitted to … enter[] into any agreement in which the payments made by [Cogent] [would] exceed, or are expected to exceed $10,000" without "the approval of the Members owning at least one hundred percent (100%) of the outstanding [membership] units." This act was therefore ineffective since Zarallo was not permitted to vote his units.

177.    According to Keegan, concurrently with the promissory note, McCoy would then cause Cogent to assign a certain account receivable to himself. Keegan stated that the "non-responsiveness of customers to the manager of Cogent is the reason that the actions that have been taken had to be taken." Keegan stated that as a proposed resolution in lieu of enforcing the

assignment of the receivable, McCoy was willing to lend money to Cogent in exchange for payments from future receivables.

178.    Despite the meeting agenda item titled "Settlement of DSI's account receivables [sic] to Cogent Renewables, LLC," there was no discussion of any receivables from DSI at the meeting.

179.    Zarallo attended the members' meeting teleconference while he was within the Eastern District of Texas.

180.    Consistently with Keegan's representations at the July 7 members' meeting, McCoy: (a) purported to cause Cogent to enact a resolution that resolved on behalf of Cogent that Cogent "is currently indebted to Joshua McCoy in the amount of $906,354.56l" ("July 7 Resolution") (b) purported to cause Cogent to execute a Demand Promissory Note of that same amount in favor of McCoy (the "Note"), and (c) purported to cause Cogent to execute an Assignment in favor of McCoy ("Assignment") of Cogent's rights to a $1,415,580.43 account receivable associated with a particular invoice due from one of Cogent's contractual counterparties, Inovateus Solar LLC (the "Inovateus Receivable"). All of these events occurred at around 5:00 pm on a Friday—McCoy/MEH's last business day as Cogent fiduciaries. A true and correct copy of the July 7 Resolution, the Note and Assignment are attached to this complaint as **Exhibit C**.

181.    These documents were transmitted to Zarallo on July 7, 2023, while Zarallo was within the Eastern District of Texas.

182.    The July 7 Resolution states that the action that was being taken through the Resolution—*i.e.*, Cogent's recognition of the previously unrecognized $906,354.56l in debt to McCoy—was done "in order for Cogent to take advantage of the discount" that purportedly was

"reflected in the [$906,354.56] current balance;" in order "to avoid immediate suit on such debt by Joshua McCoy;" and—perhaps most brazenly—"in order to avail [Cogent] of future financing opportunities with Joshua McCoy."

183.    The Note has an interest rate of 10.75 percent and purports to be "due and payable on Demand."

184.    When the July 7, 2023 Resolution was signed by McCoy, he knew that there were no loans on Cogent's books payable to him. The July 7 Resolution flew in the face of Cogent's own balance sheets that McCoy and MEH were responsible for creating and maintaining. As late as June 22, 2023, while McCoy was misappropriating funds from Cogent to "pay back" purported "loans" that he made since 2021, Cogent's balance sheet on its accounting system maintained by MEH did not contain a single entry in the Liabilities and Equity section for debt to McCoy, the other Defendants, or any other McCoy affiliate, other than the (also improper and inflated) "loan" from Dynamic Group that was made in May 2023. Of course, it also flew in the face of the balance sheets presented to UCB in November 2022 that showed Cogent was debt free and enabled McCoy's embezzlement scheme. Those records were accurate, at least in regard to Cogent's debts, and McCoy/MEH's self-serving representations in June 2023 were intentionally false.

185.    Purporting to cause Cogent to recognize debt that the Defendants had not previously recognized on McCoy's last day as an Officer, and MEH's last day as a member and manager, was a self-serving, disloyal and an egregious breach of his fiduciary duty and of the LLC Agreement. Of course, the misconduct is made much worse since, at the same time that McCoy was causing Cogent to distribute all of its remaining cash to Dynamic Group and assigning to himself a receivable that Cogent desperately needed, Cogent's vendors and contractual counterparties were not being paid, and projects were faltering.

186.    On July 7, 2023, Zarallo sent McCoy a letter formally accepting McCoy's offer in his Withdrawal Notice to sell his units to McCoy for zero dollars and communicating his understanding that the transaction would close on July 9, 2023. Zarallo noted that "I have not been able to determine the accuracy of your statement in your letter regarding the Company's EBITDA over the previous 12 months, since I have not been given access to accounting records for the Company."

187.    More generally, Zarallo had a right, just as MEH did at all times, to withdraw and require Cogent to purchase his units for a fixed price. Had McCoy and MEH not previously concealed the fact that exploitative loans were being made to Cogent, and not concealed the fact of the embezzlement of the UCB loan proceeds, both before and after it occurred, Zarallo could have and **would have** exercised his right under Section 10.01(g)(2) to terminate his relationship with McCoy by withdrawing and being paid the Purchase Price set by the LLC Agreement.

**Mccoy and MEH Exploit Cogent for the Benefit of Another Mccoy Entity, Power Strategies, in Furtherance of Misappropriation of Public Funds.**

188.    Power Strategies is another company controlled by McCoy/MEH. On information and belief, McCoy makes all significant decisions on behalf of Power Strategies and controls Power Strategies' bank accounts within the same Hancock Whitney "treasury management" system as the other McCoy entities. Paul Declouet represents himself as general counsel for Power Strategies and also represents himself as general counsel of Dynamic Group and MEH.

189.    McCoy/MEH, as controllers of both Cogent and Power Strategies, took several actions in connection with an arrangement between Cogent and Power Strategies taht constituted breaches of their fiduciary duties owed to Cogent, including by depriving Cogent of compensation for the services it was providing to Power Strategies, and by exploiting Cogent as a pawn in what

appears to have been a misappropriation of public funds allocated for the development of solar power.

190.    On MEH's website, Power Strategies is described as one of MEH's "portfolio companies." As referenced on MEH's website, Power Strategies is "developing renewable energy sites" on "six bases currently in development for the Louisiana National Guard" (the "LANG Projects").

191.    The referenced LANG Projects involve the Louisiana National Guard Foundation ("LANGF"), which is a nonprofit organization that, according to its website, "manages the commercial operations of the Louisiana Military Department ['LMD'] on National Guard posts" throughout Louisiana.

192.    According to LANGF's audited financial statements from June 30, 2022, it is a party to numerous long-term ground leases over LMD's military installations. LANGF's financial statements further provide that in September 2017 it entered into a "memorandum of understanding" with an unnamed developer to "develop solar energy on [LMD] installations," and "entered into a master development agreement with [that] developer in June 2022" which "provides the developer the exclusive right to develop solar projects at LMD installations for ten years."

193.    According to LANGF's financial statements, its partner developer has an exclusive right to execute long-term subleases with LANGF for the installations, and has executed a specific sublease agreement described in LANGF's financial statements which permits the developer (through a special-purpose entity) to lease land at one LMD facility, the "Gillis Long Center," for a mere $5,500 annually for as long as 60 years.

194.    MEH's website makes clear that Power Strategies, which it describes as the developer "developing renewable energy sites" on "six bases currently in development for the Louisiana National Guard," is the unnamed "developer" who has an exclusive right to develop on LMD land, as referenced in LANGF's financial statements.

195.    Retired Major General Glenn Curtis, who was the Adjutant General of the Louisiana National Guard and head of LANGF from 2011 to 2019 has partnered with McCoy in Sunco, formed in 2021, where they are both managing members, along with a LANG colonel, Jennifer Mumme and the other individual associated with Power Strategies, Jeff Richardson.

196.    Power Strategies and Sunco, as companies that are competing for solar development work with Cogent, were McCoy/MEH's favored companies as opposed to Cogent which McCoy/MEH only saw as a target for exploitation. Sunco and Power Strategies are ostensibly identical in their business purposes, but General Curis and Colonel Mumme are not involved in Power Strategies directly since they were with LANGF when Power Strategies was awarded its lucrative development deal with LANGF. Cogent was utilized in service of both companies.

197.    In connection with the LANG Projects, in or around March 2022, Power Strategies and Cogent executed a Consulting Agreement made effective July 15, 2021.  McCoy and his cohorts had led Cogent to believe that it would ultimately be the EPC on the LANG Projects.

198.    The Consulting Agreement expired by its terms on June 29, 2022, and, as set forth below, was not validly renewed.  Cogent nonetheless continued to provide services to Power Strategies during the period of June 30, 2022, through MEH's withdrawal from Cogent on July 9, 2023.

199.    The State of Louisiana has granted LANGF appropriations of $10.0 million over two years for the development of the solar projects. In connection with an appropriation of $5.0 million covering the period of July 1, 2022, through June 30, 2023, LANGF entered into a Cooperative Endeavor Agreement with the Louisiana Department of the Treasury and the State of Louisiana (the "2022 CEA"). The 2022 CEA contemplates LANGF "entering into agreements with one or more qualified subcontractors to provide a 'turn-key' design, engineering financing, construction, installation, operation, and maintenance of the [solar-power] facilities to be developed on the Military Installations."

200.    The 2022 CEA requires completion of key deliverables by June 30, 2023, and sets forth specific earmarked budget line-items from the $5,000,000 appropriation, including $850,000 for "EPC Contracts" which includes construction management, permitting and compliance, and construction procurement. Among other requirements, LANGF is obligated under the 2022 CEA to provide government auditors with progress reports and cost reports, which attach supporting documentation, including invoices.

201.    The term of the 2022 CEA is from July 1, 2022, to June 30, 2023, and no extension of the June 30, 2023 termination date is permitted "without legislative actions and approval." That period of time was the same period of time Cogent was providing services to Power Strategies without a written contract.

202.    Along with Cogent's HW Account, McCoy also caused a second Hancock Whitney account to be opened for Cogent that was specific for work on LANG projects and receipt of public-fund allocations (the "LANG Account").

203.    As part of McCoy/MEH's last-minute maneuvers at close of business on July 7, 2023, Mitchell transmitted several documents by email to Zarallo at 4:38 p.m. CST on Friday, July

7, 2023. Zarallo was within the Eastern District of Texas when he received the documents. The documents were intended to ensure that two individuals, Hal Leggett ("Leggett") and Alan Barksdale, would be paid from the 2022 CEA allocations and the LANG Account for the period covering June 30, 2022 through June 30, 2023, and included invoices and agreements in support of such payments.

204.    One of the documents McCoy/MEH caused to be created and transmitted to Zarallo was a spreadsheet titled "Purchase Order" on Cogent letterhead listing Leggett's limited liability company as the "Vendor" for an amount of $30,000. The description in the purchase order lists four of the LANG Projects, including the "Gillis Long" site referenced in the LANGF financial statements, and next to each project just states "Permitting & Compliance Management (07/2022-06/2023)." The four entries add up to $30,000.00

205.    Leggett is the former head of the Louisiana Department of Environmental Quality. Cogent did not receive any services or work product from Legget over the referenced time period.

206.    Most troubling is the section of the purchase order identifying the purported "Requisitioner" for the payment. Instead of McCoy listing himself as the Requisitioner, the purchase order lists "Zarallo" as Requisitioner and uses Zarallo's email and personal cellphone number as contact information. On the bottom of the purchase order it states: "If you have any questions about this purchase order, please contact Drew Zarallo," and lists Zarallo's personal mobile number and Cogent email address. But Zarallo would be unable to answer any questions regarding the purchase order as he did not create it; did not "requisition" the referenced payment; and specifically is not aware of any services that Leggett provided to Cogent.

