# EXHIBIT A

(TO PLAINTIFFS' FIRST AMENDED COMPLAINT)

## AMENDED LIMITED LIABILITY COMPANY AGREEMENT
### OF
### COGENT RENEWABLES LLC

### A DELAWARE LIMITED LIABILITY COMPANY

THIS LIMITED LIABILITY COMPANY AGREEMENT of Cogent Renewables, LLC (as from time to time amended, including any schedules and exhibits hereto, this "Agreement") is entered into as of ___August 16_____, 2021, by and among Drew Zarallo ("Drew") and McCoy Equity Holdings, LLC ("McCoy") (each of the foregoing is, individually, a "Member" and, collectively, the "Members").

### RECITALS

A.      Oakwood Renewables, LLC was formed under the Delaware Limited Liability Company Act (the "Act") upon the filing of Certificate of Formation with the Secretary of State of Delaware on January 15, 2021. On or about April 22, 2021, the name of Oakwood Renewables, LLC was changed to Cogent Renewables, LLC (the "Company") pursuant to a Certificate of Amendment to Certificate of Formation of Oakwood Renewables, LLC filed in the State of Delaware.

B.      The Company has been formed for the purposes of providing services relating to renewable energy construction or construction management contracts or subcontracts entered into by the Company. The Members have identified several potential projects listed on Schedule 1, and will endeavor to obtain other project opportunities. As potential projects are identified, the Members shall identify any specific duties a Member is expected to perform in respect to such potential project.

C.      The Members desire to enter into this Agreement to set forth the rights, powers, and interest of the Members with respect to the Company and their membership interest therein and to provide for the management of the business and operations of the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Capitalized terms used in this Agreement (including any Exhibits attached hereto) will have the meanings given them in Exhibit A.

### ARTICLE II
### THE COMPANY

Section 2.01    Formation.  The Company was formed on January 15, 2021 pursuant to the provisions of the Act.  The Members agree to continue the Company as a limited liability company under and pursuant to the provisions of the Act.

Section 2.02     <u>Limited Liability Company Operating Agreement</u>.  The Members execute this Agreement for the purpose of establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Act.  During the term of the Company set forth in <u>Section 2.04</u>, the rights, powers and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and the Act. Notwithstanding any provision of the Act to the contrary, no other agreement, document or record, whether written or oral, will be deemed to be an implied or express operating agreement of the Company.

Section 2.03     <u>Name</u>.  The name of the Company as of the date of this Agreement is "Cogent Renewables, LLC." On or about April 22, 2021, the name of Oakwood Renewables, LLC was changed to Cogent Renewables, LLC pursuant to a Certificate of Amendment to Certificate of Formation of Oakwood Renewables, LLC filed in the State of Delaware.   The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Members and upon compliance with all applicable laws and requirements relating to fictitious or assumed names.

Section 2.04     <u>Term</u>.  The term of the Company commenced upon the filing of the Articles in accordance with the Act and will continue until termination and dissolution thereof in accordance with the provisions of <u>Article VII</u>.

Section 2.05     <u>Purposes</u>.  The purpose and business of the Company is to engage in any lawful acts or activities for which limited liability companies may be organized under the Act, including the acquisition of contracts or subcontractors for the construction of renewable energy project as agreed upon by the Members.

Section 2.06     <u>Powers</u>.  The Company will have the powers set forth in the Act, subject to any limitations provided in any other Delaware statute or in the Company's Articles.

Section 2.07     <u>No State-Law Partnership</u>.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this <u>Section 2.07</u>, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof will be construed to suggest otherwise.  The Members will cause the Company to be treated as a partnership for federal and, if applicable, state and local income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

ARTICLE III
<u>GOVERNANCE AND MANAGEMENT</u>

Section 3.01     <u>General</u>.  The Company shall be governed by a Manager, and the day-to-day operations of the Company shall be vested in the Manager.  McCoy Equity Holdings, LLC is hereby named the Manager. The Manager may make all decisions and take all actions for the Company not otherwise provided for in this Agreement or expressly reserved to a vote by the Members.

(a)    Action of the Members. Any determination or action required to be taken by the Members in ordinary course shall be taken through meetings and written consents as described in Section 6.02.   Any determination or action required to be unanimously taken by applicable law, may be taken through a Member meeting or written consent.

(b) Power of the Manager. The Manager shall have full authority to bind the Company, including, but not limited to, the following expressly granted powers:

(1) make purchases or expenditures on behalf of the Company;

(2) enter into a contract or agreement on behalf of the Company;

(3) open bank accounts, checking accounts, savings accounts, CMA accounts, or similar accounts, and buy or sell stocks, bonds, or other such items;

(4) borrow from any lender or lenders willing to lend to the Company;

(5) purchase, sell, lease, exchange, partition, mortgage, pledge or otherwise transfer or encumber movable property of the Company; and

(6) purchase, sell, lease exchange, partition, mortgage, pledge or otherwise transfer or encumber immovable property of the Company;

(7) execute oil, gas and other mineral leases, unitization and pooling agreements, division orders, royalty sales and purchases, and any and all other documents relative to mineral rights.

Section 3.02    Designation of Officers.  The Members may, from time to time, delegate to one or more Persons (including any individual designated as an Officer of the Company and including through the creation and establishment of one or more committees) such authority and duties as the Members may deem advisable.  Any delegation pursuant to this Section 3.02 may be revoked at any time by the Members.   Without limiting the generality of the foregoing, the Company may have a chief executive officer or president, a treasurer (or chief financial officer), a chairman, one or more vice presidents, and a secretary, each of whom will, unless otherwise directed by the Members, have the same powers and duties as comparable officers of a Delaware corporation.  Any number of offices may be held by the same person, as the Members may determine.  Unless otherwise provided in the appointment of any Officer, each Officer will be chosen for a term which will continue until such Officer's successor will have been chosen and qualified or such Officer's earlier resignation or removal by the Members. The salaries of all Officers of the Company will be determined by the Members.  As of the date hereof, the Officers and initial salary and duties are as set forth on Exhibit C, each of whom is elected to serve until his death, resignation or earlier removal by the Members.

Section 3.03    Duties of Officers.  The Officers will discharge their duties in good faith, in a manner they reasonably believe to be in the best interests of the Company, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. The

3

Officers may rely on information received from other persons if that reliance is consistent with their respective duties.

Section 3.04 <u>Limitations of Officer Authority</u>. Notwithstanding anything in this Agreement to the contrary, the Officers of the Company are not permitted to undertake any of the following actions without the approval of the Members owning at least one hundred percent (100%) of the outstanding Units:

(a) Entering into any agreement for the provision of construction or construction management services as a general contractor or subcontractor;

(b) entering into any lease, or amendment or renewal of a lease, for real property;

(c) entering into any agreement in which the payments made by the Company will exceed, or are expected to exceed, $10,000;

(d) the approval of the Company's annual budget;

(e) entering into any employment or consulting agreement or relationship on behalf of the Company where the annual compensation exceeds, or is expected to exceed, $25,000.