207.    Right above the foregoing sentence directing inquiring parties to reach out to Zarallo is a text-box titled "Comments or Special Instructions" which states that:

> [LANG] Foundation, LMD, and the Louisiana Legislative Auditor and Treasury Department has the right to audit all Approved Expenditures, Approved Provider Contracts, Approved Invoices and the NGO Grant Funding Account ("Audit Rights").  LMD and the Louisiana Legislative Auditor and Treasury Department shall be deemed to be third party beneficiaries.

208.    McCoy and Power Strategies thus worked together to put both Zarallo and Cogent at risk of being held to have violated civil and criminal laws by "Requisitioning" an unsupported payment out of public funds.

209.    This was not the first unsupported payment MEH/McCoy caused Cogent to make to a purported "vendor" without Cogent obtaining any services from the "vendor." In further breach of fiduciary duties to Cogent, McCoy/MEH had previously caused Cogent to make a $50,000 payment from the LANG Account to an influential political figure in Louisiana, Paul Rainwater, as a "Consultant" to Cogent, but Rainwater did not provide any services to Cogent either. Rainwater was formerly Chief-of-Staff for Governor Bobby Jindal. Rainwater did not participate on a single relevant phone call, meeting, email, produce any document or work-product, or provide any service to Cogent in exchange for the $50,000 payment.

210.    The improper payments made to Rainwater and Leggett were taken directly from the State of Louisiana appropriations, and McCoy caused them to be made from Cogent's LANG Account.

211.    As set forth above, despite not having a written contract with Power Strategies since June 29, 2022, Cogent continued to provide valuable services to Power Strategies during the period from June 30, 2022, through June 30, 2023, in connection with Power Strategies' efforts to develop solar facilities on LMD sites. After expiration of the Consulting Agreement between Power Strategies and Cogent on June 29, 2022, a subsequent agreement was not executed. Although drafts had been circulated, Zarallo's concerns that public funds were not being spent in

accordance with the directives of the 2022 CEA was one of several issues preventing execution of a new agreement.

212.    In another last-minute maneuver and document transmitted along with the "vendor" payment documents, McCoy executed an "Amendment" to the original Consulting Agreement between Cogent and Power Strategies at the end of his last business day with Cogent. The term of the purported Amendment was established to be the same period during which Cogent had been providing services to Power Strategies without a written contract—July 1, 2022, through June 30, 2023—which is also the term of the 2022 CEA.

213.    The Amendment is signed by McCoy as "member" of Cogent, and by Jeff Richardson, who is a non-controlling officer and partial owner of Power Strategies (through Envirofyx, LLC), along with McCoy (and is also a member of Sunco along with McCoy and General Curtis). The original Consulting Agreement was signed by Zarallo on behalf of Cogent, and the expectation at all subsequent times was that any extension of the original agreement would also be signed by Zarallo. A true and correct copy of the purported Amendment is attached hereto as **<u>Exhibit D</u>**.

214.    This unauthorized and improper Amendment was not effective and does not bind Cogent. Section 3.04(a) of the LLC Agreement requires 100 percent member approval before an Officer of Cogent is permitted to cause Cogent to "Enter[] into any agreement for the provision of construction or construction management services as a general contractor or subcontractor." Since the original Agreement was for Cogent's provision of construction management services related to the LANG projects, and since Zarallo did not approve it, this purported "Amendment," which really is not an amendment but a new, backdated agreement that incorporates by reference most of the prior agreements' terms, is not binding on Cogent.

215.    Power Strategies, as a MEH/McCoy-controlled entity, knew that McCoy lacked the authority to execute the Agreement on Cogent's behalf without Zarallo's authorization. Indeed, Paul Declouet—the general counsel for both MEH and Power Strategies—repeatedly asked Zarallo to execute the amendment during June 2023, but Zarallo would not execute it. One of Zarallo's primary concerns was the amendment contained no provision reflecting that any payment to Cogent was owed.

216.    In fact, despite ensuring that Leggett was paid, McCoy/MEH failed to include any fees owed to Cogent as part of their purported "Amendment" to the Power Strategies agreement, and otherwise failed to ensure that Cogent would be paid for the services it rendered over the period of June 30, 2022 through June 30, 2023. Those services included extensive work specific to the LANG Projects under development, as well as extensive consultation services regarding additional projects. Cogent's performance on behalf of Power Strategies was rendered substantially from the Eastern District of Texas as none of the LANG projects have passed the pre-construction stage.

217.    On July 17, 2023, Cogent sent Power Strategies an invoice for $244,000 which only related to Cogent's services connected with the 2022 CEA. It was denominated as payable on a "net 30" basis, and yet as of the time of this filing it remains unpaid.

218.    The full amount that Power Strategies owes Cogent is significantly more than $244,000 because Cogent also provided Power Strategies with services outside the scope of the 2022 CEA.

219.    On August 23, 2023, Zarallo wrote McCoy, Mitchell and Richardson a letter formally objecting to all of the actions taken on July 7, 2023. Additionally, Zarallo formally terminated what was to that point an implied-in-fact contract for Cogent to provide services to

Power Strategies, and notified them of Cogent's intent to begin lien procedures on the LANG project sites.

220.    MEH/McCoy took even more unlawful actions to ensure the improper payment to Leggett would be consummated despite Zarallo's objection. It appears that by the time McCoy and his cohorts executed all of the last-minute documents referenced above, they had run out of time to ensure that banking transactions would take place prior to McCoy's exit. McCoy/MEH therefore caused the transfers from Cogent's bank account to occur on July 10, 2023—the day **after** McCoy and MEH had withdrawn from Cogent. McCoy did not have the authorization or authority to cause a transfer of funds out of Cogent's account once he and MEH had withdrawn on July 9, 2023.

**After Mccoy's Exit Defendants Continue Their Misconduct.**

221.    Zarallo and his team regained control of Cogent's email system after MEH's withdrawal on July 9, 2023. But as it turns out, McCoy and MEH did not terminate their access to Cogent's computer systems concurrently with their withdrawal. Instead, on July 10, 2023, the day **after** Zarallo became the sole member and manager of Cogent on July 9, 2023, MEH's IT contractor, Trevor Cormier, accessed Cogent's servers and deleted a substantial amount of electronically stored information from Cogent's system, including Mitchell's Cogent email account. On information and belief, this was done at the direction of McCoy and/or his cohorts. Cogent's own forensic investigators have been unable to recover the deleted data.

222.    Once Zarallo and Angela were able gain access to Cogent's checking accounts previously controlled by the Defendants, they discovered that McCoy had left a negative balance in the HW Account. Indeed, McCoy had literally emptied Cogent of every last cent on his way out and left Cogent with a $4600 overdraft due to automatic payments that had not been stopped.

223.    Aside from embezzlement of Cogent funds and destruction of Cogent's electronically stored property, McCoy and his cohorts immediately began sending threatening communications to Inovateus demanding to receive payment of the invoice associated with the Inovateus Receivable that was purportedly assigned to McCoy pursuant to the Assignment. Such communications became increasingly more harassing, and the Defendants threatened that they would immediately sue Inovateus on July 18, 2023, the day they believed the invoice was due, if they did not receive payment.

224.    These communications caused Inovateus serious concern about the proper party to be paid, and led to long delays in Cogent obtaining payment, as well as forcing Cogent to incur legal fees as Cogent had to negotiate a resolution with Inovateus and provide Inovateus with an indemnification agreement to finally secure payment.

225.    The delay in obtaining overdue receivables caused by McCoy's threats to Inovateus regarding the Assignment caused even more delays in getting vendors and contractual counterparties paid, and has further damaged Cogent.

**Defendants' Conduct Has Ruined Cogent's Reputation and Existing Business Relationships.**

226.    Cogent's goodwill and reputation have now been tarnished, possibly irreparably, by repeated missed payments and the insecurity that its counterparties now feel regarding its financial wherewithal and reliability. This item of damages has a particular sting to Zarallo since he built Cogent with the vision and hope of being a paradigm of reliability and accountability.

227.    McCoy's failure to cause payments to be made to contractors and vendors has destroyed Cogent's relationship with its previously top customer, Ormat Nevada, Inc. ("Ormat"). The Defendants' non-payment of subcontractors and vendors on Ormat's project in Nevada, where Cogent is a subcontractor, from the beginning of April through July 9, 2023, led to Cogent's

subcontractor and equipment providers to stop providing services and equipment to Cogent for work on the project. Since time is of the essence under the Cogent-Ormat contract, and liquidated damages are available to Ormat for Cogent's delay, Ormat has taken the position that Cogent owes hundreds of thousands of dollars in liquidated damages due to the resulting delays, in addition to other categories of damages resulting from hiring a substitute subcontractor. Cogent has had to incur significant attorneys' fees in dealing with this situation and has still not been paid for services rendered to Ormat. Most disappointing to Cogent is that its previously stellar relationship and reputation with Ormat have been ruined.

228.    Whereas Ormat indicated to Cogent that it would continue to provide services to Ormat on on an ongoing expansion of the existing project, and whereas Cogent was quickly becoming Ormat's go-to subcontractor for certain categories of services, Ormat has now retained other subcontractors to provide services on its expansion and has no intent to continue to engage Cogent in the future. Ormat had been Cogent's first non-McCoy customer and had already re-engaged Cogent multiple times. The loss of this customer relationship was directly caused by McCoy/MEH.

**McCoy and MEH's Failure to Provide Bonding Capacity to Cogent and Failure to Maintain Proper Accounting Records and Procure Audited Financial Statements Has Damaged and Continues to Damage Cogent.**

229.    Cogent has a competitive edge in renewable energy construction. It has uniquely skilled and experienced managers with deep experience in developing and constructing renewable energy facilities. The demand for contractors with this level of capability and experience is extremely high and has been at all relevant times.

230.    Aside from the capabilities and reputation of Cogent's core team, and the proven work-quality and other substantive measures of Cogent's quality as a contractor, bidding for

renewable-energy construction contracts also requires that Cogent maintain financial records sufficient to present to potential counterparties and sufficient bonding capacity to support construction projects. Potential counterparties very often require bidders to present audited, or at a minimum CPA-reviewed, financials. Failure to meet these pre-qualification criteria disqualify even otherwise outstanding contractors.

231.    McCoy and MEH failed to discharge their obligation to provide sufficient bonding capacity to Cogent, failed to maintain proper accounting records, failed to procure CPA-reviewed or audited financials, and failed to file a tax return on behalf of Cogent for 2022. Among other losses, these failures directly led to losses of multiple contract opportunities that otherwise would have been awarded to Cogent both before and after McCoy/MEH's withdrawal. Cogent is entitled to be compensated for all damages flowing from these failures.

232.    As set forth above, in addition to the financial support necessary to reach critical mass, the additional commitments McCoy made prior to the Unit Transfer were to provide Cogent with construction bonding capacity at limits that would permit Cogent to bid for projects with contract values of at least $30 million and aggregate project values of at least $100 million, and soon bonding capacity at $100 million per individual project and $300 million in the aggregate. He also insisted that he would "utilize [McCoy's] accounting firm and CPA firm to manage" Cogent's accounts, and to make accounting records "available [to Zarallo] at anytime [sic]."