(f) the approval of any merger, consolidation, share or interest exchange, or sale of all or substantially all of the assets of the Company;

(g) the dissolution or liquidation, in whole or in part, of the Company, or the institution of proceedings to have the Company adjudicated bankrupt or insolvent;

(h) the filing of a petition seeking or consenting to reorganization or relief under any applicable federal or state bankruptcy law;

(i) consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property;

(j) authorizing any transaction, agreement or action on behalf of the Company that is unrelated to or inconsistent with its business purpose or would make it impossible for the Company to carry on the ordinary business of the Company or to change the business purpose of the Company;

(k) the admission of any new Member;

(l) the hiring or firing of any managerial-level (exempt) position; or

(m) amending the Certificate of Formation.

Section 3.05 <u>(Intentionally blank)</u>.

Section 3.06    <u>Insurance</u>.  The Company will purchase and maintain insurance on behalf of any person in such person's official capacity with the Company against any liability asserted against and incurred by such person in or arising from that capacity with the Company, whether or not the Company would otherwise be required to indemnify the person against the liability.  In addition, the Company may elect to purchase and maintain key-person life insurance on each Member (or principal owner of a Member), and to the extent the Company elects to purchase any such life insurance, each Member agrees to provide reasonable assistance and cooperation related to the Company's acquisition of such policies. The Company shall purchase and maintain insurance coverage as required under any contract to which the Company becomes bound.

Section 3.07    <u>Contracts with Officers or their Affiliates</u>.  No contract or transaction between the Company and an Officer, or their Affiliates or between the Company and any other entity in which an Officer or Affiliate has a material financial interest will be void or voidable or require the Officer to account to the Company or hold as trustee for it any profit or benefit derived therefrom solely for this reason *provided* (i) that the terms of the contract or transaction are or were commercially reasonable, (ii) are or were no less favorable to the Company than could be or could have been obtained from an unaffiliated third party and (iii) are disclosed to and approved  by the Members prior to the execution and consummation of such contract or transaction.

Section 3.08    <u>Reimbursement</u>.  McCoy shall be reimbursed for overhead allocable to the Company or to the business of the Company, which shall include, but not be limited to, the payment for employees of McCoy who perform work for the Company and expenses incurred by McCoy for the Company. Should McCoy delegate any of its duties to the Company to any entity or person, McCoy shall make the required payment to that entity or person for performing such duties, and shall be entitled to prompt reimbursement from the Company for such services.

Section 3.09    <u>Removal of Manager.</u> A Manager may be removed by the majority vote of the Percentage Interests of the Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Member.

Section 3.10    <u>Resignation of Manager.</u>    A Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Member. Upon resignation by the Manager, the Members may appoint a new Manager by a majority vote of the Percentage Interests of the Members.

ARTICLE IV
<u>UNITS, CAPITAL ACCOUNTS AND CONTRIBUTIONS</u>

Section 4.01    <u>Units</u>.

(a)    <u>Generally</u>.  The relative rights, powers, preferences, duties, liabilities and obligations of the Members will be as set forth herein.  Each Member's interest in the Company, including such Member's interest in income, gains, losses, deductions and

5

expenses of the Company, will be represented by issued and outstanding Units, which may be divided into one or more types, classes or series, or subseries of any type, class or series, with each type, class or series, or subseries thereof, having the rights and privileges, including voting rights, if any, set forth in this Agreement.  The Company may (but need not) issue certificates representing the Units.   The Company may issue fractional Units.

(b)     Class of Units. As of the date hereof, the Company has one class of Units. The Members will have voting rights, and rights with respect to Profits and Losses of the Company and Distributions from the Company as are set forth herein.  Units issuable hereunder in exchange for services are intended to be treated as "profits interests" for United States federal income tax purposes under Revenue Procedures 93-27 and 2001-43 and the provisions of this Agreement will be interpreted and applied in a manner consistent therewith.

(c)     Members.  The Schedule of Members attached hereto lists the Members, the initial Capital Contribution made by each Member, and each Member's Percentage Interest.  Any reference in this Agreement to the Schedule of Members will be deemed a reference to the Schedule of Members as amended in accordance with this Agreement and in effect from time to time.

Section 4.02     Capital Contributions.     No Member will be obligated to make any additional Capital Contributions following the date hereof, except as provided in this Section 4.02. A Member may agree (but will not be obligated) to make additional Capital Contributions as is necessary. Each Member agrees to make Capital Contributions to the Company as follows: each Member who has not already done so shall contribute $2,500 in cash to the Company promptly following the date of this Agreement.

Section 4.03     Capital Accounts.

(a)     In General.  A separate capital account (each a "Capital Account") will be established on the books and records of the Company in compliance with Section 704(b) of the Code and the Treasury Regulations.  This Section 4.03 and the other provisions relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b) and will be interpreted and applied in a manner consistent with such Treasury Regulation.

(b)     Transfer of Capital Accounts.   Unless otherwise agreed upon by the Members, the transfer of a Member's Units shall not transfer that Member's Capital Account.

(i) Execution of this Agreement; Transfer of Units. Upon the execution of this Agreement, the transfer of any Units from Oliver or Drew to McCoy shall not affect the Capital Accounts of Drew or McCoy. The effect of the Oliver Transfer shall be that the Capital Accounts of both Drew and McCoy shall be deemed to be in an amount of $2,500. Any Capital Contributions made after the Oliver Transfer and the execution of this

6

Agreement shall be Additional Capital Contributions which increase the contributing Member's Capital Account above $2,500.

Section 4.04    No Right to Return of Capital Contributions.  No Member will have the right to the withdrawal or the return of such Member's Capital Contributions except to the extent set forth in Section 7.02 herein upon liquidation of the Company or as provided in Section 5.01.

Section 4.05    No Interest or Salary.  No Member will receive any interest, salary, or drawing with respect to such Member's Capital Contributions or such Member's Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise provided in this Agreement.

(a)    Salary.    Drew shall be paid $175,000 base salary, which shall be characterized as a guaranteed payment for partnership tax purposes and will not be characterized as a return of a Member's Capital Contribution.  Payment of the salary will be made on twice-per month basis, and is subject to the Company having sufficient Net Cash Flow; it being understood that the compensation will be reviewed and approved annually by the Members and may include incentive performance plans adopted by the Members. The Company shall also provide: (a) Any benefits provided to employees of the Company, including healthcare benefits and (b) a simple IRA account, or something equivalent, with a match by the Company of 3%.

Section 4.06    Loans to Company.  A Member may lend money to the Company from time to time, if authorized by the Members, in which case any such loan will be evidenced in a demand promissory note.  Any such loan will not be treated as a Capital Contribution for any purpose and will not entitle the Member to any increase in such Member's interest.  The Company will be obligated to such Member for the amount of any such loan, with interest thereon at the rate of five percent (5%) over the prime rate as may be announced by Wall Street Journal from time to time, or at such other rate as may have been agreed upon by such Member and the Members.  Any payment or offer to the Company by a Member which is not an agreed upon Capital Contribution will be deemed a loan to the Company.  In no event will a Member's ownership interest in the Company be adjusted without an amendment to the Schedule of Members.

Section 4.07    No Repayment Liability.  No Member will be personally liable for the repayment of any Capital Contributions of any other Member, or to restore a deficit balance in its Capital Account.

ARTICLE V
DISTRIBUTIONS AND ALLOCATIONS

Section 5.01    Distributions.  Distributions will be made only in accordance with the applicable provisions of this Section 5.01.

(a)    Net Cash Flow.  The Members may through a vote as established under Section 6.02 (but will not be obligated to) cause the Company to make Distributions of Net Cash Flow at any time or from time to time in the order of priority and to the extent specified as follows:

7

      (i)     If the Unreturned Capital Contributions of the Members are not equal, the Company shall make Distributions to the Member with the highest Unreturned Capital Contributions only until the Unreturned Capital Contributions of the Members are equal.