233.    As it turned out: (a) McCoy did not dedicate substantial bonding capacity for Cogent's benefit and it is clear he never intended to do so; and (b) while McCoy did use his own accountants and bookkeepers to manage Cogent's accounts and keep Cogent's records, this was poorly managed and was corrupted by fraud.

234.    By December 2022, Zarallo was very frustrated by McCoy's lack of support of bonding for Cogent. On December 16, 2022, Zarallo wrote McCoy an email asking to plan "a path forward" for bonding. McCoy again made clear that Cogent was not his first priority, saying that "for now all Cogent bonds will have to go through Dynamics [sic] program." He added that "[o]nce we finish out this year's financials, we should be able to get Cogent some type of bonding capacity without Dynamic. But might take getting through 2023 with strong profits to get the fully needed bonding program." McCoy's requirement that 2023 profits be "strong" to finally allow Cogent to have a bonding program was duplicitous; McCoy himself ensured that Cogent's cash would be siphoned away from Cogent so that profits would be perpetually out of reach and thus his commitment to future bonding was illusory.

235.    Despite multiple requests for bonds to be put in place on projects that required such bonds, McCoy and MEH failed to do so.

236.    McCoy/MEH led Zarallo to believe that Cogent had secured a bond for one project as subcontractor for Vanguard Energy Partners, LLC ("Vanguard"). After Vanguard became concerned about Cogent's financial wherewithal in the context of MEH's harassing communications to them regarding payments, it demanded proof that a bonds had been put in place. It turns out that McCoy/MEH never ensured that they were, and these projects had in fact been unbonded. The failure to ensure bonds were in place has put Cogent at risk of default on this project, and Vanguard has stopped making payments to Cogent.

237.    Regarding accounting records, Section 8.01 of the LLC Agreement provides that "[t]he Company will, … , keep books of record and account in which full, true and correct entries are made of all of its and their respective dealings, business and affairs, in accordance with generally accepted accounting principles." It further provides that such books and records "shall

be kept at a location chosen by the Manager." As set forth above, at all relevant times, MEH was responsible for ensuring that these obligations were satisfied.

238.    Indeed, McCoy specifically insisted that in addition to 70 units in Cogent, he wanted his "CPA and accounting firm" to administer Cogent's accounts.

239.    MEH/McCoy failed to use generally accepted accounting principles in maintaining Cogent's accounting records and failed to generate accurate financial statements for Cogent's use in qualifying for projects. MEH refused to procure CPA-reviewed and/or audited financials, which are commonly required in the pre-qualification process.

240.    The reasons for MEH and McCoy's failure to provide adequate financial statements include: (a) that McCoy and MEH's financial recordkeeping was plagued with mismanagement and falsified information, and they were not consistent with generally accepted accounting principles; and (b) that any audit would have exposed serious misconduct, misappropriation, and fraud by McCoy and his cohorts.

241.    After being repeatedly asked for audited financials to be prepared for Cogent in response to customer requests, the accountant MEH appointed to oversee Cogent's accounts, Joel Salvaggio, stated in October 2022: "It's quite an extensive process to have an audit done. I'm sure it's something we could aim for in the future but we really aren't audit ready at this point."

242.    However, it was part of McCoy/MEH's duty as Manager and as those charged with management of Cogent's accounts to ensure that Cogent had the financial statements necessary to qualify for projects.

243.    Additionally, despite MEH charging Cogent around $6,000 per month for the services of their (now former) CPA Joel Salvaggio, MEH failed to prepare a 2022 tax return for Cogent and failed to prepare anywhere near proper financial statements for Cogent.

244.    These forgoing failures proximately caused Cogent to lose opportunities to be awarded numerous highly valuable contracts that otherwise would have gone to Cogent. By way of example, were Cogent able to provide adequate financial statements and/or bonding within the limits McCoy had previously represented, Cogent would have entered into a major subcontract with Lighthouse BP, a major renewables developer, in or around June or July of 2022, for a solar development in Ohio. Among other reasons Cogent was best-positioned for this major opportunity relative to competitors was that one of the key decisionmakers for Lightsource BP in connection with the prospective project was Oliver Chua, the former 50-percent owner at Cogent, who also worked under Zarallo at a global developer and trusted Zarallo's abilities and integrity. Lightsource BP would have entered into a profitable contract with Cogent had Cogent been able to submit the basic prerequisite information that MEH was responsible for creating and maintaining. Because Cogent could not do so, it lost an opportunity worth many millions of dollars over approximately two years.

245.    Similar lost opportunities involved potential contracts with Borrego Solar, Grupo Ortiz, and Blue Ridge Power, all of which were lost because of the inability to provide adequate financial statements and/or bonding capacity.

246.    And even today Cogent continues to lose opportunities because its financials were left in such disarray by McCoy and MEH. Cogent's accountant is at the time of this filing scrambling to try to make sense of the accounting records McCoy was responsible for creating and maintaining, and must correct past financial statements, and potentially past tax returns, to reflect proper accounting for prior transactions. This must be done before filing a 2022 tax return, which deadline has already passed. And all of this must be done before Cogent can even begin to qualify for bonding, and before its financials can be submitted to third parties.

247.    Aside from the accounting misconduct and disorder that Cogent was left with after McCoy's departure, Cogent's financial health itself has been needlessly and wrongfully damaged, including by the presence of a $2.5 million purported liability to UCB and almost $1.0 million purported liability to McCoy. These purported liabilities will need to be reflected on Cogent's balance sheets, despite Cogent disputing their validity and/or enforceability against Cogent. Nearly $3.5 million in debt is a heavy burden on Cogent's growing operations and make Cogent less attractive to investors, potential customers and bond underwriters. McCoy and MEH must compensate Cogent for any losses that flow from unlawfully saddling Cogent with this purported debt.

248.    In hindsight it appears that McCoy lured Zarallo and Cogent into what MEH's former CFO titled a "spiderweb" of affiliated alter-ego companies in July 2021 with just one purpose in mind: to consume everything he could from Cogent and withdraw when Cogent had nothing left to take.

249.    On information and belief, McCoy's mismanagement of Cogent is his modus operandi and is motivated by his prime objective of misappropriating public funds to his own benefit. On information and belief, DSI's financial woes and ultimate demise, although partly due to operational mismanagement, were also due in large part to McCoy living up to his well-earned reputation for "stripping the cash" from companies under his control.

250.    On further information and belief, McCoy and his cohorts regularly engage in the practice of falsifying financial information and submitting false financial statements to parties that rely on them, just as they did to Zarallo. In fact, as just one example that MEH and Dynamic Group's former CFO calls the "tip of the iceberg," in April 2021, the former CFO was terminated for refusing to fabricate a false accounting entry to assist in Defendants' fraud. Mitchell requested

that she send him internal financial statements so that he could submit those statements to a third party. Mitchell instructed her, however, to exclude a recent $1.0 million withdrawal from the financial statements to be submitted. Mitchell said she should book the transaction as a "bond expense" or as general "overhead," but the CFO knew those were fabrications and refused to do so. She emailed McCoy on May 24, 2021, to ask him about that same mysterious withdrawal, but received no response. On the CFO's next day at work, she was terminated. This was just days before Zarallo was first introduced to McCoy.

251.    Thus it appears Zarallo and Cogent were just the latest of a series of victims of McCoy and his enterprise's *modus operandi* of fiduciary breaches, falsification of financial and embezzlement.

## PERSONAL JURISDICTION & VENUE

252.    Plaintiffs repeat and reallege paragraphs 1 through 251 hereof, as if fully set forth herein.

253.    This Court has specific personal jurisdiction over all Defendants.

254.    As set forth more fully below, Defendants have committed various torts in the state of Texas subjecting them to specific personal jurisdiction over the claims arising from these torts. McCoy and MEH have intentionally and in bad faith breached their fiduciary duties to a Texas-based company, and all other Defendants have aided and abetted and conspired to commit these breaches. McCoy and MEH directed false promises, misrepresentations and materially misleading documents into the State of Texas while knowing that Zarallo, on behalf of himself and on behalf of Cogent, would rely on those promises, misrepresentations and documents. The actual content of those communications gives rise to causes of action at issue, including breach of fiduciary duties and fraud.

68

255.     McCoy/MEH at all times understood and intended that Cogent's headquarters would be in Texas and that Zarallo and his operations team would run Cogent's day-to-day activities. When Zarallo was introduced to McCoy in or around April 2021, the Covid-19 pandemic was just winding down. Cogent was formed in January 2021, while the pandemic was still keeping many offices closed. It was common during this period for businesses to be run from home offices, and Cogent was no exception. Thus, Zarallo and the rest of the Cogent team used Zarallo's home address and/or a P.O. box in Gunter, Texas, as the primary address for Cogent.

256.     McCoy was informed and understood that Cogent operated out of Gunter, Texas prior to entering into any transactions with Zarallo or Cogent. On or around August 11, 2021, Mitchell was inputting Cogent information in the MEH system, and asked for Cogent's address. Zarallo provided the same Gunter, Texas PO Box for mailing and 1117 Macgregor Lane, Gunter TX, 75058, as the physical address.

257.     There was never a discussion or an intent to relocate Cogent to Louisiana, or to associate Cogent with the Baton Rouge address that McCoy and his companies generally use.

258.     All of Cogent's assets—tools, equipment, vehicles and protective gear—have at all times been stored in Texas when not in use on job sites.

259.     Zarallo and the core team, when they were not on work sites, worked from home for the rest of 2021, however, in 2022 Zarallo began seeking a permanent office and storage space for Cogent. McCoy himself was involved in the search for office space and specifically asked that the office be strategically selected to be reasonably close to DFW airport, which was not Zarallo's preference. Zarallo wanted an office location that was closer to his home in Gunter, Texas.

260.     Ultimately, after weeks of searching, in March 2022 Zarallo found a combined office and warehouse space in Frisco, within 40 minutes of the airport (the "Frisco Office").

McCoy was informed and approved of the Frisco Office, and Zarallo signed a lease for the location in April 2022.

261.    Per the lease, construction on the Frisco Office was ongoing and was supposed to be completed and ready for move-in before January 1, 2023, however, construction has been delayed and as of the date of this pleading, the Frisco Office is still not ready for move-in. Since June 2023, Cogent has leased a temporary workspace from Regus, located at 6136 Frisco Square Boulevard, Frisco Square, Suite 400, Frisco, TX 75034 (the "Regus Location"), and have operated out of the Regus Location since that time. Given that the Regus office space was meant to be temporary, Cogent has generally continued to use the Gunter P.O. Box and/or Zarallo's home address for most purposes and will continue to do so until the Frisco Office is completed and operational.

262.    Both McCoy and Zarallo intended and understood that the Frisco Office would be Cogent's headquarters. It will display Cogent signage to the public which is contemplated in the lease.

263.    By contrast, McCoy's Baton Rouge office used by all of the entity defendants herein never displayed Cogent signage and was never associated with Cogent in any public-facing materials, including internet search or yellow pages. Other than a single former DSI employee who was put on Cogent's payroll after DSI's operations began winding down (Tabatha Smith) no Cogent employees have worked out of Baton Rouge.