      (i)     (ii)     If the Unreturned Capital Contributions of the Members are equal, the Company shall make Distributions to the Members pro rata, in proportion to their respective Percentage Interests.

      (iii)     The Members may also through a vote as established under Section 6.02 (but will not be obligated to) make Distributions of Net Cash Flow at least annually of an amount estimated to equal the federal and state income taxes payable by an individual resident of the State of Louisiana in respect of the taxable income of the Company. Such Distributions will be made to the Members pro rata, in proportion to their respective Percentage Interests.

      (b)     <u>Liquidity Event Distributions</u>. Subject to the provisions of this Article V, the Members will cause the Company to make Distributions from the proceeds from a Liquidity Event to the Members in the following order of priority:

      (i)     First, to the Members in proportion to and to the extent of their Unreturned Capital Contributions; and

      (ii)     Second, to the Members pro rata, in proportion to their respective Percentage Interests.

      (c)     <u>Limitations on Distributions</u>. Notwithstanding any provision of this Article V, the Company will not make a Distribution to any Member if such Distribution would violate any provision of the Act.

      Section 5.02     <u>No Distribution upon Withdrawal</u>. No withdrawing Member will be entitled to receive any Distribution of the value of such Member's interest in the Company as a result of withdrawal from the Company prior to the liquidation of the Company, except as specifically provided in this Agreement.

      Section 5.03     <u>No Other Distributions of Capital</u>. Except as expressly provided in <u>Articles V</u> and <u>VII</u> of this Agreement or as otherwise agreed upon by the Members, no Member will be entitled to withdraw capital or to receive Distributions of or against capital without the prior written consent of, and upon the terms and conditions agreed upon by, the other Members. No Member will have the right to demand property other than cash in return for its Capital Contribution.

      Section 5.04     <u>Withholding</u>. The Company is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any applicable law. For all purposes under this Agreement, any amount so withheld will be treated as actually distributed to the Member with respect to which such amount was withheld. If the Company is required by law to make any payment to a taxing authority that is specifically

attributable to a Member or a Member's status as such (including federal withholding taxes, state personal property taxes, and state unincorporated business taxes), then such Member will indemnify and contribute to the Company in full for the entire amount paid (including interest, penalties and related expenses). The Members may offset Distributions to which a Member is otherwise entitled under this Agreement against such Member's obligation to indemnify the Company under this Section 5.04. A Member's obligation to indemnify and make contributions to the Company under this Section 5.04 will survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section 5.04, the Company will be treated as continuing in existence.

Section 5.05. Allocations. Profits and Losses, and items of income, gain, loss, deduction and credit, will be allocated among the Members in accordance with Exhibit B.

ARTICLE VI
MEMBERS

Section 6.01    Admission of Additional Members. Subject to compliance with the other terms of this Agreement, the Members will have the right at any time and from time to time to authorize and cause the Company to issue additional Units of the Company, in which event, the Members will have the power to amend this Agreement and/or the Schedule of Members to reflect such additional issuances and dilution and to make any such other amendments as they deem necessary or desirable to reflect such additional issuances, without the approval or consent of any other Person; provided, that the Members will cause a copy of any such amendment to this Agreement and/or Schedule of Members to be provided promptly to each Member. Any Person who acquires Units may be admitted to the Company as an Additional Member. In connection with any issuance of Units, the Person who acquires such Units will execute a counterpart to this Agreement accepting and agreeing to be bound by all terms and conditions hereof, and will enter into such other documents, instruments and agreements to effect such purchase and evidence the terms and conditions thereof (including transfer restrictions, vesting and forfeiture or buyback provisions) as are required by the Members. Each Person who acquires Units will, in exchange for such Units, make a Capital Contribution to the Company in an amount to be determined by the existing Members in their sole discretion (which amount may be zero).

Section 6.02    Acts of Members Generally. The Members shall act through meetings and written consents as described in this Section 6.02. Except as otherwise provided herein and as otherwise required by applicable law, the Members shall be entitled to one vote per Unit held by such Member on all matters to be voted on by the Members. The actions by the Members permitted hereunder may be taken at a meeting called by the Members holding at least a majority of the Units entitled to vote or consent on the matter on at least three days' prior written notice to the other Members entitled to vote or consent thereon, which notice shall state the purpose or purposes for which such meeting is being called. A majority of the voting power of the Members shall constitute a quorum sufficient for conducting meetings and making decisions. The act of a majority of the voting power of the Units present at a meeting at which a quorum is present shall be the act of the Members. The actions taken by the Members entitled to vote or consent at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Members entitled to vote or consent as to whom it was improperly held signs a

9

written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof. The actions by the Members entitled to vote or consent may be taken by vote of the Members entitled to vote or consent at a meeting by written consent (without a meeting and without a vote) so long as such consent is signed by the Members having not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the action so taken without a meeting shall be given to those Members entitled to vote or consent who have not consented in writing. Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof.

Section 6.03   Proxies. A Member may cast or authorize the casting of a vote by filing a written appointment of a revocable proxy with the other Members at or before the meeting at which the appointment is to be effective. The Member may sign or authorize the written appointment by telegram, cablegram, or other means of electronic transmission stating, or submitted with information sufficient to determine, that the Member authorized the transmission. Any copy, facsimile, telecommunication, or other reproduction of the original of either the writing or the transmission may be used in lieu of the original, if it is a complete and legible reproduction of the entire original. Any holder of a proxy shall agree to maintain in confidence information acquired in connection with his or her activities as a proxy.

Section 6.04   No Right of Partition. No Member shall have the right to seek or obtain partition by court decree or operation of law of any the Company property, or the right to own or use particular or individual assets of the Company.

Section 6.05   Limitation of Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company; provided that a Member shall be required to return to the Company any Distribution made to it in clear and manifest accounting or similar error. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company, except to the extent constituting fraud, willful misconduct or a violation of the express terms of this Agreement by such Members. No amendment or repeal of this Section 6.05 shall have any effect on a Person's rights under this Section 6.05 with respect to any act or omission occurring prior to such amendment or repeal.

Section 6.06   Other Activities of Members and Manager. Except as may be otherwise specifically provided in a written agreement between the Company and a Member, the Members and Manager may participate in other business ventures, whether or not similar to the business of the Company, and neither the Company nor any other Member shall have a claim against any profits or other interest with respect to such ventures.

## ARTICLE VII
## DISSOLUTION AND TERMINATION

Section 7.01    Dissolution upon Specific Events.  The Company will be dissolved and its affairs will be wound up upon the happening of any of the following events (each, a "Dissolution Event"):

(a)    the voting Members' approval of dissolution; or

(b)    the entry of a decree of judicial dissolution of the Company under the Act.

Except as otherwise set forth in this Article VII, the Company is intended to have perpetual existence.  The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company will not cause a dissolution of the Company and the Company will continue in existence subject to the terms and conditions of this Agreement.

Section 7.02    Liquidation and Winding Up.

(a)    Upon the occurrence of a Dissolution Event, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member will take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs; provided, however, that all covenants contained in this Agreement and obligations provided for in this Agreement will continue to be fully binding upon the Members until such time as the Company Property has been distributed pursuant to this Section 7.02.