264.    McCoy, Mitchell and the entity defendants, all of which act at the direction of McCoy and Mitchell, considered Gunter, Texas to be Cogent's primary place of business. By way of illustration:

- Cogent's 2021 tax return, which McCoy's accountants were responsible for preparing, and McCoy/MEH were responsible for reviewing and approving, listed Cogent's address as "1117 Macgregor Ln, Gunter, TX 75058."

- In drafting the original Consulting Agreement between Power Strategies and Cogent, which McCoy and Power Strategies improperly attempted to "amend", the general counsel for Power Strategies and the other McCoy entities, Paul Declouet, asked for "Cogent's official address" to use, and the address ultimately used was "P.O. Box 280, Gunter, TX 75058."

- MEH/Dynamic Group's former in-house counsel, McKenzie Ledet reviewed and edited a draft contract between Cogent and Ormat, which McCoy approved prior to execution. The first paragraph of the contract states Cogent's "principal office" as "1117 Macgregor Lane, Gunter, Texas 75058."

- In email correspondence between Zarallo, Angela, Mitchell and his assistant Whitley Ballard in May 2022, in connection with transitioning Cogent away from Insperity and to the exploitative Southland arrangement, Ballard filled out and circulated a Certificate of Liability Insurance on behalf of Cogent where she initially used MEH/Dynamic Group's Baton Rouge address for Cogent. Upon receipt of this draft, Angela responded that "You need to change the address please ma'am. Cogent uses either PO BOX 280, Gunter, TX 75058 or if they need a physical address it is 1117 Macgregor Lane, Gunter, TX 75058." Ballard made the change to PO BOX 280, Gunter, TX 75058, and MEH or others acting on its behalf submitted this form to third parties.

- The HW Account and LANG Account through which many of the improper transactions set forth above occurred were set up by MEH or others working at McCoy's direction and under his control. At all times, the address used for Cogent with Hancock Whitney bank was "PO Box 280, Gunter, TX 75058" rather than the Baton Rouge address associated with the entity defendants.

- Joel Salvaggio, the MEH/Dynamic Group accountant assigned to Cogent, was given a Cogent email address and signature block by individuals or contractors working under MEH's direction. Although Salvaggio worked out of MEH/Dynamic Group's Baton Rouge office, the signature block he used used "PO BOX 280  Gunter, Texas  75058" as the address for Cogent.

- Every invoice Southland and MGS generated for the improperly marked up "services" to Cogent, created by MEH and/or Dynamic Group employees, stated at the top of the invoice "Bill To:" Cogent at "PO Box 280, Gunter TX 75058."

- The inflated MEH Invoices all stated at the top of each invoice "Bill To:" Cogent at "PO Box 280, Gunter TX 75058."

- The improper purchase order using Zarallo's name as "Requisitioner" of payment to Leggett without Zarallo's authorization, and  generated by individuals acting on behalf of McCoy, MEH and Power Strategies, shows under the Cogent logo an address for Cogent at "PO Box 280, Gunter TX 75058."

265.    Thus, at all times, all Defendants herein recognized Cogent's primary place of business as being in Texas.

266.    The only exception to the foregoing is the UCB loan documents where the address used for Cogent was the McCoy companies' Baton Rouge address. As indicated by UCB

representative Talisha Johnson in correspondence with Angela, McCoy only caused that address to be used under these unique circumstances so that he would receive the check with the loan proceeds and embezzle the funds.

267.    Per the LLC Agreement (Recital B) Cogent was "formed for the purposes of providing services relating to renewables energy construction or construction management contracts or subcontracts entered into by the Company." Zarallo by being the Director of Operations and "Partnership Representative" under the LLC Agreement, was at all times the person charged with carrying out Cogent's purpose.

268.    MEH was responsible for handling back-office accounting and bookkeeping for Cogent while Zarallo and his team handled Cogent's core business and construction operations. Cogent's key personnel, without which Cogent would have no value, are Drew Zarallo and Mark Zarallo, Sr. who himself has more than 15 years managing the development of utility-scale solar power facilities. McCoy's investment in Cogent was an investment in a business the value of which was dependent on this core management team operating out of the Eastern District of Texas. Despite formally being the "Manager" of Cogent, McCoy referred to Zarallo as the person "managing Cogent" in a written communication on December 14, 2021.

269.    The core business functions relevant to Cogent—qualifying for, bidding, budgeting and directing renewable construction projects—were all executed by Drew Zarallo and Mark Zarallo, Sr. primarily from home-offices in Gunter and the Regus Location in Frisco, Texas.

270.    Were it not for the mere fortuity that construction of Cogent's Frisco Office has been delayed, Cogent would have been operating since January 2023 from the Frisco Office as its headquarters and principal place of business.

271.    Although McCoy, Mitchell and others at MEH and/or Dynamic Group maintained control over Cogent's bank accounts and kept accounting records, they provided no strategic guidance and did not generally participate in Cogent's business decisions (such as what construction opportunities to pursue) or project management. At best, the functions executed by MEH and/or others working from Louisiana could be described, albeit generously, as something akin to a corporate controller, administrator and/or bookkeeper.

272.    Employee records maintained by the APS payroll system that McCoy/MEH required Cogent to use demonstrate that out of the approximately 135 employees that have been part of Cogent's labor force from early 2022 through July 9, 2023—nearly all of whose payroll was used as a basis for McCoy extracting an unearned 15 percent markup on such payroll—only **four** employees are registered as having residence in Louisiana. By contrast, a total of **56** employees are residents of Texas. The next largest state representation after Texas is Florida with 20 employees. That there is a national distribution of employees is a result of the fact that Cogent handles renewable energy projects nationwide. However, that there are substantially more Texas employees than from any other states is a result of Texas being Cogent's headquarters and homebase.

273.    An important part of McCoy's initial interest in partnering with Zarallo and Cogent was Cogent's presence in Texas and ability to operate as a renewables contractor in Texas. Specifically, one of the first potential projects McCoy engaged Zarallo in was a project where Cogent would be a contractor for Sunco, which McCoy owns and controls. McCoy wanted Cogent to operate as a Texas-based contractor for Sunco for development of a microgrid on behalf of the Texas National Guard at Camp Mabry in Austin. McCoy and Sunco asked Cogent to attend numerous meetings in Austin on behalf of Sunco and Zarallo met with General Curtis (another

owner in Sunco) in Austin, to discuss this opportunity and the overall partnership between Cogent and McCoy. These initial discussions and several meetings began in June 2021, prior to McCoy/MEH's acquisition of units in Cogent and execution of the LLC Agreement, and comprised a substantial part of initial activities and negotiations related to Zarallo's unit transfer to MEH and the LLC Agreement. Cogent's involvement in the pursuit of the Texas opportunity continued for the next seven months.

274.    The recitals state that the "Members have identified several potential projects listed on Schedule 1" to the LLC Agreement "Schedule 1 to the LLC Agreement. The very first potential project listed in Schedule 1 is a project referred to as "Grid Resiliency – Army National Guard." This is a reference to the potential project of developing a solar microgrid for the Texas National Guard.

275.    Cogent's Texas presence was therefore a strategic benefit to McCoy. McCoy made a strategic decision to invest in Cogent in significant part because Cogent was a Texas-based company and he knew that he was entering into a long-term arrangement that would lead to significant economic activity in Texas. The "financial obligation" that McCoy took upon himself in investing in Cogent and managing its accounts created "continuing obligations" between himself, MEH and residents of Texas—Zarallo and Cogent.

276.    All of McCoy's activities, on his behalf and on behalf of the entity defendants herein, had the aim of establishing a long-term association with Texas residents with the foreseeable and intended result of causing economic activity within Texas. McCoy and the entities on whose behalf he was acting should have reasonably anticipated being haled into court in Texas on any claims related to management of Cogent, including the breach of contract and breach of fiduciary duty claims set forth herein.

277.    As set forth herein, McCoy or others acting on his behalf, directed written and verbal communications, and actively participated in telephone communications where misrepresentations and material omissions were made, with Texas residents while they were present in Texas, and while he knew that they resided in Texas. The actual content of these communications gives rise to the tort claims herein. This includes communications and conduct referenced in the following paragraphs of this complaint: 22-23, 25, 47, 57, 99, 106, 111, 130, 142, 145, 158, 164, 174, 179, 180-81 and 203.

278.    McCoy in his role as manager of Cogent, and controller of all entity defendants herein, personally approved and executed most, if not all, of the transactions that are the subject of this Complaint, and either made or authorized the false and misleading communications that underlie, or have substantial nexus with, effectively each claim. Additionally, under Louisiana law governing the entity defendants' internal affairs, McCoy is personally liable for the fraud practiced by him, or the negligent or wrongful acts performed by him, while acting in the course and scope of his role as a member of MEH and the other Louisiana limited liability company Defendants. La. R.S. 12:1320.

279.    Mitchell aided in and conspired to breach fiduciary duties and committed acts of fraud alleged herein, and did so in large part through communications that he initiated, or actively engaged in, with Texas residents while knwing they were in Texas, as set forth in detail above.

280.    Separately, embezzling $2.5 million in loan proceeds from a Texas company, and causing Cogent to be burdened with a $2.5 million debt while planning to exit just two months after consummating the transaction; knowing that Cogent was a Texas company and would be impacted in Texas; and allowing UCB to maintain a security interest in Cogent's assets, confers specific jurisdiction over each of the co-conspirators in the associated embezzlement scheme,

conversion and breach of fiduciary duty. McCoy and Mitchell knew by embezzling funds and leaving Cogent with a debt that could very well render Cogent insolvent once McCoy/MEH withdrew from Cogent ensured the demise of Cogent and that the brunt of that injury would be felt in the Eastern District of Texas. This would be true even if, as Defendants have claimed, Cogent was operated out of Louisiana during McCoy/MEH's tenure in control; even if that counterfactual statement were true, all of the co-conspirators, aiders and abettors in the embezzlement knew that as soon as they withdrew Cogent would immediately become a Texas company burdened by an unserviceable and fraudulent debts caused by them.

281.    All of McCoy's and Mitchell's contacts with Texas should be imputed to all entity defendants herein, as agents of each entity named herein.

282.    All of the McCoy and MEH's contacts with Texas should be imputed to Dynamic Group, DSI, Southland, MGS and Power Strategies under a single business enterprise theory because, among other factors: (1) McCoy and/or MEH own and control each of the entity defendants; (2) all of the entity defendants have the same Baton Rouge headquarters; (3) all of the entity defendants have the same managers and/or officers; (4) none of the entity defendants observe corporate formalities; (5) none of the entity defendants maintains separate accounting systems; (6) McCoy and/or MEH exercise complete authority over the general policy of all entity defendants; and (7) McCoy and/or MEH exercise complete authority over daily operation of each entity defendant.

283.    On alternative grounds, this Court has personal jurisdiction over all entity defendants because each has directed tortious conduct into Texas, and aided, abetted and conspired with MEH and McCoy to commit the violations set forth herein.