(b)    The Members and/or the Manager will be responsible for overseeing the prompt and orderly winding up and dissolution of the Company.  The Members and/or Manager will take full account of the Company's liabilities and Company Property and will cause the Company Property or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(i)    First, to creditors (including Members who are creditors, to the extent permitted by law) in satisfaction of all of the Company's liabilities (whether by payment or the making of reasonable provision for payment thereof), in the order of priority as provided by law;

(ii)    Second, to the establishment of any reserves deemed necessary by the Members for any contingent liabilities or obligations of the Company; and

(iii)    Third, to the Members, in accordance with Section 5.01(b).

Section 7.03    Deficit Capital Accounts.  No Member will be required to pay to any other Member or the Company any deficit or negative balance which may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

Section 7.04    Rights of Members.  Except as otherwise provided in this Agreement, each Member will look solely to the Company Property for the return of its Capital Contribution and has no right or power to demand or receive Company Property other than cash from the Company.  If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members will have no recourse against the Company or any other Member, Governor, Officer or Partnership Representative.

Section 7.05    Allocations during Period of Liquidation.  During the period commencing on the first day of the Fiscal Year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Members pursuant to Section 7.02 (the "Liquidation Period"), the Members will continue to share Profits, Losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Exhibit B.

Section 7.06    Character of Liquidating Distributions.  All payments made in liquidation of the interest of a Member in the Company will be made in exchange for the interest of such Member in Company Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

ARTICLE VIII<br>FINANCIAL STATEMENTS, BOOKS AND BANK ACCOUNTS

Section 8.01    Books and Records.

(a)    The Company will, and will cause each of its Subsidiaries to, keep books of record and account in which full, true and correct entries are made of all of its and their respective dealings, business and affairs, in accordance with generally accepted accounting principles.  The books and records of the Company shall be kept at a location chosen by the Manager, which can be within or without the State of Delaware.

(b)    Each Member and its duly authorized representatives may, in connection with any purpose reasonably related to its interest as a Member, visit and inspect any of the properties of the Company and any of its Subsidiaries, examine their books of account, records, reports and other papers, make copies and extracts therefrom, and request information relating to the affairs, finances and accounts of the Company and any of its Subsidiaries from any independent public accountants of the Company (and by this provision the Company authorizes said accountants to provide information to each Member regarding the finances and affairs of the Company and any of its Subsidiaries), all at such reasonable times and as often as may be reasonably requested.

(c)    The books and records of the Company and its Subsidiaries will be kept on the accrual basis of accounting, and the accrual basis of accounting will be followed by the Company for federal income tax purposes.  The fiscal year of the Company and its Subsidiaries will end on December 31 of each year.

(d)    The general bookkeeping and financial reporting of the Company and its Subsidiaries shall be provided to the Company by the Members or by a third-party

appointed by the Members.  The Company will be responsible to employ personnel or retain third parties to provide.

Section 8.02    Tax Information.  Within a reasonable time after the end of each Fiscal Year, the Company will deliver to each Person who was a Member at any time during such Fiscal Year a Schedule K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain or loss and credits for such Fiscal Year for federal or state income tax purposes.  Within a reasonable time after the end of each Fiscal Year, and otherwise upon each Member shall provide the other Member with copies of the Member's federal income tax return, personal financial statement, and a copy of a recent credit report regarding the credit rating of such Member or its owner.

Section 8.03    Tax Elections.  Subject to Section 8.04, the Members will make all tax elections.

Section 8.04    Tax Audits.  The Manager will designate the "partnership representative" to act pursuant to Sections 6221 through 6241 of the Code (and comparable provisions of state and local law) (the "Partnership Audit Rules"), and in such capacity such Person will represent the Company in all disputes, controversies or proceedings with the Internal Revenue Service or other applicable taxing authorities (any such Person, the "Partnership Representative").  The Partnership Representative will be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds the settlement or other resolution of examinations, audits and other proceedings, as well as for professional services and other expenses reasonably incurred in connection therewith.  In accordance with the foregoing, the Partnership Representative will be entitled to take any and all actions authorized pursuant to the Partnership Audit Rules (including, acting on behalf of the Company in any partnership examinations, audits or other proceedings and causing the Company to elect out of the partnership audit rules and procedures set forth in the Partnership Audit Rules).  Each Member agrees to cooperate with the Company and to do or refrain from doing any or all things reasonably requested by the Company with respect to the conduct of such proceedings.  If (a) the Company becomes liable for any taxes, interest or penalties under Section 6225 of the Code or under any analogous provision of state, local, or foreign law and (b) the amount of such tax liability that is allocable to a Person that was a Member of the Company for all or a portion of the taxable year to which such liability relates (a "Reviewed Year Member"), including any associated interest and penalties, as reasonably determined by the Members, taking into account (i) the Reviewed Year Member's share of the Profits or Losses, of specially allocated, individual items of Company income, gain, deduction, and loss, and of credits to which such adjustment and imputed underpayment relate and (ii) other relevant information (for example, the Reviewed Year Member's obligation (if any) to indemnify, defend, or hold harmless the Company or any other Member for some or all of such adjustment and imputed underpayment (and any associated interest and penalties) or the Reviewed Year Member's obligations and liabilities (if any) arising from or related to the Reviewed Year Member's representations, warranties, and covenants pursuant to this Agreement), exceeds the amount of Company funds that otherwise would be then distributable to the Reviewed Year Member, notwithstanding any other provision of this Agreement, the Reviewed Year Member will contribute to the Company at least three (3) business

13

days prior to the due date of the Company's payment the amount of funds required (*i.e.*, the full amount of the payment with respect to the Reviewed Year Member if no Company funds would be then distributable to the Reviewed Year Member or the amount by which the amount of the payment with respect to the Reviewed Year Member exceeds the amount of Company funds that otherwise would be then distributable to the Reviewed Year Member) to allow the Company to satisfy fully and timely its obligation to pay such taxes, interest, or penalties under Section 6225 of the Code or under any analogous provision of state, local, or foreign law. In addition, each of the Partnership Representative and the Member is authorized to withhold from distributions, if any, then otherwise to be made to one or more of the Reviewed Year Members and to pay to any such taxes, interest, or penalties under Section 6225 of the Code or under any analogous provision of state, local, or foreign law. Any amount withheld or paid with respect to a Reviewed Year Member pursuant to this <u>Section 8.04</u> shall be treated as an amount distributed to such Reviewed Year Member for all purposes under this Agreement. Each Reviewed Year Member shall furnish the Partnership Representative with such information as the Partnership Representative may reasonably request to permit the Partnership Representative to perform the Partnership Representative's duties under the Code. The Partnership Representative will keep the Members informed of the progress of any examinations, audits or other proceedings. Promptly following the written request of the Partnership Representative, the Company will, to the fullest extent permitted by law, reimburse and indemnify the Partnership Representative for all reasonable expenses, including reasonable legal and accounting fees, consulting fees (as approved by the Manager), claims, taxes, liabilities, losses and damages incurred by the Partnership Representative in connection with any administrative or judicial proceeding (i) with respect to the tax liability of the Company and/or (ii) with respect to the tax liability of the Members (or former Members) in connection with the operations or activities of the Company. Drew Zarallo (or his designee) shall be the Partnership Representative, unless otherwise agreed by the Manager. The Partnership Representative may be removed by the Manager. This <u>Section 8.04</u> will survive the termination of this Agreement, the dissolution of the Company and the termination of a Member's interest in the Company.