284.    Pendent personal jurisdiction over any claims where specific jurisdiction is otherwise lacking is appropriate here because all of Plaintiffs' claims arise from a common nucleus of operative facts—namely a series of events whereby McCoy and others under his control, took control of and exploited Cogent and Zarallo, while in a fiduciary relationship with them, and every claim and allegation herein is part of one series of exploitative events. McCoy acquired control of Cogent to obtain Cogent's services for free, burdened Cogent with fabricated loans, embezzled from Cogent, left Cogent's financials in shambles, caused Cogent to make improper payments constituting misappropriation of public funds, and apparently spoliated evidence once he already withdrew from Cogent. In the event any particular cause of action does not independently meet the specific jurisdiction test, The Court should exercise its discretion to take pendent jurisdiction over the claim.

285.    Regarding venue, the communications and conduct referenced in paragraphs 22-23, 25, 47, 57, 99, 106, 111, 130, 142, 145, 158, 164, 174, 179, 180-81 and 203 comprise a substantial part of the events giving rise to Plaintiffs' tort claims. Moreover, venue is proper over Plaintiffs' breach of contract claims, without limitation, because Cogent at all time was operated out of Gunter and Frisco, Texas; performance of Zarallo's duties under the LLC Agreement, and Cogent's duties under other agreements alleged herein, were primarily performed in Gunter and Frisco, Texas; many "owner's investment" transfers which were misallocated to DSI income in breach of agreements alleged herein were made from Dynamic Group's Baton Rouge bank account to Cogent's Gunter, Texas account; and the exploitative invoices for "services" from MGS, MEH and Southland were billed to Cogent in Gunter, Texas, and such invoices contained inflated charges in breach of the contracts alleged herein.

286.    This Court may and should exercise "pendent venue" over any claim for which venue may otherwise not proper lie because all of Plaintiffs' claims arise out of a common nucleus of operative facts, as set forth above.

### FIRST CAUSE OF ACTION
#### (Breach of Fiduciary Duty by MEH and McCoy to Cogent)

287.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

288.    Cogent is a Delaware limited liability company and, as such, Delaware law defines the scope of fiduciary duties by Cogent's members, managers and officers.

289.    Section 11.04 of the LLC Agreement provides that "All questions with respect to … the rights and liabilities of the Members will be determined in accordance with the applicable provisions of the laws of the State of Delaware without regard to the principles of conflicts of law."

290.    The LLC Agreement does not vary from the default fiduciary duties applicable under Delaware law.

291.    McCoy, both as the manager of MEH and as an Officer and Manager of Cogent, owed Cogent fiduciary duties of care and loyalty.

292.    MEH, as the majority member and Manager of Cogent, owed Cogent fiduciary duties of care, good faith and loyalty.

*Mulligan Project*

293.    DSI is an "Affiliate" of McCoy's under the LLC Agreement.

294.    MEH is the sole member and manager of DSI.

295.    MEH, as Manager of Cogent, and McCoy, as Officer and Manager of Cogent, caused Cogent to enter into a self-interested transaction with DSI by causing Cogent to provide

services to DSI on the Mulligan Project. The terms of that transaction or series of transactions were not "entirely fair" to Cogent.

296.    McCoy and MEH breached their fiduciary duties to Cogent by failing to ensure that a written subcontract was in place for Cogent's work on the Mulligan Project.

297.    McCoy and MEH breached their fiduciary duties to Cogent by putting DSI's interests ahead of Cogent's in failing to ensure that Cogent could earn a commercially reasonable markup on its invoices related to the Mulligan Project.

298.    McCoy and MEH breached their fiduciary duties to Cogent by failing to take any actions to collect the debt related to the Mulligan Project, including by failing to utilize mechanics' lien procedures available under Illinois law.

299.    McCoy and MEH breached their fiduciary duties to Cogent by failing to recognize the full amount of DSI's debt on Cogent's books and records.  This includes, but is not limited to, reallocating what should have been accounted as McCoy or MEH capital contributions to income from DSI receivables. This also includes causing other amounts owed by DSI to disappear from Cogent's books without explanation.

300.    As a result of their fiduciary breaches, Cogent has been deprived of fair compensation for its work on the Mulligan Project.

*Breaches Related to Southland and MGS*

301.    Southland and MGS are wholly owned by MEH.

302.    MEH and McCoy caused Cogent to enter a self-interested arrangement with Southland and MGS. The terms of this arrangement were not "entirely fair" to Cogent as required by Delaware law. Cogent has been harmed by this arrangement by paying Southland and MGS "markup" charges on payroll in an amount to be determined at trial.

*UCB Loan*

303.    McCoy's and MEH's intent at all times in arranging for a line of credit in Cogent's name at UCB was to use Cogent as the loan debtor and use Cogent's assets as collateral for the loan which they would use to pay off DSI's debt. Every action taken in furtherance of this plan was a breach of loyalty to Cogent.

304.    McCoy and MEH's embezzlement the proceeds of the loan by instructing UCB to issue a check written to DSI for the loan proceeds, and depositing the check in DSI's bank account was another breach of fiduciary duty to Cogent.

305.    Repeated efforts to conceal the embezzlement were further breaches of fiduciary duty.

306.    McCoy and MEH's devotion of resources into obtaining an injurious loan to Cogent instead of making good faith efforts to obtain alternative financing for Cogent that would serve as working capital for Cogent was a further breach of their fiduciary duties.

307.    Cogent was damaged by these breaches, including by being deprived of the UCB loan proceeds during a time when Cogent needed the proceeds to pay vendors and contractors on ongoing projects, and being saddled with $2.5 million of debt and interest payments which is a deterrent to potential investors and bond underwriters.

*MEH's Withdrawal*

308.    MEH and McCoy committed numerous breaches of their fiduciary duties to Cogent over the last several months of their association with Cogent.

309.    It was a breach of loyalty for MEH and McCoy to fail to disclose to Zarallo the terms of purported "loans from Dynamic Group" in May 2023, and to execute a note memorializing those terms.

310.    It was a breach of loyalty for MEH and McCoy to cause Cogent's books and records to reflect $491,942.67 in loans from Dynamic Group, where banking records reflect only $360,133.80 in transfers from Dynamic Group in May 2023.

311.    For all amounts transferred by Dynamic Group in May 2023, it was a breach of loyalty by MEH and McCoy to cause Cogent to account for these transfers differently than prior transfers from Dynamic Group, which had been accounted for either as owner's investments or income from DSI receivables; MEH and McCoy should have caused these transfers to be treated in the same way.

312.    It was a breach of loyalty and care to Cogent to cause Cogent to transfer $656,061.29 to Dynamic Group and/or other McCoy/MEH-owned companies over the period of May 1, 2023, through July 10, 2023. Those funds should have been used to pay Cogent's subcontractors and vendors instead of letting Cogent to default on financial obligations to third parties.

313.    It was a breach of loyalty and care to for MEH and McCoy to fail to make any arrangements for financing for Cogent in order to pay contractors and vendors.

314.    It was a breach of loyalty and care for MEH and McCoy to Cogent to transfer $656,061.29 to McCoy/MEH-owned companies because that amount of money was not in payment for goods, services, repayment of any debts, and was not an authorized distribution, and instead constituted embezzlement from Cogent.

315.    It was a breach of fiduciary duties to Cogent to cause Cogent to pay inflated amounts to MEH for inflated MEH Invoices, and to make any payments to MEH instead of payments to contractors and vendors.

316.    It was a breach of fiduciary duties for MEH and McCoy to cause Cogent's books and records to be plagued with inconsistencies and inaccuracies.

317.    It was a further breach of fiduciary duty to Cogent to cause Cogent to recognize a purported debt to McCoy in the amount of $906,354.56l by executing the Resolution. This amount was not a "debt" and was not owed to McCoy.

318.    It was a further breach of fiduciary duty by MEH and McCoy to cause Cogent to execute the Note in favor of McCoy for $906,354.56.

319.    It was a further breach of fiduciary duty on the part of McCoy and MEH to cause Cogent to execute the Assignment.

320.    McCoy and MEH's execution of the Assignment was a further breach of fiduciary duty because it put Cogent in breach of provisions of the UCB loan agreement.

321.    The foregoing breaches have damaged Cogent in various ways, including by reducing its assets, saddling Cogent with improper debt, leaving Cogent's financial records in disarray, leading to contractual defaults with numerous parties, destroying Cogent's reputation and goodwill, leading to the loss of existing and future business opportunities.

*Power Strategies/LANGF*

322.    MEH and McCoy own and control Power Strategies.

323.    MEH and McCoy caused Cogent to enter into an arrangement with Power Strategies that was not "entirely fair" to Cogent as required by Delaware law.

324.    MEH and McCoy breached their fiduciary duties to Cogent by causing Cogent to make payments to Harold Leggett, Paul Rainwater and/or their associated limited liability companies without any consideration. This was a misuse of Cogent's assets. It has also put Cogent

at risk of being held responsible for misapplication of public funds by making unsupported payments from public allocations.

325.    MEH and McCoy breached their fiduciary duties to Cogent by executing various documents on behalf of Cogent on or around July 7, 2023, that purported to "Requisition" a payment from Power Strategies to pay Harold Leggett, despite Leggett not providing any services to Cogent.

326.    MEH and McCoy breached their fiduciary duties to Cogent by using Zarallo's name as "Requisitioner" and as the contact person in relation to the request for payment.

327.    MEH and McCoy breached their fiduciary duties to Cogent by purporting to cause Cogent to execute an "Amendment" to a Consulting Agreement between Cogent and Power Strategies without including a provision for payment to Cogent. It was also a further breach to include within the Agreement provisions for payment to Leggett which Cogent cannot justify if audited by public authorities.

*Accounting Records*

328.    Section 8.01 of the LLC Agreement provides that "[t]he Company will, … , keep books of record and account in which full, true and correct entries are made of all of its and their respective dealings, business and affairs, in accordance with generally accepted accounting principles."

329.    MEH and McCoy were exclusively responsible for maintaining Cogent's books and records, preparing financial statements, and preparing tax returns.

330.    MEH and McCoy breached their fiduciary duties to Cogent by failing to ensure that Cogent's financial statements were generally consistent with GAAP, CPA-reviewed and/or audited.

331.    MEH and McCoy breached their fiduciary duties to Cogent by including various false entries and omissions on Cogent's financial records, including the recording of non-existent loans and the omission of a $2.5 million debt to UCB.

332.    MEH and McCoy breached their fiduciary duties to Cogent by causing Cogent to book certain transfers from Dynamic Group as loans rather than capital contributions.

333.    MEH and McCoy breached their fiduciary duties to Cogent by failing to ensure that 2022 tax returns were prepared in a timely manner. They further breached their fiduciary duties by failing to ensure that Cogent's accounting records were in a condition to enable a CPA to prepare a 2022 tax return in a timely manner once MEH withdrew from Cogent.

334.    MEH and McCoy's failure to ensure the maintenance and availability of proper accounting records has damaged Cogent in various ways, including by depriving Cogent of profitable opportunities that required such financial statements as part of pre-qualification, depriving Cogent of the ability to obtain bonding and subjecting Cogent to fees for a late-filed tax return for 2022.

*Bonding*

335.    It was a breach of fiduciary duties by McCoy and MEH to fail to diligently work to procure bonding for Cogent, including on existing projects which are now in default as a result of McCoy and MEH's failures to do so.