ARTICLE IX
<u>AMENDMENT OF AGREEMENT</u>

This Agreement may be amended by unanimous consent of the Members.

ARTICLE X
<u>TRANSFERS OF UNITS</u>

Section 10.01    <u>Transfers of Units</u>.

(a)    <u>General Restriction on Transfer</u>. No Member may Transfer all or any portion of such Member's Units (or any other right or interest in such Units), except (i) in a Permitted Transfer, (ii) with the prior written majority consent of the Members (which consent may be withheld for any or no reason) or (iii) as otherwise provided in this <u>Article X</u>.

(b)    <u>Substituted Members</u>. In connection with the Transfer of a Unit permitted under the terms of this Agreement, the transferee shall only become and be admitted to

the Company as a Member (a "Substituted Member") in respect of such Units on the later of (i) the effective date of such Transfer and (ii) the date the transferee and transferor have complied with (and delivered any materials required by) the applicable transfer provisions of this Agreement and the Members approves the admission of the Transferee as a Substituted Member as provided in in this Section 10.01(b).

(c)    Termination of Rights.  Any Member who will assign any Units or other interest in the Company will cease to be a Member with respect to such Units or other interest and will no longer have any rights or privileges of a Member with respect to such Units or other interest.

(d)    Deemed Agreement.  Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, will be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in the Company of such Person was subject to or by which such predecessor was bound.

(e)    Transfer Fees and Expenses.  The transferor and transferee of any Units or other interest in the Company will be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

(f)    Void Transfers.  Any Transfer by any Member of any Units or other interest in the Company in contravention of this Agreement (including the failure of the Transferee to execute a counterpart to this Agreement) or which would cause the Company to not be treated as a partnership for U.S. federal income tax purposes will be void and ineffectual and will not bind or be recognized by the Company or any other party.  No purported assignee will have any right to any Profits, Losses or Distributions of the Company.

(g)    Withdrawal of Member.  Notwithstanding any other provision of this Agreement to the contrary, any Member may at any time give 30 days' written notice to the Company and all other Members of the Member's intent to withdraw from the Company.

(1) Withdrawal Within 12 Months. If the notice to withdraw is given within the first 12 months following the execution of this Agreement, the withdrawing Member shall be entitled to no compensation for the Member's Units.

(2) Withdrawal After 12 Months. If the notice to withdraw is given after the first 12 months following the execution of this Agreement, the Member shall be paid the Purchase Price. The Purchase Price shall be paid as follows: ten percent (10%) of the Purchase Price shall be paid by the Company at the closing, with the remaining ninety percent (90%) to be

paid monthly over three (3) years with an interest rate of three percent (3%).

(i) <u>Right of First Refusal.</u>  The non-withdrawing Member(s) shall have the option, but not the obligation to purchase the withdrawing Member's Units. If multiple Members elect to purchase the withdrawing Member's Units, unless otherwise agreed by the purchasing Members, the Members may purchase the Units on a pro rata basis, on the same terms as in <u>Section 10.01(g)(2)</u>. If the non-withdrawing Members do not elect to purchase the withdrawing Member's Units, the Company is obligated to purchase the withdrawing Member's Units.

(h)    <u>Buy-Back.</u> Within the first 36 months following the execution of this Agreement, and upon written notice to McCoy of his intent to purchase, Drew shall have the option to purchase, and if the option is exercised, McCoy shall have the obligation to sell, 20 of McCoy's Units, but only to the extent Drew shall own 50% of the Units in the Company in total. McCoy shall be paid the Purchase Price.

(1) <u>Buy-Back After Termination of 36 Months</u>. 36 months following the execution of this Agreement, any Member may, but is not obligated to, sell its Units to the other Members or to the Company upon notice to the Members or the Company. The purchasing Members or Company shall pay the Purchase Price for the Units.

Section 10.02    <u>Additional Restrictions on Transfer</u>.

(a)    <u>Joinder</u>. Any Person to whom Units are to be Transferred will execute and deliver, as a condition to such Transfer, all documents deemed reasonably necessary by the Company, in consultation with its counsel, to evidence such party's joinder in and to this Agreement.

(b)    <u>Notice</u>. In connection with the Transfer of any Units, the holder of such Units will deliver written notice to the Company describing in reasonable detail the Transfer or proposed Transfer.

(c)    <u>Legal Opinion</u>. No Transfer of Units or any other interest in the Company may be made unless the Member who is Transferring Units furnishes to the Company such assurances as the Members may request, including, without limitation, an opinion of counsel, which opinion and which counsel are satisfactory to the Members, that such Transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the interest to be Transferred, or cause the Company to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended.  Such opinion of counsel will be delivered in writing to the Company prior to the date of the Transfer.

(d)    <u>No Avoidance of Provisions</u>. No Member will directly or indirectly (i) permit the Transfer of all or any portion of the direct or indirect equity or beneficial

16

interest in such Member or (ii) otherwise seek to avoid the provisions of this Agreement by issuing, or permitting the issuance of, any direct or indirect equity or beneficial interest in such Member, in any such case in a manner which would fail to comply with this Article X if such Member had Transferred Units directly.

(e)    Code Section 7704 Safe Harbor.  In order to permit the Company to qualify for the benefit of a "safe harbor" under Code Section 7704, notwithstanding anything to the contrary in this Agreement, no Transfer of any Unit or economic interest will be permitted or recognized by the Company or the Members (within the meaning of Treasury Regulations Section 1.7704-1(d)) if and to the extent that such Transfer would cause the Company to have more than 100 partners (within the meaning of Treasury Regulations Section 1.7704-1(h), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3)).

Section 10.03    Transfer during Taxable Year.  In the case of the Transfer of a Member's Units (or any portion thereof) at any time other than the end of a Fiscal Year, all of the various items of the Company's income, gain, loss, deduction, credit or allowance will be allocated as of the effective date of such Transfer in accordance with this Agreement.  The effective date of a Transfer will be (i) in the case of voluntary Transfer, the effective date stated in the assignment or such other date as is mutually agreed between transferor and transferee or (ii) in the case of an involuntary Transfer, the date of the operative event, but, unless the transferor, transferee and the Company otherwise agree, such effective date will not affect any Distribution made by the Company to the transferor or contributions made by the transferor to the Company prior to the date of notice to the Company of such transfer.

Section 10.04    Sale of Units.  In the case of a sale of the Units, or a merger of the Company with another Person, the consideration payable to the Members will be shared among the Members based on the sale proceeds the Members would have received if the Company had sold its assets for the implied valued of the Company taking into consideration the purchase price for the Units and distributed the net proceeds to the Members in accordance with Section 7.02(b) (after satisfying any liabilities of the Company).

Section 10.05    Repurchase Option Upon Involuntary Transfer.

(a)    If all or any part of a Member's Units are Transferred in an Involuntary Transfer to any Person other than the Company, for any reason, the Company will have the right to purchase the Units so Transferred within 180 days of the date upon which the Company first received actual notice of the Transfer by giving written notice to the Member whose Units are subject to Involuntary Transfer and, if known, the Transferee, within the 180-day period.  The purchase price for such Units will be equal to the Purchase Price of the Units and the terms of such purchase will be as set forth in this Section 10.05.