336.    All of the foregoing breaches of fiduciary duty resulted from MEH's and McCoy's fraudulent, malicious and/or grossly negligent misconduct, entitling Cogent to exemplary damages under Texas law.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty by MEH and McCoy to Zarallo)

337.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

338.    As a controlling member and Manager of Cogent, MEH owed Zarallo fiduciary duties under Delaware law.

339.    As Officer and Manager of Cogent, and as manager of MEH, McCoy owed Zarallo fiduciary duties under Delaware law.

### *Mulligan Project*

340.    Under Section 3.04(a) of the LLC Agreement, Zarallo's consent was required for "any contract for the provision of construction or construction management services as a general contractor or subcontractor."

*341.*    On numerous occasions, including by email on October 29, 2021, MEH and McCoy failed to disclose their intent not to cause DSI to pay Cogent a substantial portion of the invoices Cogent was submitting, and not to permit Cogent to make a profit. Since these communications were being made to seek Zarallo's consent to the arrangement, under Delaware law McCoy and MEH had a *per se* obligation to disclose all material facts, including that DSI was insolvent and would be unable to pay Cogent.

### *UCB Loan*

342.    Under Section 3.04(a) of the LLC Agreement, "the Members owning at least one hundred percent (100%) of the outstanding Units [of Cogent]" had to approve an Officer, including McCoy acting as Manager, "entering into any agreement in which the payments made by [Cogent] will exceed, or are expected to exceed $10,000."

343.     Zarallo was also being asked to sign the Loan Resolution in his capacity as member of Cogent.

344.     MEH and McCoy directed several communications to Cogent intended to obtain Zarallo's consent to the UCB Loan, including phone communications, a March 30, 2023 email from Mitchell, the Loan Resolution itself. All of these communications failed to disclose the material fact that the loan proceeds would be distributed by check to DSI, and misled Zarallo into believing the proceeds would be available to Cogent.

345.     Under Delaware law McCoy and MEH had a *per se* obligation to disclose all material facts to Zarallo in connection with the UCB loan transaction.

*Zarallo's Right of First Refusal*

346.     On June 9, 2023, MEH's Withdrawal Notice triggered Zarallo's right of first refusal under Section 10.01(g) of the LLC Agreement.

347.     In connection with Zarallo's decision of whether or not to exercise that right of first refusal, McCoy and MEH, as his fiduciaries, had duties to disclose all material facts bearing on his decision and the financial condition of Cogent.

348.     On numerous occasions between June 9, 2023, and July 7, 2023, when Zarallo exercised his right of first refusal, MEH and McCoy sent Zarallo false and misleading financial information concerning Cogent and its liabilities, including fabricating previously unrecorded liabilities and omitting an existing $2.5 million debt to UCB.

349.     Under Delaware law McCoy and MEH's failure to discharge their duties of disclosure in connection with Zarallo's exercise of his right of first refusal is a *per se* breach of fiduciary duty.

*The July 7, 2023 Members' Meeting*

87

350.    On June 30, 2023, McCoy called a members' meeting to be held on July 7, 2023, at which Zarallo was informed he would vote on several items, including whether to execute a note in favor of McCoy.

351.    Zarallo had the right and ability to prevent the actions described in the agenda for the members' meeting.

352.    The failure to permit Zarallo to vote at the members' meeting was a breach of loyalty to Zarallo by McCoy and MEH, and had the effect of disenfranchising his vote.

353.    Since the June 30, 2023 members' meeting notice misled Zarallo into believing his vote would be counted at the meeting, he did not exercise his right under Section 10.01(h) of the LLC Agreement to cause an immediate buy-back of 20 units, which he otherwise would have done.

354.    The actions that McCoy and MEH took to deprive Zarallo of an opportunity to vote his units at the members' meeting was a breach of loyalty to Zarallo.

355.    McCoy and MEH breached their duty of loyalty to Zarallo further by providing him with false and misleading information regarding Cogent's financial condition, and other false information bearing on the agenda items, prior to the meeting.

*Power Strategies*

356.    Zarallo did not authorize his name to be used as "Requisitioner" of a payment to Leggett.

357.    The payment Requisition is subject to audit by public authorities.

358.    Zarallo has been placed in a position to have to justify his Requisition of a payment while his personal knowledge and belief is that Leggett did not render services to Cogent.

359.    This was a breach of MEH's and McCoy's fiduciary duty of loyalty to Zarallo.

*Holder Claim*

360.    Section 10.01(g) provided Zarallo with rights to withdraw and be paid a Purchase Price defined by the LLC Agreement.

361.    McCoy and MEH breached their fiduciary duties to Zarallo by concealing the fact that exploitative loans were being made to Cogent, and concealing the their intent to embezzle, and their accomplishment of the embezzlement, of UCB's loan proceeds.

362.    These misleading disclosures and omissions damaged Zarallo because had he known of McCoy and MEH's exploitative loans and embezzlement of the UCB loan proceeds, he would have exercised his right under Section 10.01(g)(2) to terminate his relationship with McCoy by withdrawing and being paid the Purchase Price set by the LLC Agreement.

363.    He specifically would have done this in February 2023, had Mitchell made a full disclosure of McCoy's and MEH's plan to carry out the UCB loan and embezzle the proceeds.

### THIRD CAUSE OF ACTION
### <u>(Breach of LLC Agreement by MEH and McCoy)</u>

364.    Plaintiffs repeat and reallege paragraphs 1 through 286  hereof, as if fully set forth herein.

365.    In the context of a manager accused of violating an LLC's operating agreement, "[u]nder Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages." *Largo Legacy Grp. v. Charles*, C.A. No. 2020-0105-MTZ, at *47 (Del. Ch. June 30, 2021) (quoting *Wenske v. Blue Bell Creameries, Inc.,* 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018)).

*McCoy's Breach of Section 3.03*

366.    As Officer of Cogent, Section 3.03 of the LLC Agreement obligated McCoy to "discharge [his] duties [*i.e.*, as "Manager"] in a manner [he] reasonably believe[d] to be in the best interests of the Company, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

367.    McCoy accepted upon himself this obligation by assenting to the role of Officer and Manager and being informed of the duties under Section 3.03.

368.    Paragraphs 287-363, which establish that McCoy breached his fiduciary duties to Cogent and Zarallo, also establish that the same conduct constituted a breach of Section 3.03 of the LLC Agreement.

*MEH's Breach of Section 3.08*

369.    Section 3.08 provides that "MEH shall be reimbursed for overhead allocable to the Company or to the business of the Company, which shall include, but not be limited to, the payment for employees of McCoy who perform work for the Company and expenses incurred by McCoy for the Company. Should McCoy delegate any of its duties to the Company to any entity or person, McCoy shall make the required payment to that entity or person for performing such duties, and shall be entitled to prompt reimbursement from the Company for such services."

370.    By employing Southland and MGS, and using MEH and/or Dynamic Group employees to perform associated HR and payroll services, MEH was only entitled to be reimbursed to the costs associated with employees' time in processing payroll and providing HR services, as well as for costs of insurance and markups charged by third-party payroll processing companies, which costs it had already charged to Cogent in the MEH Invoices.

371.    Rather than seek reimbursement for its costs, MEH, through its control of Southland and MGS, caused Cogent to pay a 15 percent markup on payroll, which was far in excess of the costs incurred by MEH.

372.    Furthermore, the MEH Invoices charged Cogent for costs that were far in excess of any allocable share of MEH's overhead.

373.    These were breaches of the duty of good faith and fair dealing implied in Section 3.08.

*MEH's Breach of Section 8.01*

374.    Regarding accounting records, Section 8.01 of the LLC Agreement provides that "[t]he Company will, … , keep books of record and account in which full, true and correct entries are made of all of its and their respective dealings, business and affairs, in accordance with generally accepted accounting principles."

375.    As Manager of MEH and the entity responsible for discharging the foregoing obligations, MEH breached Section 8.01 by failing to ensure that Cogent kept full, true and correct accounting entries in its accounting records, and failing to ensure that the financial records were made in accordance with generally accepted accounting principles.

376.    This breach has damaged Cogent, without limitation, by preventing it from being able to qualify for business opportunities and bonding that require the submission of financial statements as part of the qualification process, and by leading Cogent to incur unnecessary costs and delays in the procurement of corrected financial records and preparation of accurate tax returns.

## FOURTH CAUSE OF ACTION
### (Breach of Implied-in-Fact Contract Between Zarallo and McCoy)

377.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

378.    While fiduciaries of Zarallo, McCoy and MEH communicated numerous false representations and documents, and representations that were materially misleading because they omitted material facts under circumstances where McCoy and MEH were under a duty to speak.

379.    These include, without limitation, communications related to the financial condition of Cogent, purported loans from McCoy, false and misleading financial statements, false information regarding the UCB loan, false information in connection with McCoy/MEH's withdrawal from Cogent, and false information concerning a purported members' meeting where Zarallo was called upon to vote.

380.    McCoy and MEH had knowledge that these representations were false and intended that Zarallo should act on the misrepresentations and/or omissions.

381.    Zarallo was injured by his reliance on the foregoing misrepresentations and omissions, including by foregoing contractual rights under the LLC Agreement and the McCoy-Zarallo Agreement, voting rights as a member of Cogent, consenting to the UCB Loan and foregoing buy-back rights and the right to be paid a Purchase Price for his units, which he would have exercised had he known the truth of McCoy and MEH's actions set forth herein.

## FIFTH CAUSE OF ACTION
### (Breach of Implied-in-Fact Contract Between Zarallo and McCoy)

382.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

383.    McCoy and Zarallo entered into an implied-in-fact agreement between June and August of 2021 (the "McCoy-Zarallo Agreement").

384.    McCoy's offers to Zarallo in support of the McCoy-Zarallo Agreement, made in writing and in oral communications, were: (a) that he would take on a "financial obligation" to Cogent to cause transfers of funds to Cogent to support Cogent's growth until Cogent's income from projects became self-sustaining; and (b) that he would provide the support necessary to ensure Cogent would qualify for project bonding within the range of $30-100 million for individual projects and $100-300 million in aggregate.

385.    Both parties understood that any deposits and/or transfers McCoy would cause to be made to Cogent would be considered capital investments and not loans.

386.    In consideration for McCoy's promises, McCoy wanted 70 percent ownership of Cogent to be conveyed to MEH and to use his accountants to control Cogent's accounts.

387.    Zarallo accepted McCoy's offers and fully performed on his side of the Zarallo-McCoy Agreement by causing the transfer of 70 units in Cogent to MEH.

388.    Cogent was the intended beneficiary of promises made by McCoy to Zarallo.

389.    During the period of August 27, 2021 to July 9, 2023, McCoy caused several transfers of funds to Cogent, which he caused to be made from bank accounts belonging to Dynamic Group. These transfers were in performance of McCoy's obligation under the McCoy-Zarallo Agreement. As such, they were capital investments.

390.    In breach of the McCoy-Zarallo Agreement, McCoy has treated several of these transfers as loans to Cogent or as income from DSI receivables, rather than as capital investments.

93

391.    In further breach of the McCoy-Zarallo Agreement, McCoy did not discharge his obligation in good faith to ensure that Cogent would receive bonding within the ranges he offered Zarallo.