(b)    If the Company exercises the right to purchase the Units of any Member pursuant to this Section 10.05, then unless otherwise agreed upon by the Member, the Assignee and the Company, the closing will take place at the offices of the Company on the 45th business day after the date the notice of purchase by the Company is received by

the Member and the Assignee (or, if applicable, the date of determination of the Fair Market Value of the Units). At the closing (except as otherwise provided herein), the Company, upon such Member's and Assignee's delivery to the Company of valid assignments or other agreements properly assigning the Units then being purchased, will pay twenty percent (20%) of the Purchase Price to the Member or Assignee, appropriate, in cash, and deliver a promissory note for the balance, which shall be payable in four (4) equal annual payments of principal and interest per annum at one (1) point above prime rate as reported in the Wall Street Journal on the date of the closing compounded quarterly. By delivery of proper assignment documents assigning the Units to the Company, such Member and the Assignee will be deemed to represent and warrant to the Company that the Transferred Units are owned by such Person free and clear of all liens, claims and encumbrances. The Member and Assignee will promptly perform, whether before or after such closing, such additional acts (including executing and delivering additional documents) as are reasonably required by either such party to effect more fully the transactions contemplated by this Section 10.05.

ARTICLE XI<br>MISCELLANEOUS

Section 11.01    Power of Attorney. Each of the undersigned does hereby constitute and appoint the Manager with full power to act without the others (subject to the provisions of Article III), as such Member's true and lawful representative and attorney-in-fact, in such Member's name, place and stead, to make, execute, sign, acknowledge and deliver or file in such form and substance as is approved by the Members (a) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Company, or to qualify or continue the qualification of the Company in the State of Delaware and in all jurisdictions in which the Company may conduct business or own property, and any amendment to, modification to, restatement of or cancellation of any such instrument, document or certificate, (b) all instruments, documents and certificates which the Members will deem appropriate to reflect any amendment, change, modification, or restatement of this Agreement approved in accordance with the terms hereof and, if applicable, or any other action or change permitted by this Agreement, (c) all conveyances and other instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Company approved in accordance with the terms of this Agreement and (d) all instruments relating to the admission, withdrawal, or substitution of any Member in accordance with the terms hereof. The powers of attorney granted herein will be deemed to be coupled with an interest, which will be irrevocable, and will survive the death, disability, incompetency, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of such Member's Units, and will extend to such Member's heirs, successors, assigns, and personal representatives.

Section 11.02    Further Assurances. The parties will execute and deliver all documents, instruments, and certificates, provide all information, and take or refrain from taking all such further actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement and effect the provisions hereof, as determined in the sole discretion of the Members.

Section 11.03    Notices. Except as provided in this Agreement, any and all notices, consents, waivers, directions, requests, votes or other instruments or communications provided

18

under this Agreement will be in writing, signed by the parties giving the same and will be deemed properly given if sent by regular mail, by overnight courier service, by facsimile, or by hand delivery, addressed as follows:

       (a)     in the case of the Company, to the Company at its principal executive office; or

       (b)     in the case of any Member, to the address of the Member as shown on the Schedule of Members.

Any such notice will be deemed to be effective as of the date on which it was mailed (if mailed or sent by overnight courier) or received (in the case of facsimile or hand delivery service). Each Member may specify any other address for the receipt of such instruments or communications.

Section 11.04    Governing Law.  All questions with respect to the construction of this Agreement and the rights and liabilities of the Members will be determined in accordance with the applicable provisions of the laws of the State of Delaware without regard to the principles of conflicts of law.

Section 11.05    Binding.  This Agreement will be binding upon and inure to the benefit of all of the parties hereto and their assigns, successors in interest, personal representatives, estates, heirs and legatees.

Section 11.06    Survival.  Sections 5.04, 6.05 and 8.04 will survive and continue in full force in accordance with their respective terms notwithstanding any termination of this Agreement or the dissolution of the Company.

Section 11.07    Interpretation.  When the context in which words are used in this Agreement indicates that such is the intent, singular words will include the plural and vice versa and masculine words will include the feminine and neuter genders and vice versa.

Section 11.08    Validity.  If any provision of this Agreement is held to be invalid, the provision will be enforced to the extent not so invalid, and no such provision will affect, in any respect whatsoever, the validity of the remainder of this Agreement.

Section 11.09    Title to the Company Assets.  The Company assets will be deemed to be owned by the Company as an entity, and no Member, individually or collectively, will have any ownership interest in such the Company assets or any portion thereof.  Legal title to any or all the Company assets may be held in the name of the Company or one or more nominees, as the Members may determine.

Section 11.10    Captions.  Any article, section or paragraph titles or captions contained in this Agreement are for convenience only and will not be deemed a part of the text of this Agreement.

Section 11.11    Agreement and Counterparts.  This Agreement may be executed in several counterparts (and delivered by facsimile, "pdf" or other electronic means) and all so executed will

constitute one and the same agreement binding upon all of the parties hereto, notwithstanding that all parties are not signatory to the original or the same counterpart.

Section 11.12    Entire Agreement.    This Agreement contains the entire understanding among the Members and supersedes any prior written or oral agreement between or among them respecting the subject matter of this Agreement.    There are no representations, agreements, arrangements or understandings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed herein and in the Company's Articles.

Section 11.13    Mutual Waiver of Jury Trial.    BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.    THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.    EACH OF THE PARTIES TO THIS AGREEMENT AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 11.14    Acknowledgement.    Upon execution and delivery of a counterpart to this Agreement or a joinder to this Agreement, each Member (including an additional Member) shall be deemed to acknowledge to the Company and each other Member as follows:    (a) the determination of such Member to acquire Units pursuant to this Agreement or any other agreement has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Member or any of their Affiliates or by any agent or employee of any other Member or any of its Affiliates, and (b) no other Member has acted as an agent of such Member in connection with making its investment hereunder and no other Member shall be acting as an agent of such Member in connection with monitoring its investment hereunder.

* * * * *

IN WITNESS WHEREOF, the parties hereto have signed and acknowledged this Operating Agreement as of the date and year first above written.

By: *Drew Zarallo*
Drew Zarallo (Aug 16, 2021 17:30 CDT)

Drew Zarallo

By: _____ Equity
Joshua McCoy as Member of McCoy Holdings

[SIGNATURE PAGE TO OPERATING AGREEMENT OF COGENT RENEWABLES, LLC]

## SCHEDULE OF MEMBERS

| Member | Contribution* | Percentage Interest | Units |
|---|---|---|---|
| DREW ZARALLO<br>1117 MACGREGOR LN<br>GUNTER, TX 75058<br>(772) 361-9067 | $2,500 cash | 30% | 30 |
| MCCOY EQUITY HOLDINGS, LLC<br>3045 WESTFORK DRIVE<br>BATON ROUGE, LOUISIANA 70816 | $50,000 | 70% | 70 |
| TOTAL | $52,500 | 100% | 100 |

\* Contributions to be made as provided in Section 4.02 and in accordance the contribution agreements of each Member dated as of the date of this Agreement.

Schedule of Members of Cogent Renewables, LLC

**EXHIBIT A**
**DEFINITIONS**

"Act" has the meaning set forth in the Recitals.

"Additional Capital Contributions" means, with respect to each Member, the Capital Contributions made by such Member pursuant to Section 4.02. In the event Units are Transferred in accordance with the terms of this Agreement, Section 4.03(b) and Section 4.03(b)(i) shall govern the transfer of Capital Contributions and Capital Accounts.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

1. Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

2. Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and will be interpreted consistently therewith.