392.    As a result of the foregoing breaches, the intended beneficiary of McCoy's promises to Zarallo, Cogent, has been damaged in the following ways: (a) it has been deprived assets including monies that were transferred out of Cogent in repayment of incorrectly designated "loans" from Dynamic Group and a purported reduction in receivables from DSI; (b) it has been further damaged by the presence on Cogent's books and records of an improperly classified "debt" to McCoy in the form of the Note; and (c) it has been further damaged by the lack of sufficient bonding capacity, which has placed Cogent in default of existing projects and deprived Cogent of opportunities for other profitable projects.

393.    As a result of the foregoing breaches, the promisee, Zarallo, has been damaged by the diminution in value of his membership units in Cogent.

## SIXTH CAUSE OF ACTION
### (Promissory Estoppel Against McCoy Related to Unit Transfer)

394.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

395.    McCoy made several promises to Zarallo within the timeframe of June 2021 and August 2021, including: (a) that he would take on a "financial obligation" to Cogent to cause transfers of funds to Cogent to support Cogent's growth until Cogent's income from projects became self-sustaining; and (b) that he would provide the support necessary to ensure Cogent would qualify for project bonding within the range of $30-100 million for individual projects and $100-300 million in aggregate.

396.    The mutual intent of both Zarallo and McCoy was that any transfers made to Cogent would be considered capital investments and not loans.

397.    Cogent was an intended beneficiary of the foregoing promises.

398.    From McCoy's vantage point at the time he made the foregoing promises to Zarallo, it was foreseeable that Zarallo would rely on these promises in causing 70 units in Cogent to be transferred to MEH.

399.    Zarallo relied on the foregoing promises by causing 70 units in Cogent to be transferred to MEH.

400.    Zarallo's reliance has been to his detriment. Specifically, McCoy caused several transfers that were within the scope of his promises to "fund" Cogent to be treated as loans to Cogent rather than capital investments; McCoy caused several transfers to be treated as payments on DSI receivables; and McCoy did not deliver sufficient bonding capacity to Cogent, which has placed Cogent in default of existing projects and deprived Cogent of opportunities for other profitable projects.

**SEVENTH CAUSE OF ACTION**
**(Violation of Tex. Bus. & Comm. Code § 27.01 (Statutory Fraud) Against McCoy and MEH)**

401.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

402.    Zarallo causing 70 membership units to be transferred to MEH within the timeframe of June 2021 to August 2021 was a "transaction involving stock" for purposes of Texas Business & Commercial Code Section 27.01 (the "Transaction").

403.    During the Transaction, McCoy made several false promises, including: (a) that he would take on a "financial obligation" to Cogent to cause transfers of funds to Cogent sufficient

to support Cogent until Cogent's income from projects became self-sustaining; and (b) that he would provide the support necessary to ensure Cogent would qualify for project bonding within the range of $30-100 million for individual projects and $100-300 million in aggregate.

404.    Regarding his "financial obligations" to Cogent, McCoy's actual intent when these promises were made was to cover some portion of the costs Cogent would incur in service of the Mulligan Project and to treat transfers to Cogent as loans.

405.    Regarding bonding, McCoy did not intend to make bonding capacity available at promised limits, and instead intended to provide very limited, if any, bonding capacity.

406.    Cogent was the intended beneficiary of these promises.

407.    These promises were made on McCoy's own behalf and on MEH's behalf.

408.    McCoy made these promises for the purpose of inducing Zarallo to enter into the Transaction.

409.    Zarallo relied on these promises by entering into the Transaction.

410.    Zarallo's reliance caused injury to him and to Cogent by: (a) depriving Zarallo of 70 units in Cogent through July 9, 2023; (b) causing Cogent to be saddled with debt that should instead have been treated as capital investments; and (c) depriving Cogent of sufficient bonding capacity on existing projects and on potential projects that Cogent could have otherwise qualified for.

### EIGHTH CAUSE OF ACTION
### (Fraud in the Inducement Against McCoy and MEH)

411.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

412.    The McCoy-Zarallo Agreement was formed between June 2021 and August 2021.

413.    McCoy made several false promises, including: (a) that he would take on a "financial obligation" to Cogent to cause transfers of funds to Cogent to support Cogent's growth until Cogent's income from projects became self-sustaining; and (b) that he would provide the support necessary financial support to ensure Cogent would qualify for project bonding within the range of $30-100 million for individual projects and $100-300 million in aggregate.

414.    Regarding his "financial obligations" to Cogent, McCoy's actual intent when these promises were made was to cover costs related to Cogent's service on the Mulligan Project and to treat transfers to Cogent as loans.

415.    Regarding bonding, McCoy did not intend to make bonding capacity available at promised limits, and instead intended to provide very limited, if any, bonding capacity.

416.    Cogent was the intended beneficiary of these promises.

417.    These promises were made on McCoy's own behalf and on MEH's behalf.

418.    McCoy made these promises for the purpose of inducing Zarallo to enter into the McCoy-Zarallo Agreement and the LLC Agreement.

419.    Zarallo relied on these promises by entering into the McCoy-Zarallo Agreement, executing the LLC Agreement and transferring membership units in Cogent to MEH.

420.    Zarallo's reliance caused injury to him and to Cogent by: (a) depriving Zarallo of 70 units in Cogent through July 9, 2023; (b) causing Cogent to be saddled with debt that should instead have been treated as capital investments; and (c) depriving Cogent of sufficient bonding capacity on existing projects and on potential projects that Cogent could have otherwise qualified for.

**NINTH CAUSE OF ACTION**
**(Breach of Implied-in-Fact Contract Between Cogent and DSI)**

421.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

422.    Cogent and DSI are parties to an implied-in-fact agreement for Cogent to render construction services to DSI in connection with the Mulligan Project between August 2021 and April 2022 (the "DSI-Cogent Agreement").

423.    Cogent fully performed under the DSI-Cogent Agreement.

424.    Cogent submitted a total of $3,530,912.72 in invoices pursuant to the DSI-Cogent Agreement.

425.    DSI remitted $1,110,188.87 in payments to Cogent in 2021 and has remitted no further payments to Cogent.

426.    DSI's failure to remit further payments Cogent is a material breach of the DSI-Cogent Agreement.

427.    Cogent has been damaged in an amount to be determined at trial, but in no event less than $2,420,723.85 in unpaid invoices along with pre-judgment interest.

**TENTH CAUSE OF ACTION**
**(Breach of Implied-in-Fact Contract Between Cogent and Power Strategies)**

428.    Plaintiffs repeat and reallege paragraphs 1 through 286  hereof, as if fully set forth herein.

429.    Cogent and Power Strategies were parties to an implied-in-fact contract pursuant to which Cogent provided Power Strategies with services related to the development and pre-construction of solar power facilities.

430.    Cogent fully performed on the contract until it formally terminated its relationship with Power Strategies on August 23, 2023.

431.    On July 17, 2023, Cogent sent Power Strategies an invoice for some, but not all, of Cogent's services rendered, in an amount of $244,000, which was payable 30 days from receipt.

432.    As of the date of this filing, the invoices has not been paid, even after Cogent made a subsequent demand for payment on August 23.

433.    Cogent has consequently been damaged.

### ELEVENTH CAUSE OF ACTION
### (Quantum Meruit Against McCoy and MEH and DSI)

434.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

*Mulligan Project*

435.    Cogent rendered valuable services and furnished materials for the benefit and at the request of DSI, McCoy and MEH, in connection with the Mulligan Project.

436.    DSI, McCoy and MEH accepted, used and enjoyed Cogent's services and materials in connection with the Mulligan Project.

437.    DSI, McCoy and MEH were all reasonably notified that Cogent was performing its services and furnishing materials under the expectation that it would be paid for the services and/or materials.

438.    DSI, McCoy and MEH must pay Cogent the for the reasonable value of the work it performed and the materials it furnished.

*Power Strategies*

439.    Cogent rendered valuable services for the benefit and at the request of McCoy, MEH and Power Strategies, in connection with solar-power development projects.

440.    McCoy, MEH and Power Strategies accepted, used and enjoyed Cogent's services.

441.    McCoy, MEH and Power Strategies were all reasonably notified that Cogent was performing its services and furnishing materials under the expectation that it would be paid for the services it was rendering for their benefit.

442.    McCoy, MEH and Power Strategies must pay Cogent the for the reasonable value of the work it performed and the materials it furnished.

**TWELFTH CAUSE OF ACTION**
**(Conversion Against McCoy and MEH)**

443.    Plaintiffs repeat and reallege paragraphs 1 through 286  hereof, as if fully set forth herein.

*UCB Loan*

444.    Cogent was entitled to possession of any distribution of loan proceeds from the UCB loan.

445.    McCoy and MEH, unlawfully and without authorization, assumed and exercised dominon and control over the UCB loan proceeds to the exclusion of, or inconsistent with, Cogent's rights.

446.    On numerous occasions, Plaintiffs asked that the loan proceeds be made available, effectively making a demand for the property which, at the time, Plaintiffs did not know was converted.

447.    McCoy and MEH have refused to return the loan proceeds.

*July 10, 2023 Bank Transfers*

448.    The LANG Account at Hancock Whitney bank is a checking account owned by Cogent, and Cogent at all times was entitled to possession of the funds in the account.

449.    McCoy and MEH had no agency or other authority to act on behalf of Cogent effective July 9, 2023 at 12:00 CST.

450.    Without authority or authorization from Cogent, on July 10, 2023, McCoy and MEH assumed and exercised dominion and control over the LANG Account inconsistently with Cogent's rights, and caused a transfer of funds out of Cogent's account.

451.    Cogent's objections to this conduct on August 23, 2023, as well as this lawsuit, constitute a demand for the property, and MEH and McCoy's inaction constitutes a refusal to return the property.

### *Electronically Stored Information*

452.    Cogent owns, has legal possession of, and at all times was entitled to possession of all of the electronically stored information that it maintains on its secure servers.

453.    MEH and McCoy unlawfully and without authorization, caused their agent to assume and exercised dominion and control over Cogent's secure servers on July 10, 2023, in a manner inconsistent with Cogent's rights. Specifically, MEH and McCoy's agent destroyed files and email accounts on Cogent's computer systems.

454.    No demand for return was made. Demand is excused under the circumstances. The files have been destroyed and are irrecoverable.

**THIRTEENTH CAUSE OF ACTION**
**(Violation of the Computer Fraud and Abuse Act)**

455.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

456.    On July 10, 2023, McCoy, Mitchell and MEH directed their IT personnel access Cogent's secure computer systems without authorization and to destroy electronically stored information, including Mitchell's email account.

457.    By causing the deletion of many files, McCoy, Mitchell and MEH, and others operating on their behalf, caused the permanent loss of data belonging to Cogent.

458.    By doing so, McCoy, Mitchell and MEH violated 18 U.S.C. § 1030(a) (5) which provides that anyone who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer" commits a federal crime.

459.    Cogent has a private right of action under 18 U.S.C. § 1030(a)(g).

460.    Cogent has been damaged, including through the loss of evidence in this lawsuit, and in an amount to be determined at trial.

### FOURTEENTH CAUSE OF ACTION
**(Aiding and Abetting Against Mitchell, Dynamic Group, DSI, Southland, MGS and Power Strategies)**

461.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

462.    As set forth above, McCoy and MEH have breached their fiduciary duties to Cogent and Zarallo.

463.    The other Defendants herein have knowingly participated in the breaches.

464.    McCoy and MEH exercise complete dominion and control of Dynamic Group, DSI, Southland, MGS and Power Strategies. McCoy and MEH are agents of each of these defendants and McCoy and MEH's knowledge is imputed on each of them at all relevant times.