"Affiliate" means with respect to any Person, any other Person which is controlling, controlled by, or under common control with (directly or indirectly through any Person) the Person referred to, and, if the Person referred to is a natural person, a Family Member of such Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning provided in the Preamble.

"Allocation Year" means (i) the period commencing as of the date hereof and ending on December 31, 2021, (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clauses (i) or (ii) for which Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Exhibit B hereof.

"Articles" means the Company's Certificate of Formation as filed with the Secretary of State of Delaware, as amended from time to time.

"Assignee" means a Person to whom Units have been Transferred in accordance with the terms of this Agreement and the other agreements contemplated hereby, but who has not become a Member pursuant to Article X.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the provisions of Section 4.03 hereof.

"Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any Company Property (other than money) contributed to the Company with respect to the Units in the Company held or purchased by such Member, including Additional Capital Contributions.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Company" has the meaning provided in the Recitals.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Company Property" means all real and personal property acquired and operated by the Company and any improvements thereto, and will include both tangible and intangible property.

"Depreciation" means, for each Allocation Year of the Company, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

"Dissolution Event" has the meaning provided in Section 7.01.

"Distribution" means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise; provided that none of the following will be a Distribution: (i) any redemption or repurchase by the Company of any securities of the Company in connection with the termination of employment of an employee of the Company or any of its Subsidiaries or any service provider of the Company or any of its Subsidiaries, and (ii) any recapitalization, exchange or conversion of securities of the Company, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any outstanding Units.

(a)    "Fair Market Value" of any asset as of any date means the purchase price which a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction provided that the "Fair Market Value" of any Unit at any time is the aggregate amount that the holder of such Unit would receive by reason of such Unit if the assets of the Company were sold, as a going concern, for their Fair Market Value in cash and the proceeds of such sale (after repayment of all indebtedness of the Company and a deduction for expenses that would reasonably be expected to be

incurred by a seller in such a sale) were distributed to the holders of Units in accordance with Section 7.02. The "Fair Market Value" of any Units will be determined by the Company. The Company may, but is not obligated to, engage an independent professional appraiser. Such independent professional appraiser will determine the fair market value of the assets of the Company taken as a whole as if sold on a going concern basis pursuant to an arms-length transaction. All costs associated with the appraisal will be borne by the Member or Assignee, as applicable.

"Family Member" means, as applied to any Person who is an individual, such individual's spouse, parent, sibling, child, grandchild or other descendent thereof (whether natural or adopted) and each trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity created for the exclusive benefit of the individual or one or more of such Persons.

"Financial Rights" means the right to share in Profits and Losses and the right to receive Distributions in accordance with the terms of this Agreement.

"Fiscal Year" means the 12-month period ending on December 31, or such other annual accounting period as may be established by the Members or as required by the Code.

"Governance Rights" means all of a Member's rights as a Member in the Company (including voting rights) other than (i) Financial Rights and (ii) the right to assign Financial Rights.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

1.    The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the Members and the contributing Member;

2.    The Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by the Members as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution or services; (B) the Distribution by the Company to a Member of more than a *de minimis* amount of Company Property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; and (D) such other times as the Regulations may permit, provided that an adjustment described in clauses (A), (B) or (D) of this paragraph will be made only if the Members reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

3.    The Gross Asset Value of any item of Company assets distributed to any Member will be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of Distribution as determined by the Members; and

4.      The Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations and subparagraph (vi) of the definition of "Profits" and "Losses" or Section 1.02(g) of Exhibit B; provided, however, that Gross Asset Values will not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (ii) or (iv), such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Involuntary Transfer" means a Transfer (other than a Permitted Transfer) resulting from the death of a Person or any other Transfer by operation of law, including a Transfer resulting from a bankruptcy or other insolvency proceeding, termination of existence of an entity, divorce or legal incapacity.

"Issuance Items" has the meaning provided in Exhibit B.

"Liquidation Period" has the meaning provided in Section 7.05.

"Liquidity Event" means each of the following: (a) the sale, exchange, Transfer or other disposition of majority of the Units with any other Person that is not a Member or an Affiliate of a Member; (b) a sale or other disposition of all or substantially all of the assets of the Company; (c) the liquidation, dissolution or winding up of the Company by means of any transaction or a series of related transactions with any other Person that is not a Member or an Affiliate of a Member; or (d) any consolidation or merger of the Company with or into any other Person that is not a Member or an Affiliate of a Member, or any other Company reorganization, in which the Members immediately prior to such consolidation, merger or reorganization own equity interests of the entity surviving such merger, consolidation or reorganization representing less than fifty percent (50.0%) of the combined voting power of the outstanding securities of such entity immediately after such consolidation, merger or reorganization.

Liquidity Event shall not include the Oliver Transfer.

"Member" or "Members" has the meaning provided in the Preamble. The Members and their holdings are identified on the Schedule of Members attached hereto.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Net Cash Flow" means the gross cash proceeds from the Company's operations (other than cash funds obtained as Capital Contributions and cash funds obtained from loans to the

Company and excluding the proceeds of a Liquidity Event), less the portion thereof used to pay or establish reserves for expenses and fees (including fees, expenses and reimbursements paid to a Member) ordinary and necessary to the Company's business, principal and interest payments on all Company debt (including Member loans), capital improvements, replacements and contingencies. Net Cash Flow will not be reduced by depreciation, amortization or other similar non-cash allowances, and will be increased by any reductions in reserves which, when previously established, reduced Net Cash Flow.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Officer" means a person elected, appointed, or otherwise designated as an Officer of the Company by the Members, and any other person considered elected as an Officer pursuant to the Act.

"Oliver Transfer" means the transfer of Units to McCoy from Drew and former member Oliver resulting in Drew owning 30 Units and McCoy owning 70 Units.

"Partner Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Partnership Audit Rules" has the meaning provided in Section 8.04.

"Partnership Representative" has the meaning provided in Section 8.04.

"Percentage Interest" means, with respect to each Member, the percentage determined by dividing the total number of Units held such Member by the total number of issued and outstanding Units held by all Members.

"Permitted Transfer" means:

(b)    in the case of a Member that is an entity, (i) any Transfer of Units by such Member to any Affiliate thereof, or (ii) a pro rata Transfer of Units to its equity holders; provided, that any transferee shall become a party to this Agreement and shall be admitted to the Company as a Member; or

(c)    in the case of any Member that is a natural Person, any Transfer without consideration to a Family Member of such Member solely for estate planning purposes; provided that (i) such transferee Family Member agrees to execute a joinder to this Agreement providing that such Family Member is bound by all of the terms and conditions of this Agreement to the same extent that the Transferor was bound with respect to the Transferred Units and shall be admitted to the Company as a Member and (ii) if requested by the Members in its sole discretion,

the Member proposing to make such Transfer shall provide documentation reasonably acceptable to the Company evidencing that such Member has retained and will continue to hold, directly or indirectly, voting and dispositive power with respect to the Units to be Transferred.

"Person" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency or any other entity, whether acting in an individual, fiduciary or other capacity.