*Breach of Fiduciary Duty*

465.    Inasmuch as Mitchell was not a fiduciary himself, Mitchell knowingly participated in the breaches of fiduciary duty set forth herein.  Mitchell transmitted numerous communications containing false or misleading representations that were designed to accomplish the breaches set forth above, including persuading Zarallo to authorize the UCB Loan and creating the Exit

Analysis, and through those efforts did in fact accomplish the breaches set forth above. Mitchell was instrumental in executing on McCoy's and MEH's breaches.

466.   Dynamic Group knowingly participated in the breaches set forth herein, including by receiving embezzled funds in June 2023 and assisting in procuring the UCB loan by pledging its bank account with UCB as collateral for the loan.

467.   DSI knowingly participated in the breaches set forth herein, including by knowingly receiving embezzled funds to have its debt with UCB paid off, and continuing to induce Cogent into providing it services in connection with the Mulligan Project while knowing it would not pay.

468.   Southland and MGS knowingly participated in the breaches set forth herein, including by receiving improperly marked up payroll payments.

469.   Power Strategies knowingly participated in the breaches set forth herein, including by participating in the creation of the false "Requisition" document to assist in the improper payment to Leggett and using Zarallo's name without permission, knowingly participating and facilitating an improper payment to Rainwater, and executing an unauthorized and improper "Amendment" to an expired consulting agreement in order to facilitate the improper payment, knowing it was also depriving Cogent of compensation for its services.

470.   Damages resulted from the concerted action MEH/McCoy and the other entities herein.

## FIFTEENTH CAUSE OF ACTION
### (Civil Conspiracy Against all Defendants)

471.   Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

472.    As set forth above, McCoy and MEH have breached their fiduciary duties to Cogent and Zarallo.

473.    All of the defendants conspired to commit breaches of MEH and McCoy's fiduciary duties, and took one or more unlawful and overt acts in furtherance of the conspiracy, as detailed herein. Without limitation, those overt acts include: Mitchell making various false and misleading communications to Zarallo; DSI receiving the embezzled loan proceeds; Dynamic Group pledging assets in furtherance of obtaining the loan and embezzling the proceeds; Power Strategies directing the creation of the "Requisition" document and executing an improper purported "Amendment" to further misappropriation of public allocations.

474.    This damaged Cogent in an amount to be determined at trial.

## SIXTEENTH CAUSE OF ACTION
### (Unjust Enrichment Against all Defendants)

475.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

### *Mulligan Project*

476.    Cogent rendered valuable services and furnished materials for the benefit and at the request of DSI, McCoy and MEH, in connection with the Mulligan Project.

477.    DSI, McCoy and MEH accepted, used and enjoyed Cogent's services and materials in connection with the Mulligan Project.

478.    DSI, McCoy and MEH were all reasonably notified that Cogent was performing its services and furnishing materials under the expectation that it would be paid for the services and/or materials.

479.    DSI, McCoy and MEH have wrongfully secured the benefits of Cogent's services and materials or, in the alternative, DSI, McCoy and MEH have passively received the benefit of its services and materials on the Mulligan Project and it would be unconscionable for it to retain that benefit without payment.

*Markups on Payroll by Southland and MGS*

480.    Southland and MGS wrongfully secured the benefit of a 15-percent markup on payroll payments made to Cogent's workers for no services rendered in return.

481.    These entities have been unjustly enriched by the receipt of wrongful transfers of funds from Cogent's HW Account disguised as charges for services rendered, where no goods or services were rendered to Cogent in return for such receipts.

*UCB Loan Proceeds*

482.    By securing $2.5 million in embezzled loan proceeds, DSI has wrongfully secured a benefit or passively received one that it would be unconscionable to retain.

483.    McCoy and MEH have wrongfully secured the benefit of $2.5 million in loan proceeds to satisfy debts of an entity under their control and thereby avoided potential liabilities including payment on personal guarantees and/or foreclosures on assets.

*Transfers to Dynamic Group*

484.    McCoy caused transfers of funds from Cogent's HW Account to accounts held by Dynamic Group on numerous occasions from early 2022 through July 9, 2023.

485.    A substantial amount of these transfers were wrongful and by knowingly receiving them Dynamic Group wrongfully secured the benefit of Cogent's funds.

## SEVENTEENTH CAUSE OF ACTION
### (Veil Piercing/Alter Ego/Single Business Enterprise)

486.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

487.    All of the entity defendants are Louisiana limited liability companies, meaning that Louisiana law applies to piercing the corporate veil, and whether they constitute a single business enterprise.

### *Personal Liability Against McCoy*

488.    McCoy has engaged in fraud and deceit such that justice demands the "corporate veil" of the companies he owns be pierced to allow Zarallo to recover from McCoy personally.

489.    McCoy disregards corporate formalities to such an extent that he has become indistinguishable—*i.e.*, is the "alter ego"—of the companies he owns, including MEH.

490.    McCoy has engaged in a practice of fraud and deceit through his network of affiliates.

491.    McCoy has disregarded the requisite corporate formalities to the extent that the entity Defendants have ceased to be distinguishable from McCoy himself.

492.    McCoy regularly mingles, and does not distinguish between, company and shareholder funds.

493.    McCoy fails to follow statutory formalities for transacting corporate affairs, including disregarding LLC Agreements and background company law.

494.    McCoy keeps companies undercapitalized, stripping away any significant capitalization as soon as it materializes.

495.    McCoy fails to maintain regular members' or manager meetings except when those meetings are designed to serve his breaches of fiduciary duty.

*Liability Against all Defendants as Single Business Enterprise*

496.    All of the entity defendants herein should be treated as a single entity because they constitute a single business enterprise.

497.    Each of the entity defendants have an identity of ownership, giving McCoy and/or MEH active working control of each entity.

498.    Each of the entity defendants has common or identical officers and/or managers.

499.    Each of the entity defendants has unified administrative control.

500.    The managers and/or officers of each company acts independently in the interest of that company.

501.    Each of the entity defendants is financed by at least one of the other companies.

502.    The companies, including MEH, MGS and Southland are inadequately capitalized.

503.    Each of the entity defendants uses the property of other companies as its own.

504.    Each of the entity defendants fails to comply with corporate formalities.

505.    Each of the entity defendants has common employees.

506.    Each of the entity defendants renders services or receives services from employees of one company on behalf of another company.

507.    Each of the entity defendants operates out of the same offices.

508.    Each of the entity defendants operates with centralized accounting.

509.    Each of the entity defendants transfers funds between companies without properly document such transfers.

510.    Each of the entity defendants allocates profits and losses between the companies in an unclear manner.

511.    Each of the entity defendants performs functions that others would be expected to perform, rendering them excessively fragmented.

## EIGHTEENTH CAUSE OF ACTION
### (Accounting)

512.    Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

513.    Based on the facts set forth herein, Plaintiffs are entitled to an accounting under Delaware law. McCoy, MEH and their affiliated entities, including DSI, and Dynamic Group, exercised exclusive power and control over Cogent's financials and assets. As fiduciaries, they have a duty to account for the disposition of corporate funds and other assets entrusted to their care. They must establish the purpose, amount, and propriety of the disbursements made from Cogent.

514.    McCoy and his affiliated entities engaged in fraudulent conduct, misclassification of funds, unauthorized withdrawals, and improper allocation of overhead expenses. These actions demonstrate a lack of transparency and breach of fiduciary duties. McCoy and his affiliated entities must be held accountable for their actions and provide a full accounting of the financial transactions and disbursements made from Cogent.

515.    An accounting will allow Plaintiffs to understand the full extent of the financial harm caused by Defendants' actions and seek appropriate remedies for the damages suffered. It will also ensure that Defendants are held responsible for their breach of fiduciary duties and fraudulent conduct. Therefore, Plaintiffs are entitled to an accounting under the law provided.

## NINETEENTH CAUSE OF ACTION
### (Constructive Trust)

516.     Plaintiffs repeat and reallege paragraphs 1 through 286 hereof, as if fully set forth herein.

517.     The Defendants have embezzled Cogent's assets and the proceeds of a UCB loan.

518.     The facts alleged in the complaint demonstrate the elements necessary for the imposition of a constructive trust. First, there is evidence of actual or constructive fraud, as McCoy and his affiliated entities engaged in fraudulent and deceptive conduct, including misrepresentations, omissions, and intentional actions to deceive Zarallo and Cogent.

519.     Second, there is evidence of unjust enrichment of the wrongdoers: McCoy, through his control over Cogent and his affiliated entities, improperly diverted funds, misclassified capital contributions, and embezzled loan proceeds. These actions resulted in significant financial harm to Cogent and Zarallo, while unjustly benefiting McCoy and his affiliated entities. The unjust enrichment of the wrongdoer is evident from the facts alleged.

520.     Finally, the complaint outlines specific transactions and actions taken by McCoy and his affiliated entities, including the diversion of funds, misclassification of capital contributions, and embezzling loan proceeds. These transactions can be traced to specific accounts and entities, providing the necessary elements for the imposition of a constructive trust.

521.     Based on these facts, Plaintiffs are entitled to the imposition of a constructive trust to prevent further unjust enrichment of the wrongdoers and to ensure that the wrongfully obtained property is returned to its rightful owners.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that the Court:

a.  issue declaratory judgment that all instruments executed in contradiction to the LLC Agreement, or by breach of fiduciary duties, or in the furtherance of fraud be considered null, void and of no effect, including the July 7, 2023 Resolution, Note and Assignment, and purported "Amendment" with Power Strategies.

b.  permanently enjoin Defendants from seeking to enforce any instruments adjudged to be null, void and of no effect;

c.  award Plaintiffs damages for all forms of compensable injury, including economic injury and mental and physical anguish caused by Defendants' misconduct;

d.  order that Defendants disgorge all profits and ill-gotten gains derived from their misconduct;

e.  impose a constructive trust over property rightfully belonging to Plaintiffs;

f.  order an accounting be done and on the basis of such accounting order Defendants to pay to Plaintiffs all amounts owed;

g.  award any other equitable relief necessary to prevent and remedy Defendants' misconduct;

h.  award Plaintiffs treble damages under applicable statutes;

i.  award Plaintiffs punitive damages to the maximum permissible extent under Texas law or the U.S. Constitution to deter such heinous conduct in the future;

j.  impose any other penalties that may be available under applicable statutes;

k.  order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs associated with this action;

l.  grant such other and further relief as the Court deems just and proper.

Respectfully submitted,


By:  /s/ *Eliyahu Ness*

**NESS PLLC**

Eliyahu Ness (SBN 24119651)
eness@nesslegal.com
5900 Balcones Drive, Suite 13460
Austin, Texas 78731
Telephone: (754) 241-3477

ATTORNEYS FOR PLAINTIFFS

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial on all issues so triable.


Respectfully submitted,


By:  _/s/ *Eliyahu Ness*_____

**NESS PLLC**

Eliyahu Ness (SBN 24119651)
eness@nesslegal.com
5900 Balcones Drive, Suite 13460
Austin, Texas 78731
Telephone: (754) 241-3477

ATTORNEYS FOR PLAINTIFFS