"Profits" and "Losses" mean, for each Allocation Year, an amount equal to the Company's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments (without duplication):

1.    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" will be added to such taxable income or loss;

2.    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" will be subtracted from such taxable income or loss;

3.    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses;

4.    Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the Company Property disposed of, notwithstanding that the adjusted tax basis of such Company Property differs from its Gross Asset Value;

5.    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there will be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation;

6.    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Section 1.704-(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses; and

7.     Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 1.02, 1.03 or 1.04 of Exhibit B will not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 1.02, 1.03 or 1.04 of Exhibit B will be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

"Purchase Price" means a sum that is equal to the product that results from multiplying the Member's Units by a multiple of 4 times EBITDA, calculated for the 12-month period ending with the month preceding the month that the notice to withdraw or the notice to purchase is given.

"Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

"Regulatory Allocations" has the meaning provided in Exhibit B.

"Reviewed Year Member" has the meaning provided in Section 8.04.

"Schedule of Members" has the meaning provided in Section 4.01(c).

"Subsidiary" means any corporation, partnership, joint venture, limited liability company, association, or other entity in which such Person owns, directly or indirectly, 50% or more of the outstanding equity securities or interests, the holders of which are generally entitled to vote for the election of the Members of directors or other governing body of such entity.

"Substituted Member" has the meaning provided in Section 10.01(b).

"Transfer" when used as a noun, means any actual or proposed disposition of Financial Rights, Governance Rights or any other right or interest in Units, by any of the following means: any sale, delivery, assignment, gift, bequest, devise, exchange or other transfer of any kind, as well as any pledge, hypothecation or encumbrance.  As used in this Agreement, the term "Transfer," when used as a verb, means the act of making a Transfer, as that term is used as a noun.

"Unit" means a Unit of a Member representing a fractional part of the interests in Profits, Losses and Distributions of the Company held by all Members.

"Unreturned Capital Contributions" means, with respect to any Member, the positive difference, if any, between (i) the total Capital Contributions made by such Member, and (ii) the total Distributions made to such Member.

## EXHIBIT B
## ALLOCATIONS

Section 1.01    Allocation of Profits and Losses.  After giving effect to the special allocations set forth in Section 1.02 of this Exhibit B, and after giving effect to the special allocation in Section 5.06 of the Agreement, all remaining Profits or Losses (and to the extent necessary to achieve the resulting Capital Account balances described below, any allocable items of gross income, gain, loss and expense includable in the computation of Profits and Losses) for any Allocation Year will be allocated among the Members in such a manner as to reduce or eliminate, to the extent possible, any difference, as of the end of such Allocation Year, between (a) the sum of (i) the Capital Account of each Member (as adjusted to reflect all allocations set forth in Section 1.02 this Exhibit B and all contributions and distributions through the end of such Allocation Year), (ii) such Member's share of Company Minimum Gain (as determined according to Treasury Regulations Section 1.704-2(g)) and (iii) such Member's Partner Minimum Gain (as defined in Treasury Regulations Section 1.704-2(i)(2)) and (b) the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to the Company under the Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Gross Asset Value, (ii) satisfy all of its liabilities in cash according to their terms (limited, with respect to each nonrecourse liability (within the meaning of Treasury Regulation Section 1.752-1(a)(2)) to the Gross Asset Value of the assets securing such liability) and (iii) distribute the remaining proceeds pursuant to Section 7.02(b).

Section 1.02    Special Allocations.  The following special allocations will be made in the following order:

(a)    Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Exhibit B, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member will be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations.  Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated will be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations.  This Section 1.02(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and will be interpreted consistently therewith.

(b)    Partner Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Exhibit B, if there is a net decrease in Partner Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member who has a share of the Partner Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, will be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation

Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated will be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This <u>Section 1.02(b)</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and will be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)<u>(d)(4)</u>, 1.704-1(b)(2)(ii)<u>(d)(5)</u>, or 1.704-1(b)(2)(ii)<u>(d)(6)</u> of the Regulations, items of Company income and gain will be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this <u>Section 5.03(c)</u> will be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Exhibit B</u> have been tentatively made as if this <u>Section 1.02(c)</u> were not in the Agreement.

(d)    <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of any Allocation Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member will be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>Section 1.02(d)</u> will be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this <u>Exhibit B</u> have been made as if <u>Section 1.02(c)</u> and this <u>Section 1.02(d)</u> were not in this Agreement.

(e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Allocation Year will be specially allocated to the Members in proportion to the number of Units held by each Member.

(f)    <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for any Allocation Year will be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations.

(g)    <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts as the result of a Distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Members in

accordance with the number of Units held by each Member in the Company in the event Section 1.704-1(b)(2)(iv)(m)(2) of the Regulations applies, or to the Member to whom such Distribution was made in the event Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations applies.

(h)     Allocations Relating to Taxable Issuance of Company Units.  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of Units by the Company to a Member (the "Issuance Items") will be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member will be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(i)     Offsetting Allocations.  If, and to the extent that, any Member is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Member and the Company pursuant to Code Sections 1272-1274, 7872, 483, 482 or 83 or any similar provision now or hereafter in effect, and the Members determines in good faith that any corresponding Profits or Losses of the Member who recognizes such item should be allocated to such Member in order to reflect the Members' economic interest in the Company, then the Members may so allocate such Profits or Losses.

Section 1.03   Curative Allocations.  The allocations set forth in Sections 1.02(a), (b), (c), (d), (e), (f) and (g) and Section 1.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 1.03.  Therefore, notwithstanding any other provision of this Exhibit B (other than the Regulatory Allocations), the Members will make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 1.01 of this Exhibit B.

Section 1.04   Loss Limitation.  Losses allocated pursuant to Section 1.01 may not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Allocation Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 1.01, the limitation set forth in this Section 1.04 will be applied on a Member-by-Member basis and Losses not allocable to any Member as a result of such limitation will be allocated to the other Member in accordance with the positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations.

Section 1.05   Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items will be determined on a daily, monthly, or other basis, as determined by the Members using any permissible method under Code Section 706 and the Regulations thereunder.  To the extent authorized by the Members, the Chief Financial Officer may make any elections available to the Company under Treasury Regulation Section 1.706-4 with respect to methods, conventions, or extraordinary items and this Section 1.05 will be deemed a grant of general authority provided for in a partnership agreement for purposes of Treasury Regulation 1.706-4(f). The Company will maintain dated, written statements regarding elections made under Treasury Regulation 1.706-4 with the Company's books and records.

(b)     The Members are aware of the income tax consequences of the allocations made by this Exhibit B and agree to be bound by the provisions of this Exhibit B in reporting their shares of Company income and loss for income tax purposes.

(c)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Regulations, the Members' interests in Company profits are in proportion to the number of Units held by each Member.

Section 1.06    Tax Allocations: Code Section 704(c).

(a)     In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Company Property contributed to the capital of the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Company Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value).

(b)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)     Allocations under this Section 1.06 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits or Losses or Distributions under any provision of this Agreement.

**EXHIBIT C**

| Name | Primary Duties | Secondary Duties | Salary |
|---|---|---|---|
| Josh McCoy | Manager | | |
| Drew Zarallo | Director of Operations | Partnership Representative | $175,000.00 |

**SCHEDULE 1**

**POTENTIAL PROJECTS**

1.    Grid Resiliency- Army National Guard

2.    Utility Scale Solar Projects- Maryland, Georgia, and Alabama

3.    Distributed Solar Projects- Maryland, Georgia, and Florida

4.    Solar Engineering and Utility Coordination Contracts: Louisiana

5.    Battery Back up and Charging Stations:  Florida