UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

MARK A. ZARALLO, JR, *ET AL.*

                PLAINTIFFS.

V.

JOSHUA MCCOY, *ET AL.*

                DEFENDANTS.

CASE NO. 4:23-CV-00683-SDJ

HON. SEAN D. JORDAN

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE OR TO TRANSFER

1

# TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................................... 1

    A.   McCoy assumes continuing obligations with citizens of Texas through fraudulent misrepresentations directed into Texas. ................................................................. 1

    B.   McCoy's long-term association with residents of Texas had the foreseeable and intended result of causing economic activity within Texas. ................................................ 4

    C.   McCoy expressly aimed tortious activity at the Eastern District of Texas in the course of his fiduciary relationship with Texas residents. ............................................... 7

II.  THE COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS ....... 12

    A.   Legal Standard ............................................................................................... 12

    B.   All entity Defendants are part of a single business enterprise and McCoy is an alter ego of the enterprise. .......................................................................................... 13

    C.   Zarallo's place of injury and Cogent's actual presence in Texas are relevant and important considerations for personal jurisdiction. ............................................ 19

    D.   Plaintiff's tort claims arise from Defendants' minimum contacts with the State of Texas. 22

    E.   Plaintiff's contract-based claims arise from Defendants' minimum contacts with the State of Texas. ................................................................................................. 36

III. VENUE IS APPROPRIATE IN THE EASTERN DISTRICT OF TEXAS .................. 39

IV.  THE MIDDLE DISTRICT OF LOUISIANA IS NOT CLEARLY A MORE CONVENIENT AND JUST FORUM FOR THIS DISPUTE .......................................................... 44

    A.   The Private Interest Factors Weigh Against Transfer .................................... 46

    B.   The Public Interest Factors Weigh Against Transfer ..................................... 50

V.   ALL CLAIMS HAVE BEEN SUFFICIENTLY PLED .............................................. 52

    A.   The Merger Clause in the LLC Agreement is not an Impediment to any of Plaintiffs' Claims. ............................................................................................................. 53

    B.   Zarallo's Individual Breach of Fiduciary Duty Claims Survive. .................... 55

VI.  CONCLUSION ........................................................................................................... 57

i

## I.    BACKGROUND

### A.    McCoy assumes continuing obligations with citizens of Texas through fraudulent misrepresentations directed into Texas.

In June 2021, Louisiana-based businessman McCoy[1] convinced Texas-based entrepreneur and seasoned director of solar construction projects Zarallo to give McCoy effective control over 70 percent of Zarallo's Texas-based company, Cogent. On June 4, 2023, during a phone call with Zarallo and his co-founder Oliver Chua conducted while Zarallo and Chua were in the Eastern District of Texas, McCoy asked for Cogent's business plan and, after reviewing it, emailed Zarallo and Chua, stating that his financial backing would mean "the opportunity to do more faster" than they projected and that with his partnership "funding and bonding [would not be] a hold back." (FAC ¶ 22.)

After McCoy asked that Zarallo and Chua send him a proposal for a transaction whereby McCoy would take a majority interest in Cogent, on June 10, 2021, McCoy agreed to take on a "financial obligation" to "fund" Cogent until Cogent could "support itself." (*Id.* ¶ 23.) McCoy also insisted that he would "use [his] accounting firm and CPA firm to manage [Cogent's bank] account." (*Id.*) McCoy transmitted these commitments and representations by email to Zarallo and Chua while they were in the Eastern District of Texas. (*Id.*) McCoy also represented to Zarallo on a phone call held on a day between June 11 and June 13, 2021, that he would ensure Cogent qualified for construction bonding at substantial limits (*id.* ¶ 24-25), and already on June 14, 2021,

---

[1] All capitalized terms used herein have the same meaning as used in the First Amended Complaint ("FAC") unless otherwise specified. The FAC is Docket No. 30. All references to the Zarallo Declaration refer to the Declaration of Mark A. Zarallo, Jr., unless otherwise specificied (not to be confused with Mark A. Zarallo, Sr., who has also filed a supporting declaration).

McCoy advised Zarallo to revise Cogent's existing statement of qualifications ("SOQ") (a standard solicitation document distributed to prospective customers) to include a statement that Cogent, with McCoy's backing, qualified to provide bonding at the very specific and substantial limits promised by McCoy, which Zarallo proceeded to include in the SOQ and represent to third parties from that point forward. (*Id*.; Zarallo Decl. ¶ 5.) McCoy made these bonding commitments by email to Zarallo while Zarallo was within the Eastern District of Texas. (*Id.* ¶ 25.)

It was around the time Zarallo began including McCoy's representations regarding bonding in Cogent's SOQ that McCoy and Zarallo had reached a meeting of the minds on Zarallo's transferring of control to McCoy and were already conducting themselves as co-owners. (*Id.* ¶ 30; Zarallo Decl. ¶ 4.)[2]  In view of the bargain they had struck, McCoy caused a transfer of funds to Cogent in July 2021 and again in early August 2021 through his wholly owned company, Dynamic Group (*id.* ¶ 30) to Cogent's Texas bank account (*id.* ¶ 57). Zarallo understood that McCoy was personally taking funding and bonding obligations to Cogent (McCoy specifically used the words "*my* financial obligation" and "*my* accountant"), and was indifferent to whether McCoy utilized entities he owned to satisfy the obligations. (*Id*. ¶¶ 26-27.) In fact, it was Dynamic Group that made the first funding transfers to Cogent in July and August 2021,[3] and in the LLC Agreement

---

[2] Chua relinquished his units to Zarallo in June 2021 prior to Zarallo transferring the units to McCoy/MEH. (FAC ¶ 28, n. 1.)

[3] It is important to note that neither McCoy nor MEH ever transferred funds to Cogent directly. (*See* Zarallo Decl. ¶ 1(g).) Since MEH never transferred funds to Cogent, Defendants' entire discussion regarding the purported "default" rule under the LLC Agreement regarding loans/contributions by members (Mot. at 7-8) is irrelevant, since it was non-member Dynamic Group that transferred funds to Cogent. Plaintiffs' position is that these should have been treated as capital contributions attributable to MEH not because of any default rules under the LLC Agreement, but because of McCoy's agreement to "fund" Cogent in June 2021 until it could sustain itself, because he considered these transfers as personal transfers made "through" Dynamic Group; because most of the transfers were accounted for internally as "owner's investments;" and because they were not recorded as loans in financial statements provided to Zarallo or to

executed on August 16, 2021, those Dynamic Group transfers were defined as the "Initial Capital Contribution" by MEH, even though it was not MEH that made the transfers.[4]

The reasonableness of Zarallo's understanding is supported by the subsequent course of performance, whereby McCoy/MEH regularly treated transfers of funds from McCoy's wholly owned entities as personal transfers from McCoy, and transfers from one entity as attributable to another entity. McCoy's own accountants accounted for transfers from Dynamic Group as ***owner's equity*** in Cogent and more specifically: "to specific owner (Josh)." (*Id.* ¶ 60.) McCoy and Mitchell referred to the original $50,000 in transfers from Dynamic Group as "Josh [McCoy] initial investment" (*id.* ¶ 148). In other words, McCoy/MEH treated transfers of funds from Dynamic Group ***both*** as an Initial Capital Contribution by MEH ***and*** as "owner's investments" by McCoy personally. Even for those transfers that Defendants now seek to treat as loans to Cogent, Defendants referred to them as "loans made by Joshua McCoy ***through*** his company Dynamic [Group] to Cogent…" (*id.* ¶ 176, emphasis added), which is why the July 7 Resolution "recognizes" almost a million dollars of debt to McCoy personally, even though McCoy never personally transferred funds to Cogent. On this background, Zarallo's belief that McCoy had taken on personal obligations was reasonable.

Plaintiffs' position is that Zarallo's transfer of membership units was legally effectuated at some time between June 10 and August 16, 2021, when Zarallo and McCoy had a "meeting of the minds" and began performing on an implied agreement. (*E.g.*, *id.* ¶¶ 24-30, 382-93.) By the time

---

UCB at any time. It is further Plaintiffs' position that McCoy should be equitably estopped from taking the position that these were loans. (FAC ¶ 139.)

[4] Note that this is in stark contradiction to the assertion that it is "axiomatic" that capital contributions can only be made by owners. (Mot. at 13.) McCoy/MEH clearly did not believe it was axiomatic when executing the LLC Agreement, since they treated the $50,000 in transfers from Dynamic Group as MEH's Initial Capital Contribution.

Zarallo and McCoy executed the LLC Agreement on August 16, 2021, they had already been interacting as co-owners for two months. It is therefore Plaintiffs' position that the unit transfer had already been consummated by the time the LLC Agreement was executed pursuant to a separate, implied-in-fact agreement between Zarallo and McCoy, providing a basis for Zarallo's individual claims related to the unit transfer.[5]

McCoy's inducements regarding funding and bonding were knowingly false and part of a bait-and-switch ploy—a means of obtaining Cogent's first-in-class services for the benefit of DSI's failing Mulligan Project on the cheap. (*See id.* ¶ 76.) Nor was McCoy ever actually willing to provide bonding anywhere near the levels promised, and in fact failed to provide bonding even at much lower levels, leading to a contractual default which was part of a cascade of defaults leading to Cogent's demise. (Zarallo Decl. ¶¶ 8-9; FAC ¶ 236.) Regarding McCoy's representation that his accountant and CPA would manage Cogent's account, McCoy's accountants did his bidding to assist him in exploiting Cogent over the next two years. (*E.g.*, FAC ¶¶ 237-43.) Zarallo would not have agreed to parting with 70 units in Cogent, or executing the LLC Agreement, had he known that McCoy's communications into the Eastern District of Texas were false.

### B.   McCoy's long-term association with residents of Texas had the foreseeable and intended result of causing economic activity within Texas.

At all times, McCoy knew that Cogent was operating out of Texas and this was a strategic advantage to McCoy. (*E.g.*, FAC ¶¶ 22, 255-57, 273-76; Zarallo Decl. ¶ 1(a).) Neither McCoy nor Mitchell deny these allegations in their affidavits, though their counsel asks that the allegations

---

[5] These include breach of implied-in-fact contract between Zarallo and McCoy (5th cause of action), promissory estoppel related to the unit transfer (6th cause of action), statutory fraud related to the unit transfer (7th cause of action, and fraud in the inducement against McCoy and MEH (8th cause of action).

"not be considered" (Mot. at 17) (a request that the Court should deny). Cogent was "formed for the purposes of providing services relating to renewables energy construction or construction management contracts or subcontracts." (LLC Agreement, Recital B.) The only individuals qualified to carry out Cogent's purposes were Drew Zarallo and Mark Zarallo, Sr. who at all times were based out of the Eastern District of Texas and it was from there that they (and other Cogent employees) executed Cogent's core business functions—qualifying for, bidding, budgeting and directing renewable construction projects. (FAC ¶ 268-69.) Cogent's value as a business was predominantly (if not exclusively) a function of the Zarallos' work out of the Eastern District of Texas as well as their personal goodwill in the industry. (*See id.*) Defendants admit that the functions MEH performed for Cogent were "administrative, accounting and bookkeeping functions" (McCoy Aff. ¶ 10) and, as Plaintiffs allege, MEH was intended to be equivalent to a financial controller (FAC ¶ 271).[6] And although McCoy/MEH were designated "Manager" of Cogent,[7] which is a role that carries with it specific meaning under Delaware limited liability company law and under the LLC Agreement, as a practical matter even McCoy acknowledged that it was Zarallo who was "managing Cogent" at all times. (*See id.* ¶ 268.) Moreover, even though Zarallo was a minority member, Zarallo had the right under the LLC Agreement to decide (due to the requirement of 100-percent member approval) what construction contracts Cogent would enter

---

[6] Nevertheless, McCoy/MEH's more limited role in relation to Cogent's core business purpose should not be mistaken for a diminishment of the scope of their fiduciary duties to Cogent and Zarallo. McCoy/MEH utterly failed to discharge those obligations and indeed wantonly abused their fiduciary position.

[7] The LLC Agreement defines McCoy's "Primary Duties" as "Manager." (LLC Agr. § 3.03, Ex. C.) McCoy now claims that the reference to McCoy as Manager was an "error." (Mot. at 2, n. 2.) Zarallo disagrees. (Zarallo Decl. ¶ 3.) However, even if it were an error it would be a direct function of McCoy's routine failure to distinguish between himself personally and the entities he controls, and thus there is no reason the unambiguous meaning of "Manager" needs to be ignored due to an alleged unilateral mistake, and moreover it is certainly not appropriate to accept McCoy's assertion as to his asserted construction of the LLC agreement in the present procedural posture.

into, how much debt Cogent would take on (for amounts over $10,000), what leases it would execute, and any substantial hiring decisions, among other critical decisions. (*See* LLC Agr, § 3.04.)

Moreover, Cogent's ability to provide renewable energy construction services in Texas, and in particular on a prospective project involving the Texas Army National Guard was an important part of McCoy's interest in Cogent. (FAC ¶ 273; Zarallo Decl. ¶ 1(a).) The meetings that Zarallo (and Chua) attended in Austin related to Texas-based synergies between Cogent and McCoy's existing companies and were a substantial part of the negotiations related to execution of the LLC Agreement. (*Id*.) Recital B of the LLC Agreement specifically provides that "[t]he Members have identified several potential projects listed in Schedule 1" to the LLC Agreement, the first of which was "Grid Resiliency – Army National Guard," a reference to a specific Texas opportunity they were jointly pursuing and continued to pursue for the next seven months. (FAC ¶¶ 273-74.) McCoy does not deny any of this in his affidavit.

Since Cogent was formed during the Covid-19 pandemic, Cogent utilized home offices in Gunter, Texas, and a Gunter P.O. Box as its business address. (*Id*. ¶ 255.) That in no way diminished the fact that Cogent was operating out of Gunter, Texas during that time. At the beginning of 2022 Zarallo, on behalf of Cogent, began seeking permanent office and warehouse space that would serve as Cogent's permanent headquarters (*id*. ¶ 259), and at McCoy's request, chose a location in Frisco; executed a long-term lease with expected move-in on January 1, 2023; and in the interim operated Cogent out of the Regus Location in Frisco as well as Zarallo's home-office in Gunter (*id*. ¶¶ 260-61). Defendants' Baton Rouge office never housed any Cogent assets (*id*. ¶¶ 258, 263), never had any signage or other public-facing materials associating it with Cogent. (*Id*. ¶¶ 262-63) and, outside of a single exception which was clearly in furtherance of

embezzlement of the UCB loan proceeds (*id.* ¶ 109), Defendants never used their Baton Rouge address as an address of Cogent in any filings, invoices, contracts or other documents and, instead, consistently and intentionally utilized a Texas address as Cogent's principal place of business. (*Id.* ¶ 264.) Although the construction of the permanent office space was delayed, Cogent continued to operate out of the Regus Location in Frisco and Cogent's Gunter home-office at all relevant times. Moreover, it was never contemplated, discussed, or made part of any agenda that Cogent would be moved to Louisiana (*id.* ¶ 257), which is another fact McCoy does not deny.

The relationship between McCoy/MEH and Zarallo also led to substantial economic activity in Texas in terms of employment of Texas residents and relationships with Texas businesses. At least 56 Texas-based employees have been associated with Cogent since early 2022 through McCoy/MEH's withdrawal from Cogent, more than ten times the number of Louisiana-based employees over that timeframe, and substantially more than from any other state. (*Id.* ¶ 272.)[8] And now, due to Defendants' misconduct, virtually all of Cogent's employees have been let go. (Zarallo Decl. ¶ 16.) Cogent also built substantial relationships with Texas-based suppliers, which relationships have now been permanently ruined by McCoy. (*Id.* ¶¶ 14-15.)

### C.    McCoy expressly aimed tortious activity at the Eastern District of Texas in the course of his fiduciary relationship with Texas residents.

McCoy/MEH's tenure as Cogent's and Zarallo's fiduciaries was one of exploitation and gross mismanagement, leading Cogent from a company with high profit-potential in a high-demand, niche industry, to a company that has today lost its ability to operate as a going concern

---

[8] Plaintiffs do not dispute that Cogent employed people in various states, given that it worked on projects across the United States. However, Texas was clearly Cogent's hub and headquarters.

due to the destruction of its credit among suppliers and cascade of contractual defaults, all directly caused by Defendants' misconduct. (*See* Zarallo Decl. ¶¶ 8-17.)

The so-called "funding" Cogent received from McCoy in the form of transfers that he claims to have personally made "through" Dynamic Group (*e.g. id.* ¶ 176; McCoy Aff. ¶ 36[10]) was comprised almost entirely of the funds needed to cover Cogent's costs in rendering services for "DSI's project" (the Mulligan Project). (*Id.* ¶¶ 59, 79.)  McCoy offered to "fund" Cogent in June 2021 while expecting and intending that such so-called "funding" (in reality, partial payment for services rendered) would only cover Mulligan Project costs and knowing that DSI was declining precipitously towards insolvency, meaning Cogent would ultimately absorb part of the losses when DSI would inevitably be unable to pay. (*See id.* ¶ 80.) Cogent could have obtained this form of "funding" simply by executing an subcontract for services between Cogent and McCoy/MEH/DSI: (i) without Zarallo's relinquishing 70 percent of Cogent; (ii) without foregoing Cogent's lien rights on the Mulligan Project for unpaid fees (*id.* ¶ 78); and (iii) without subjecting Cogent to belated claims that a substantial part of the "funding" transfers were actually loans from McCoy (*e.g.*, FAC ¶¶ 76-77.). It was primarily through this bait-and-switch ploy of offering Zarallo this "funding" that McCoy/MEH obtained a 70 percent interest in Cogent and obtained Cogent's first-in-class services on the cheap.

Then, as soon as Cogent was ready to become self-sustaining in or around October 2022, McCoy/MEH immediately worked to offload DSI's debt onto Cogent. (*Id.* ¶¶ 103-04.) At the time

---

[10] While McCoy states that "I or Dynamic made loans to Cogent to cover operating expenses" it is not true that McCoy ever personally transferred funds to Cogent, and this position contradicts what his attorney stated at the July 7, 2023 members' meeting referring to loans that McCoy made "through" Dynamic Group. (Zarallo Aff. ¶ 1(g); FAC ¶ 176.) It is clear that formalities do not matter to McCoy, and that he views transfers made from Dynamic Group as "personal transfers."

Defendants concocted what was in fact a scheme to embezzle loan proceeds belonging to Cogent, they knew that Cogent had no reasonable way of paying off such a debt (nor was it in any way fair that Cogent should have to pay DSI's debt) and knew such a substantial debt on Cogent's books would doom Cogent's prospects to obtain future financing or bonding. (*E.g., id.* ¶ 120.) Defendants' cynical assertion now that the UCB loan was intended to be paid from Cogent's income and that this was somehow a benefit to Cogent is disingenuous and downright absurd; it was entirely unreasonable to expect that Cogent would be in a financial position to generate an *extra* $2.5 in income sufficient to cover a balloon payment of $2.5 million in March 2024, at which point the line of credit would close by its terms and be of no value to Cogent, making no financial sense whatsoever. Moreover, Defendants' innocent explanation is belied by their failure— *immediately* after the loan was issued—to ensure *any* of Cogent's vendors and subcontractors were paid, leading a cascade of defaults that has rendered Cogent non-operational as of today. (*Id.* ¶ 125; Zarallo Decl. ¶¶ 8-17.)

Moreover, Defendants had already been bloodletting Cogent's cash through the unreasonable markup arrangement with Southland and MGS, leading to the unnecessary loss of hundreds of thousands of dollars that would have been critical to keeping Cogent afloat. (FAC ¶¶ 84-95; Zarallo Decl. ¶ 2(a).)

Finally, McCoy's 30-day withdrawal period was clearly designed to extract everything possible from Cogent before it sank under the weight of the UCB debt, depleting Cogent's bank accounts, "resolving" that Cogent owed McCoy almost a million dollars, assigning to McCoy a $1.4 million receivable, and demanding payment from Cogent's customers which triggered widespread alarm. (*Id.* ¶¶ 176-84). McCoy and his cohorts took these actions while knowing that

the beneficiaries of McCoy/MEH's fiduciary duties—Zarallo and Cogent—resided in the Eastern District of Texas.

The foregoing misconduct was substantially facilitated through false and misleading communications and omissions directed into Texas. Regarding the exploitative use of Cogent in service of the Mulligan Project, Defendants induced Zarallo's, and therefore Cogent's,[11] continued acceptance of the arrangement by sending unsolicited emails to Zarallo on October 29, 2021, giving Zarallo false assurances that Cogent would be fully paid for its work and insisting that "Dynamic and McCoy are backing all of this so we are on the same team here," even though it is clear in hindsight that McCoy did not actually intend to "back" all of Cogent's invoices and certainly not to allow Cogent to make a profit. (*See id.*).[12] These communications to Texas facilitated the breach of fiduciary duty McCoy and MEH committed by exploiting Cogent's services at below-market rates and without a profit, as Zarallo had the right to withhold consent to the arrangement but did not do so at the time.

And McCoy/MEH managed to saddle Cogent with almost $3.5 million in improper debt with the following communications into the Eastern District of Texas:

(1) Mitchell's December 2022 phone call to the Eastern District of Texas where, on behalf of McCoy, he demanded that a personal loan from McCoy needed to be paid back, despite Mitchell and McCoy knowing that no such debt existed (*id.* ¶¶ 99-100);

---

[11] The LLC Agreement gave Zarallo the right to withhold consent to any construction services agreement and thus his continued consent to the arrangement is legally relevant. (LLC Agr. § 3.04(a).)

[12] Not only has McCoy failed to ensure that Cogent was fully paid for the services it provided on the Mulligan Project despite assurances that he and Dynamic Group were "backing" the invoices, but McCoy now seeks to treat a substantial amount of prior "funding" transfers that covered Cogent's costs on the Mulligan Project as loans. Moreover, despite not disputing that some amount of Cogent's invoices were never paid (McCoy Aff. ¶ 35) (and Plaintiffs disagree that $352,441.51 is the total unpaid amount), McCoy, MEH and Dynamic Group fail to present a theory for why they supposedly "backed" Cogent's invoices at one point but now rely on DSI's insolvency and distinct corporate existence to attempt to write off undisputed debts.

(2) Mitchell's February 2023 phone call to Zarallo where he falsely represented the purpose of the prospective UCB line of credit as a means of Cogent immediately having access to a $2.5 million line of credit—*not* as a means of saddling Cogent with $2.5 million in debt (*id.* ¶ 106);[13]

(3) Mitchell's email directed to Angela Zarallo in the Eastern District of Texas, copying McCoy, which misleadingly referred to the UCB loan as an "opportunity" not to be missed and demanded that an executed copy of the loan documents be returned within just a few hours, and where both Mitchell and McCoy had the opportunity but failed to ensure there was no confusion about the crucially important fact that that the loan proceeds would immediately be withdrawn and paid to DSI (*id.* ¶ 111);

(4) The May 10, 2023 teleconference, during which Zarallo specifically requested that the $2.5 line of credit be used to make payments to vendors and subcontractors, and Mitchell and Ramsey Green purposely misled Zarallo into believing that the line of credit would be made available after Cogent received payments on receivables, rather than ensuring he understood that the line of credit was entirely depleted and unavailable (*id.* ¶ 137);

(5) McCoy's June 9, 2023 letter to Zarallo (the Withdrawal Notice) whereby McCoy falsely stated that a "series of loans" had been made by "McCoy to Cogent" which was the pretext for McCoy/MEH causing Cogent to transfer to Dynamic Group all of Cogent's available cash over the subsequent thirty days and causing Cogent to assign to McCoy an approximately $1.4 million receivable belonging to Cogent (*id.* ¶¶ 142-44);[14]

(6) The "Exit Analysis" transmitted by email from Mitchell to Zarallo, replete with false statements and tortured logic that underpinned and provided cover for the breaches of fiduciary duties committed through the withdrawal date (*id.* ¶¶ 145-161);

(7) The spreadsheet titled "Cogent Balances," transmitted by email along with the Exit Analysis on June 19, 2023, which purported to show *all* of Cogent's then-current account balances but omitted any reference to the UCB account, which would have indicated that the balance was negative $2.5 million (*id.* ¶ 162);

(8) The June 27, 2023 teleconference in which agents of MEH and Dynamic Group repeated all of the same fabrications and distortions present in the Exit Analysis and omitted critical information in response to Zarallo's specific demands: (i) for records supporting any prior transactions between Cogent and Dynamic Group, (ii) for invoices supporting the purported "Time Billings" to MEH employees that were billed to Cogent without any supporting backup,

---

[13] Mitchell admits that both phone calls occurred, despite denying what was said was false or fraudulent. (Mitchell Aff. ¶ 41.) Zarallo disagrees. (Zarallo Decl. ¶ 2(b).) In the posture of the present motions Mitchell's denials of wrongdoing have no bearing.

[14] Defendants have conspicuously failed to address the issue of why, if Cogent had debts to McCoy accruing since 2021, Defendants submitted financials statements for Cogent to UCB in November 2023 that showed **zero** loans owed to anyone, or why their internal financial statements from June 2023 similarly showed no such loans existed. (*See, e.g.*, Zarallo Decl. ¶ 1(g), Ex. A). It is beyond reasonable dispute that McCoy/MEH fabricated the loans referenced in the Withdrawal Notice, Exit Analysis and later used to substantiate the almost $1.0 million Note and $1.4 million Assignment.

(iii) for an explanation of why payments to McCoy/Dynamic Group took precedence over payments to bona fide creditors that would "stav[e] off liens," and (iv) for "proof of closing" of the UCB line of credit (*id.* ¶¶ 164-65);

(9) The June 30, 2023 email from McCoy to Zarallo which facilitated the breaches of fiduciary duty committed on July 7, 2023, by calling a members' meeting and falsely representing that Zarallo would have an opportunity to vote on the agenda items listed, and by placing items on the agenda which themselves had no justifiable basis (except for "settlement of DSI's account receivables [sic]" which ultimately was not even part of the July 7, 2023 members' meeting) (*id.* ¶¶ 173-74);

(10) The July 7, 2023 members' meeting where Zarallo was not permitted to vote on the agenda items, and which facilitated the breaches of fiduciary duty that were the execution of the July 7 Resolution, the Note and the Assignment (*id.* ¶¶ 175-179); and

(11) The documents transmitted to Zarallo related to the Power Strategies arrangement on July 7, 2023, which included documents prepared by McCoy and/or MEH that falsely represented Zarallo as the "requisitioner" of unsupported payments to Harold Leggett (*id.* ¶¶ 203-208).

Additionally, McCoy and MEH failed to ensure Cogent paid Cogent's vendors in Texas. (Zarallo Decl. ¶¶ 14-15.) This specifically led to contractual defaults and to Cogent's inability to work with these vendors going forward. (*Id.*.)

Additionally, there was a substantial nexus between the improper and inflated invoices from Southland, MGS and MEH and the Eastern District of Texas, as these invoices were all billed to Cogent in Gunter, Texas. (*Id.* ¶¶ 155, 264.) McCoy also benefitted from MGS and Southland's use of Cogent's Texas-based labor force as a base for its unearned fees charged against their salaries. (*Id.* ¶ 272.)

And after their withdrawal, Zarallo turned over books and records plagued with inconsistencies, falsification and in non-compliance with MEH's accounting obligations, all of turned over to Cogent in the Eastern District of Texas. (*Id.* ¶¶ 246-47; Zarallo Decl. ¶ 7.)

## II.     THE COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS

### A.     Legal Standard

"The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (internal quotation marks and citation omitted).[15] The "constitutional touchstone" of personal jurisdiction is whether the nonresident defendant "purposefully availed himself of the benefits and protections of the forum state" such that "he should reasonably anticipate being haled into court there." *Carmona v. Leo Ship Mgmt., Inc*., 924 F.3d 190, 193 (5th Cir. 2019) (internal quotation marks and citation omitted).

Where the court does not conduct an evidentiary hearing on a motion to dismiss, "the party seeking to assert jurisdiction is required only to present sufficient facts to make out a *prima facie* case supporting jurisdiction" and  "[t]he court shall accept as true that party's uncontroverted allegations (so long as the allegations are not merely conclusory) and resolve all factual conflicts in favor of the party seeking to invoke the court's jurisdiction."[16] *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

### B.   <u>All entity Defendants are part of a single business enterprise and McCoy is an alter ego of the enterprise.</u>

"Louisiana utilizes the theory of 'single business enterprise' when evaluating whether corporate entities are the same for purposes of jurisdiction." *In re Chinese-Manufactured Drywall*

---

[15] The Fifth Circuit has framed the analysis as having three steps: (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable. *Id*. (citation omitted).

[16] Many of the allegations in Plaintiffs' FAC remain uncontroverted. Zarallo's declaration also controverts several of Defendants' assertions in their affidavits. (Zarallo Decl. ¶¶ 1-2.)

*Prod. Liab. Litig.*, No. CV 09-02047, 2017 WL 1476595, at *33 (E.D. La. Apr. 21, 2017), *aff'd*,

811 F. App'x 910 (5th Cir. 2020). Separately, the "alter ego" theory allows a court to impute an

entity defendant's contacts with a forum to an individual member or shareholder. *See, e.g.*, *Patin*

*v. Thoroughbred Power Boats Inc*., 294 F.3d 640, 653-54 (5th Cir. 2002). Both the alter ego test

for attribution of contacts and the single business theory are "less stringent" in the context of

personal jurisdiction than they are for establishing liability. *In re Chinese-Manufactured Drywall*

*Prod. Liab. Litig*., 753 F.3d 521, 546 (5th Cir. 2014) (alter ego); *Berry*, 428 F. Supp. 2d at 553

(single business). Under Louisiana law, the alter-ego test is similar to the single-business-

enterprise test (*Jackson v. Tanfoglio Giuseppe, S.R.L*., 615 F.3d 579, 587 (5th Cir. 2010)), and

both entail multi-factored and non-exhaustive lists of factors, none of which are determinative and

all of which must be viewed within a "totality of circumstances" framework. *E.g.*, *Riggins v. Dixie*

*Shoring Co*., 590 So. 2d 1164, 1169 (La. 1991) ("When a party seeks to pierce the corporate veil,

the totality of the circumstances is determinative."); *Green v. Champion Ins. Co*., 577 So.2d 249,

257–58 (La.Ct.App.1991) (applying 18-factor test for single-business enterprise).[17]

The following eighteen factors have been held relevant to the single-business enterprise

analysis:

> 1. corporations with identity or substantial identity of ownership, that is, ownership of
> sufficient stock to give actual working control; 2. common directors or officers; 3. unified
> administrative control of corporations whose business functions are similar or
> supplementary; 4. directors and officers of one corporation act independently in the interest
> of that corporation; 5. corporation financing another corporation; 6. inadequate
> capitalization ("thin incorporation"); 7. corporation causing the incorporation of another
> affiliated corporation; 8. corporation paying the salaries and other expenses or losses of

---

[17] The choice-of-law question as to what state law applies to piercing the corporate veil in the context of personal jurisdiction (by contrast to liability) is a "complicated choice of law question" that appears to remain "an open issue" in the Fifth Circuit. *Jackson v. Tanfoglio Giuseppe, S.R.L*., 615 F.3d 579, 587 (5th Cir. 2010). However, since both Texas and Louisiana apply non-exhaustive, multi-factored tests to the question, many of which overlap or are substantially similar, Plaintiffs will focus on the Louisiana factors for simplicity.

another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations.

*Green*, 577 So.2d at 257–58.[18]

The Court should hold that all of McCoy's companies comprise a single business enterprise and McCoy is an alter ego of the enterprise (and each company comprising it). All of the McCoy entities have an "identity or substantial identity of ownership" giving McCoy "actual working control." *See Green*, 577 So.2d at 257–58. McCoy is the sole member of MEH and is its CEO. (FAC ¶ 19; McCoy Aff. ¶ 7.) McCoy is also the sole member and CEO of Dynamic Group. (FAC ¶ 19.) MEH is the sole member of Defendants DSI, MGS and Southland. McCoy clearly has the power to exert effective control over each entity, which he does. (*See id.* ¶ 19.)

All of the entities have "common offices" and "centralized accounting." *See Green*, 577 So.2d at 257–58. Each entity operates out of the same office in Baton Rouge, Louisiana. (*Id.* ¶¶ 10-15.) McCoy is an officer of MEH and is an officer of Dynamic Group; Mitchell is an officer of MEH and is an officer of Dynamic Group. McCoy and Mitchell also direct DSI. (*Id.* ¶¶ 38-39.) The administrative control of all companies is unified. In fact, Mitchell himself signs all checks for "all McCoy entities" before any payments are made. (FAC ¶ 83.) Regarding MGS and

---

[18] Similarly, courts applying the test for whether an individual member of a Louisiana limited liability company is an alter ego of the company commonly apply the following five factors, which are non-exhaustive and should be taken as part of a "totality of the circumstances" review: "1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings." *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 385–86 (5th Cir. 2000). Courts are not limited to the foregoing factors. *Id.* at 386-87

Southland, the only administrative employees that operate these companies are Dynamic Group employees. (FAC ¶¶ 87-90, 94.) McCoy and Mitchell also routinely purport to act on behalf of Dynamic Group when taking actions on behalf of MEH. (*E.g.*, FAC ¶¶ 53, 73, 111.)

It is the McCoy enterprise's consistent practice that "services [are] rendered by the employees of one [company] on behalf of another [company]." *See Green*, 577 So.2d at 257–58. Indeed, Cogent was substantially overcharged for services of Dynamic Group and/or MEH employees. (FAC ¶¶ 152-58.) And this was the objective of the exploitative Mulligan Project arrangement which saw Cogent providing services on "DSI's project." (*Id.* ¶ 79.)

The McCoy entities and McCoy himself "use the property of [each other company] as [their] own." *See Green*, 577 So.2d at 257–58. The Mulligan Project is a good example of this, as it was McCoy's objective to cause Cogent to provide effectively free services on behalf of "DSI's project" (e.g., FAC ¶¶ 35-36, 41, 79) which Mitchell and McCoy claimed were being financially "backed" by Dynamic Group and McCoy personally (*id.* ¶¶ 47, 59). This is also an example of a company "paying the salaries and other expenses or losses of another [company]" (inasmuch as Dynamic Group purported to cover some of the invoices) and an "unclear allocation of profits and losses between" companies (*see Green*, 577 So.2d at 257–58). At one point McCoy indicated that bonding for Cogent would "go through [Dynamic Group's] program" supporting this factor as well (FAC ¶ 234.) Moreover, transfers by Dynamic Group were accounted as MEH "Initial Capital Contributions" and later DSI and Dynamic Group transfers to Cogent were accounted as McCoy's personal "owner's investments" showing a systematic failure to distinguish between the formal "owner" of any given company within the enterprise. (*E.g.*, FAC ¶¶ 54-55, 60, 68-69.) Indeed, McCoy systematically fails to distinguish between his personal assets and company assets: he

considers transfers of funds "through" Dynamic Group as personal transfers by him. (*E.g.*, FAC ¶¶ 98-99, 143, 147-48, 180, Ex. C.)

The McCoy entities also fail to comply with "corporate formalities" or to maintain formal intercompany agreements that would preserve some level of separation between the companies and each other or their ultimately owner, McCoy. The companies within the enterprise commonly transfer funds between affiliates within one banking system under Dynamic Group's master account, and there is no documentation supporting these transfers.  (*E.g.*, FAC ¶¶ 59-62, 135-36). Regarding Cogent, millions of dollars were transferred to at least eight different McCoy affiliates without sufficient documentation. (*E.g.*, FAC ¶¶ 81, 96, 107.) No contract was put in place for Cogent's services on the Mulligan Project or in relation to the Southland/MGS arrangement. There was no formal documentation of any transfer of funds between affiliates referenced in the FAC, or any transaction documents supporting them. Indeed, this is clearly established by McCoy's making a last-minute agenda item of "[f]ormalizing the classification of all money injected into Cogent." (FAC ¶ 173.) The internal accounting of transfers between McCoy affiliates has no internal coherence and appears driven by McCoy's self interest. (*Id.* ¶ 54.) The last-minute July 7, 2023 members' meeting was the only time anyone from MEH called a members' meeting for Cogent and the Resolution recognizing debt to McCoy was the only company resolution adopted during McCoy/MEH's tenure as Manager/member. (*See id.* ¶ 173; Zarallo Decl. ¶ 4.)

It is clearly not the case that "directors and officers of one [company] act independently in the interest of that [company]" (*see Green*, 577 So.2d at 257–58) as ultimately, the officers all appear to be acting in the interest of McCoy, and often against the interests of companies he owns. (*E.g.*, FAC ¶ 98.) They failed to take any action on behalf of Cogent to recover compensation from the owner of the Mulligan Project site through enforcing its lien rights as just one example (FAC

¶ 78), and took actions in relation to the UCB financing that were in the interest of DSI and McCoy personally rather than the independent interest of Cogent and Dynamic Group. They also ensured that one company's interests were subsumed to McCoy's personal interests in receiving immediate "repayment" instead of ensuring third-party creditors were paid. (*E.g.*, FAC ¶¶ 168, 1858.)

MGS and Southland in particular are undercapitalized, do not have assets, and take employees from other McCoy entities in order to apply an unearned markup fees to their salaries. (*E.g.*, FAC ¶¶ 88, 94.) They also "recev[e] no business other than that given to it by its affiliated companies" (*see Green*, 577 So.2d at 257–58). (*Id.*) The people who perform administrative functions for MGS and Southland are Dynamic Group employees. (*E.g.*, *id.* ¶ 89.)

Companies within the enterprise and McCoy "us[e] the property of [other companies] as [their] own" (*see Green*, 577 So.2d at 257–58). The UCB loan is a clear example, where Dynamic Group's checking account and Cogent's assets were used to pay off DSI's debt, ultimately to avoid a situation where McCoy would need to pay on his personal guarantee of DSI's line of credit. (*E.g.¸id.* ¶ 103, 123, Ex. B.) McCoy has a reputation for "stripping the cash" from the companies under his control. (*Id.* ¶ 249.) As already established, McCoy also considers Dynamic Group's funds as his personal funds.

Finally, McCoy has used his affiliated network of companies to orchestrate a fraud and embezzlement against Cogent, and more generally, to engage in fraudulent activities alleged in the FAC as part of a *modus operandi*. (*E.g.*, ¶¶ 249-50.)

The foregoing is sufficient to establish a *prima facie* case for personal jurisdiction purposes, and discovery will establish these theories for purposes of liability. It is also noteworthy that Defendants do not challenge the legal sufficiency of the alter-ego/single business enterprise cause of action in their 12(b)(6) motion nor do they address the allegations in the context of

personal jurisdiction, despite these being raised in the FAC. (*See* FAC ¶¶ 281-82, 486-511.) Accordingly, any contacts imputed by one of the McCoy entities should be imputed to *all* McCoy entities and to McCoy himself.[19]

### C.   Zarallo's place of injury and Cogent's actual presence in Texas are relevant and important considerations for personal jurisdiction.

Defendants devote nearly three pages within the 12(b)(6) section of Defendants' Motion (Mot. at 15-17) to arguing that Zarallo's place of injury is not relevant to personal jurisdiction and that Cogent was not present in Texas over the relevant time period. Defendants do this primarily by pointing to distinctions between direct and derivative claims under Delaware law, and by insisting that Cogent should be deemed either a Delaware or a Louisiana company for purposes of the due process analysis, including with reference to a provision of the general venue statute, 28 U.S.C. § 1391(c)(2). (Mot. at 16.) These arguments are not only misplaced analytically within their 12(b)(6) motion, but Defendants seem to have overlooked the directive to take a "highly realistic" approach when assessing personal jurisdiction. *See Trinity Indus., Inc. v. Myers & Assocs., Ltd.*, 41 F.3d 229, 230 (5th Cir. 1995) (citation omitted); *Mississippi Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982) (personal jurisdiction "is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state"). As explained below, whether a nonresident defendant has

---

[19] Alternatively, Mitchell's contacts with Texas should be imputed to McCoy based on agency theory, which is another theory of imputation recognized by Louisiana law. *See Chinese-Manufactured*, 753 F.3d at 546. Mitchell communicated repeatedly concerning what were purportedly McCoy's personal loans to Cogent, indicating that Mitchell was acting on behalf of McCoy himself and not just McCoy's entities. Certainly, this also applies to the statements of Kyle Keegan made at the July 7, 2023 members' meeting, clearly on behalf of McCoy personally (since it was dealing with a purported personal debt to McCoy and Keegan is McCoy's personal attorney in this dispute).

constitutionally sufficient contacts with a state to satisfy due process is not determined by the nuances of substantive corporations' law or the procedural provisions of the federal venue statute.

Despite relying on a District of Wyoming opinion (Mot. at 15), Defendants must have failed to review the highly instructive Tenth Circuit Court of Appeals opinion cited in that case.[20] In *Newsome v. Gallacher*, 722 F.3d 1257, 1266 (10th Cir. 2013)*,* the plaintiff bankruptcy trustee of a Delaware corporation brought a lawsuit in Oklahoma against the corporation's former directors and officers, all Canadian citizens. *Id.* at 1264. The company had its office, employees, equipment and real estate interests in Oklahoma (*id.* at 1262); however, the Canadian directors and officers had few contacts to Oklahoma and performed their duties from Canada (*id.* at 1263-64). Apparently using the same playbook as Defendants in this case, the defendants in *Newsome* had offloaded an affiliate's debt onto the company, encumbered the company's assets as collateral for an affiliate's line of credit, and caused the company to obtain a loan defendants knew "could never [be] service[d]," leading the company to insolvency. *Id.* at 1262-63. Since, under Delaware law, officers and directors of an insolvent company owe fiduciary duties to creditors just as they otherwise would to shareholders, the court addressed the issue of *where* the company should be deemed to have been injured and whether the location of its creditors (mostly in Oklahoma) could be considered in the personal jurisdiction analysis, even though, just like shareholders, the creditors could not bring direct claims for breach of fiduciary duty. *Id.* at 1267.

The court first recognized that "[i]n other contexts, identifying the location of the corporation is fairly simple" and gave the example of diversity jurisdiction, under which the

---

[20] *See Brown v. Asselin*, No. 19-CV-00014-ABJ, 2019 WL 13224974, at *2 (D. Wyo. June 6, 2019) (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1270–71 (10th Cir. 2013), for the proposition that "it is important to keep the 12(b)(2) and 12(b)(6) analyses distinct.").

company would be considered a citizen only of Delaware and Canada (where the company's directors and officers controlled and coordinated the company's activities). *Id.* at 1267. But the court rejected the notion that a statute governing subject-matter jurisdiction had any bearing on "[p]ersonal jurisdiction restrictions [that] come by way of the due process clause." *Id.* The court further rejected the notion that Delaware corporation law's answer "to the question of when and how creditors may sue for … injuries" meant that "due process requires us to treat the corporation and its creditors in the same way [as Delaware corporation law] for purposes of determining personal jurisdiction." *Id.* 1268. Due process simply does not require "ignor[ing] where the injury was actually felt. . . . even if those who felt [the injury] face some impediment to suit on account of substantive corporation law." *Id.* at 1267-68. The court therefore held that "a court evaluating personal jurisdiction need not ignore the creditors' or shareholders' places of residence simply because the cause of action belongs to the corporation." *Id.* at 1268.

Here, Defendants disregard the question of "where the injury was actually felt" and instead double-down on formalistic arguments under Delaware corporations law and the federal venue statute. These arguments are entirely misplaced in the context of due process and also wrong on the merits.[21] Taking a "highly realistic" view of the uncontroverted facts, it is clear no one was

---

[21] The direct/derivative issue is addressed in its proper place within the 12(b)(6) context below. Defendants' arguments under the venue statute are not only misplaced, but are wrong even as applied because under the statute, the principal place of business would not be considered Louisiana. Unlike the US company in *Newsome* whose executives and directors were all based in Canada, the executives of Cogent were at all times in Texas. Although MEH and McCoy were managers, they had no official title with Cogent, no experience in Cogent's core industry, and as alleged were more akin to (albeit corrupt) financial controllers. Zarallo had a right under the LLC Agreement to control whether Cogent entered into any contract for the provision of construction services—Cogent's core business—and whether it spent more than $10,000, among other things. It was the Zarallos from the Eastern District of Texas that decided which opportunities to pursue, how to manage projects, and other strategic considerations. Moreover, Defendants do not explain why the venue statute is more applicable than the diversity jurisdiction statute, under which Cogent's citizenship would have been determined by ***both*** Zarallo's and McCoy's place of residence.

injured in Delaware and no one was injured in Louisiana. Nor, as demonstrated above (pages 4 through 7), was Cogent ever "based" in Louisiana in any meaningful way. Like the company in *Newsome*, Cogent had its assets, real estate interests, and all of its core employees in Texas, and now can no longer operate as a going concern. Moreover, like the creditors in *Newsome*, it is clear that Zarallo, whether his claims are direct or derivative under Delaware law, "actually felt" his injuries in Texas caused by Defendants acting together from Louisiana to destroy the Texas-based company that he, unlike McCoy, was truly invested in. *See Newsome*, 722 F.3d at 1266 (personal jurisdiction obtained because "individual defendants knowingly acted in Canada to destroy a company operating entirely in Oklahoma").[22] The foregoing principles should inform the personal jurisdiction analysis whenever place of injury or Cogent's actual place of business is at issue.[23]

### D.    Plaintiff's tort claims arise from Defendants' minimum contacts with the State of Texas.

Where a nonresident defendant has taken "tortious actions outside of [a state] directed toward [the plaintiff] in [the state,]" those actions confer personal jurisdiction over the nonresident defendant for the resulting tort claims. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999). "When the actual content of communications with a forum gives rise to [an] intentional tort

---

[22] To be clear, the holding in *Newsome* applies equally to injuries suffered by a shareholder, not just creditors. As the court explained, just because "undesirable consequences" may follow a policy that "allow[s] each shareholder to sue directly for the loss of value to his or her stock," necessitating a distinction between direct and derivative claims under state substantive law, does not mean that the shareholder has not been injured by the loss of stock value. *Id.* at 1268.

[23] The cases cited by Defendants do not contradict *Newsome*. *Beene v. Beene*, No. C 11-6717 JSW, 2012 WL 3583021, at *1 (N.D. Cal. Aug. 20, 2012) and *Bartkowski v. Foni*, No. CIV. A. 07-1018, 2007 WL 2728844, at *3 (E.D. Pa. Sept. 17, 2007), involved shareholders bringing derivative suits for corporations that were not present in the forum in any meaningful way. The courts in those cases were not called on to answer the question of how to decide where the the company "actually felt" the harm and whether the location of the shareholders' injuries might be taken into account in that assessment.  Similarly, *Brown v. Asselin*, a case that relied extensively on *Newsome* and cannot be read to be inconsistent with that opinion found that the company itself, which was not a plaintiff, had no meaningful presence in Wyoming and was therefore not injured in Wyoming. *Brown*, No. 2019 WL 13224974, at *5.

… this alone constitutes purposeful availment." *Id.* at 213. Additionally, the "effects test" enunciated by the Supreme Court in *Calder v. Jones* and refined in *Walden v. Fiore* "remains good law" in the Fifth Circuit (*Defense Distributed*, 971 F.3d at 495) with the understanding that "it is the defendant's contacts with the forum state, and not just the plaintiff, that must drive the personal jurisdiction analysis." *Id.* at 495 (citations omitted) (that defendant knew the "brunt of the injury" would be felt by the plaintiffs in Texas was relevant factor); *Wien Air*, 195 F.3d at 211 ("The foreseeable effects of a tort 'are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum.'") (citation omitted) (emphasis in original).

### 1. The Court has specific jurisdiction over Plaintiffs' breach of fiduciary duty claims.

The FAC contains four causes of action based on breach of fiduciary duty. The first cause of action is for breaches by MEH and McCoy as fiduciaries to Cogent. The second is for breaches by MEH and McCoy as fiduciaries to Zarallo. Both of these have a common nucleus of operative fact. The fourteenth and fifteenth causes of action for aiding and abetting are derivative claims predicated on the same breaches of fiduciary duty.

Breach of fiduciary duty claims straddle both sides of the contract-tort divide in that certain considerations that commonly apply to contracts (*e.g.*, a continuing relationship) mix with considerations that commonly apply to torts (*e.g.*, "express aiming") as part of a combined analysis. It is important to recognize that breaches of fiduciary duty can be committed outside of a forum in myriad ways that do not strictly depend on the "actual contents" of any communication and yet the forum may still have specific jurisdiction over the resulting claims.[26]

---

[26] It is noteworthy that in stating the "actual content" rule, the *Wien Air* court was distinguishing the contract-based cases cited by the defendant, which involved communications unrelated to the causes of action. 195 F.3d at 213.

A review of the caselaw makes this clear. Take *Wien Air* itself. The defendant's attorney breached his duty of loyalty by taking the following actions in Germany: appropriating his client's business opportunity, embezzling (or assisting in embezzling) millions from his client, and acting for the benefit of another German-based client whose interests were adverse to his Texas-based client. *See Wien Air*, 195 F.3d at 210-211. All of these actions occurred in Germany. Nonetheless, the calls, letter and faxes that the German defendant made into Texas omitted information or misled the client about these core breaches taking place in Germany and therefore were "at the heart of the lawsuit." (*Id.* at 212).

Similarly, *Trinity Industries*—a case involving a Texas-based plaintiff alleging that its Illinois-based counsel breached its fiduciary duty by advising plaintiff's Pennsylvania-based competitor to file a patent infringement lawsuit against plaintiff in Pennsylvania—makes clear that it is the "ongoing relationship" component of a fiduciary duty that makes communications significant, and not necessarily their actual content. 41 F.3d at 230. The breach itself was not alleged to have taken place in Texas. *See id.* Yet because it occurred within the context of a two-to eight-year attorney-client engagement[27] during which the attorneys engaged in mail and telephonic communications with Texas and appeared *pro hac* in a Texas-based lawsuit (unrelated to the breach of fiduciary duty), the court reasoned that "the defendants deliberately availed themselves of ***the benefits of an ongoing relationship with a Texas client*** and reasonably should have anticipated the possibility of being haled into court in Texas for claims ***arising out of or related to that relationship***." *Id*. at 231 (emphasis added); *see also Century Freight*, 322 F.3d at

---

[27] The length of the "ongoing relationship" in the case of one of the lawyer defendants (Gilhooly) was only two years which was considered sufficient.

383 ("[Nonresident defendant] should have reasonably anticipated being haled into court in Texas on alleged intentional tort claims that [we]re directly related" to the "long-term association" it established with a Texas resident); *Wilson v. Kelso*, No. MO-11-CA-96-H, 2012 WL 13029489, at *3 (W.D. Tex. Feb. 17, 2012) ("Defendants actively sought a Texas partner for an ongoing business venture and directed tortious communications into the state. Based on these facts, Defendants should have reasonably anticipated being haled into court in Texas on claims relating to their partnership or arising out of their tortious communications."); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2005 WL 1651748, at *3 (N.D. Ill. July 1, 2005) ("[B]y voluntarily accepting a directorship with International, a company whose principal executive offices were located in Chicago during the alleged looting, and deriving substantial benefits … from this relationship, Colson should have reasonably anticipated being subject to litigation in Chicago.").

Federal district courts in Texas have asserted specific personal jurisdiction over breach of fiduciary duty claims analogous to this one. A helpful example is *Difusion, Inc. Difusion Venture Grp., LLC Difusion Venture Grp., LLC v. Difusion, Inc. Johns*, No. A-13-CV-258-LY, 2014 WL 12580438 (W.D. Tex. June 24, 2014). One of the defendants in *Difusion* was a former director and chairman of the board of a Delaware corporation with its assets, employes and principal office in Texas. *Id.* at *1. The defendant conducted all of his activities from Ireland. *Id.* The court nonetheless held that the defendant was subject to personal jurisdiction over plaintiff's breach of fiduciary claims because "although Parker has not physically visited Texas in connection with his position on the board of DiFusion, he could have reasonably anticipated that the effects of any actions taken as chairman of the board of DiFusion would be felt in Texas due to DiFusion's presence there." 2014 WL 12580438, at *2. Additionally, the court cited the principle articulated by the court in *Wien Air* regarding the "actual content" of communications to find that the

defendant's telephone communications with other (Texas-based) directors that facilitated their "usurp[ing] DiFusion's board" (one of the alleged breaches) as well as "participation by telephone in board meetings," established sufficient minimum contacts. *Id.* at *2. Importantly, the court did not take the *Wein Air* principle to an extreme of requiring that the "actual content" of the former director's communications establish an element of the tort; the content was not discussed. It was defendant's communications made in the course carrying out his continuing obligations as director of the Texas-based corporation, and in facilitating the alleged breaches of fiduciary duty, that created a constitutionally sufficient nexus to the breach of fiduciary duty claim. *See id.*

Another helpful example is *North Texas Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*, 107 F. Supp. 3d 620, 628 (N.D. Tex. 2015), in which the Louisiana-based fiduciaries of plaintiff, a minority shareholder, clandestinely formed a company to divert money through transfers "disguise[d]" as "administrative expenses." *Id.* at 627. At the same time, they convinced the plaintiff to sell its shares in the company for a deflated price that did not account for the diverted funds. *See id.* The fiduciaries directed numerous communications to the plaintiff in Texas but "continued to remain silent about [their] efforts to develop a competing business." *Id.* Again, there was no allegation that the formation of the business itself was done in Texas but this silence nonetheless facilitated the breach of fiduciary duty. *See id.*

Finally, *Nivisys, LLC v. Walsh*, No. EP-18-CV-369-KC, 2019 WL 5417153 (W.D. Tex. July 9, 2019), is also instructive. The defendant, an Arizona resident who had served as president and CEO of the Texas-based plaintiff, committed various breaches of fiduciary duty and acts of corporate waste while an officer of the Texas company, all while in Arizona. In concluding that specific personal jurisdiction was proper, the court considered several contacts as collectively sufficient to confer specific personal jurisdiction. First, the defendant had "agreed to become the

president and CEO" of "an enterprise based primarily in Texas" which "weigh[ed] in favor of finding specific jurisdiction over him." 2019 WL 5417153, *4 (citations omitted). Second, the defendant had visited Texas a number of times, including for a corporate training event.[29] And finally, "even while [the defendant] was physically located in Arizona, he took purposeful actions directed toward, and with foreseeable effects in Texas that g[a]ve rise to Plaintiff's claims," including causing the company serious financial losses while grossly mismanaging the company. *Id.* at *4-5.

In sum, the foregoing authorities demonstrate that a "highly realistic" analysis requires consideration of the following factors: (a) whether the fiduciary "deliberately availed [itself] of the benefits of an ongoing relationship with a Texas" beneficiary (*Trinity Industries*, 41 F.3d at 230); (b) whether the fiduciary made other purposeful contact with the state in the course of carrying out its fiduciary duties, such as communications into the state in furtherance of the alleged breach (*Difusion*, 2014 WL 12580438, *2; *North Texas*, 107 F. Supp. 3d at 628); and (c) whether the "purposeful actions" giving rise to the plaintiffs' claims, even if conducted outside of the state, were "directed toward, and with foreseeable effects" in the forum state (*Nivisys*, 2019 WL 5417153, *5). These factors support specific personal jurisdiction here.

       i)    *McCoy and MEH "deliberately availed [themselves] of the benefits of an ongoing relationship with" Cogent and Zarallo in Texas.*

---

[29] While Defendants may try to distinguish *Nivisys* by asserting that McCoy did not visit Texas in connection with his role as Officer/Manager of Cogent, it is clear that the defendant's infrequent visits to Texas in *Nivisys* were not a determinative factor in the analysis and, as has long been established, "physical presence in the forum is not a prerequisite to jurisdiction" and "physical entry" can be accomplished by "other means" including mail and telephone. *See, e.g.*, *Walden*, 571 U.S. at 285.

Just like the defendant in *Nivisys* that "agreed to become the president and CEO" of "an enterprise based primarily in Texas" McCoy and MEH agreed to become majority member, manager, officer, accountants and financial controllers of Cogent, a company based primarily in Texas,[30] "weigh[ing] in favor of finding specific jurisdiction." *Nivisys*, 2019 WL 5417153, *4. And like the law firm in *Trinity Industries*, McCoy and his business enterprise "deliberately availed themselves of the benefits of an ongoing relationship" with Texas-based Cogent and Zarallo, and thus "should have anticipated the possibility of being haled into court in Texas for claims arising out of or related to that relationship." *Id*. at 231. Moreover, just like the former director in *Difusion*, McCoy and MEH "could have reasonably anticipated that the effects of any actions taken as" majority member, manager, officer, accountant and financial controller of Cogent "would be felt in Texas due to [Cogent's] presence there," even though McCoy had "not physically visited Texas in connection with his position." *See Difusion*, 2014 WL 12580438, at *2. Specific jurisdiction over all of Defendants' breach of fiduciary duty claims is therefore proper on this basis.

> ii)    *McCoy and MEH made purposeful contact with the state in the course of carrying out their fiduciary duties and in furtherance of the alleged breaches.*

Like the defendants in *Difusion, North Texas* and *Trinity Industries*, McCoy and MEH engaged in phone calls, emails, teleconferences, and a members' meeting directed into the Eastern District of Texas. Even assuming (contrary to the facts alleged) that all of these communications were merely routine communications relating to conducting Cogent's business, those communications in combination with Defendants' "continuing obligations" to the Texas plaintiffs would itself be sufficient to find purposeful availment for any claims related to that relationship

---

[30] Based on the facts (pages 4 through 7) and arguments (pages 19 through 22) above, the Court should reject the fiction of Cogent being primarily based anywhere other than Texas.

(*e.g.*, breach of fiduciary duty).  *Trinity Industries¸* 41 F.3d at 230; *Difusion*, 2014 WL 12580438, at *2; *cf. Georgia Mobile Dental, LLC v. Napper*, No. CV 18-269-SDD-EWD, 2018 WL 6037527, at *4 (M.D. La. Nov. 16, 2018) ("[W]hen communications relating to conducting business are the only contacts" the additional presence of  "'continuing obligations' between the defendant and residents of the forum, such as is found in an ongoing business relationship, [is generally sufficient] to find that the defendant availed himself of the privilege of conducting business in the forum.") (citation omitted).[31]

But this case is a much stronger one for specific jurisdiction than cases involving a mere combination of routine communications directed at the forum along with an ongoing business relationship because the communications into Texas are "at the heart of this lawsuit." *See Wien Air*, 195 F.3d at 212. Under Delaware law, the duty of loyalty demands that the fiduciary "peremptorily" "inexorably" and "most scrupulous[ly] … protect the interests of the corporation committed to his charge" (*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) (citation omitted)) and the fiduciary "cannot act loyally towards the corporation unless [the fiduciary] acts in the good faith belief that her actions are in the corporation's best interest." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (internal quotation marks and citation omitted). Additionally, when a fiduciary requests that the beneficiary approve a contemplated action or transaction, the fiduciary has a duty to "disclose fully and fairly all material facts within their control bearing on the request." *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020).

---

[31] Just to be clear, outside of the communications alleged in the FAC, numerous communications were directed by Defendants into the Eastern District of Texas as part of day-to-day company business. Zarallo Decl. ¶ 18.

Plaintiffs have listed the relevant communications in the background above (pages 10 through 12). In the interest of brevity, those are incorporated by reference here rather than repeated. These facilitated the breaches of fiduciary duty McCoy and MEH committed, and the "actual content" of these communications was a gross departure from the forgoing Delaware standards. The communications—and their lies, half-truths, concealments, omissions, distorted logic and gaslighting—all sought to advance, support, benefit, conceal or obtain authorization or ratification of the core breaches of fiduciary duty at issue. The communications giving Zarallo false assurances that Cogent's invoices were fully "backed" by McCoy, inducing Cogent to continue to work without a profit for "DSI's project" were for the benefit of the McCoy enterprise and the detriment of Cogent and, moreover, since Zarallo had a right to withhold consent to such an arrangement it was a violation of their duty of candor to Zarallo. (*See* FAC ¶ 73.)

Similarly, Mitchell's phone call to Zarallo in December 2022 (*id.* ¶¶ 99-100) is fairly described as an attempt to gaslight Zarallo into accepting that McCoy had loaned Cogent approximately $1.0 million—despite financial statements provided to UCB just a month earlier showing no loans whatsoever on Cogent's books (Zarallo Decl. ¶ 1(g), Ex. A). This communication was clearly an act taken on behalf of McCoy to attempt to extract funds from Cogent without any justification and, they hoped, with Zarallo's authorization. The statements were false and failed to disclose the contrary information from the financial statements provided to UCB a month earlier. The plain purpose of this communication was to advance McCoy's self-interest at Cogent's expense, the definition of disloyalty.

Mitchell's February 2023 (*id.* ¶ 106) phone call to Zarallo and his email directed into the Eastern District of Texas on March 30, 2023 (*id.* ¶ 111), were designed to obtain what McCoy and MEH needed from Zarallo to consummate a transaction that was entirely unfair to Cogent. These

communications failed to disclose the true purpose of the UCB loan, violating the fiduciary duty of candor, and the entire reason these communications were made was to advance a clear breach of loyalty, as the line of credit had no practical function but to offload DSI's debt and put Cogent into utter financial distress. Moreover, these communications succeeded in obtaining the result they were seeking—Zarallo's consent. Further, just like the defendants in *North Texas* (107 F. Supp. 3d at 629) they repeatedly concealed the embezzlement even when specifically asked about the line of credit, first at the May 10, 2023 teleconference (FAC ¶ 137), then at the June 27, 2023 teleconference—after Zarallo had specifically asked for proof that the line of credit had a zero balance (*id.* ¶¶ 164)—and then again at the July 7, 2023 members' meeting, as well as in the Cogent Balances spreadsheet.

Finally, regarding McCoy's minting debt to himself before leaving and assigning to himself a critical receivable on an ongoing project, he knew that Zarallo was entitled to vote on this under the LLC Agreement; transmitted to him these agenda items to vote on; but then denied Zarallo's right to vote on these agenda items and proceed to consummate a series of disloyal and self-interested transactions on his last business day with Cogent. (FAC ¶¶ 173-79.) Defendants also disregarded Zarallo's demands for records supporting prior transactions between Cogent and Dynamic Group that would have exposed McCoy's purported debt as fabricated, and disregarded Zarallo's request for an explanation of why bona fide creditors were not being paid ((*id.* ¶ 164)— and they omitted substantive responses to these questions despite having two teleconferences on June 30, 2023 and July 7, 2023 to discuss these very issues. Moreover, although McCoy may have understood by July 7, 2023, that Zarallo would not authorize his actions, Defendants nonetheless

did their best to obtain Zarallo's consent using the fraudulent Exit Analysis and the Cogent Balances spreadsheet that were transmitted to Zarallo on June 19, 2023 (*id.* ¶¶ 145, 162).[32]

And additional acts were directed to Texas. McCoy and MEH's failure to discharge their duties to render payments to Cogent's vendors in Texas specifically led to contractual defaults and Cogent's inability to work with these Texas vendors—or really any other vendors— in the future,. (Zarallo Decl. ¶¶ 14-15.) McCoy/MEH caused Cogent to terminate its relationship with Insperity, a company based out of  Kingwood, Texas, and to replace it with the exploitative Southland and MGS. (*See* FAC ¶ 85; Zarallo Decl. ¶ 22.) McCoy caused transfers to be made to Cogent's Texas bank account in 2021 that covered Cogent's costs on "DSI's project" and should have been treated as capital contributions (or "owner's investments" as MEH originally accounted for them) but are now being treated as loans. (FAC ¶ 58.) All of the inflated invoices from Southland, MGS and MEH were billed to Cogent in Gunter, Texas. (*Id.* ¶¶ 155, 264.) McCoy intentionally leveraged and benefitted from MGS and Southland's use of Cogent's substantial Texas-based labor force as a base for its unearned markups. (*Id.* ¶ 272.) And after their withdrawal, MEH turned over books and records to the Eastern District of Texas that were replete with falsification and out of compliance with MEH's accounting obligations. (*Id.* ¶¶ 246-47; Zarallo Decl. ¶ 7.)

Defendants incorrectly conclude that the ***one and only*** case they cite to address personal jurisdiction over Plaintiffs' breach of fiduciary claims, the unreported *Shopf v. Griggers*, No. CV 17-10958, *Shopf v. Griggers*, No. CV 17-10958, 2018 WL 1453214 (E.D. La. Mar. 23, 2018), establishes that the Court lacks personal jurisdiction here. The procedural posture of *Shopf* is the

---

[32] Defendants claim that they did not need Zarallo's authorization is incorrect but, more importantly, it is utterly inconsistent with the fact that a meeting was held. If the action could have been taken without a meeting, then presumably there was no reason for a meeting.

court's reconsideration of its dispositive ruling on a 12(b)(2) motion to dismiss, which meant the court was considering whether it had made a "manifest error[] of law or fact" in its prior ruling. *Id.* at *1. In the factual background of the original 12(b)(2) opinion there is no suggestion that the defendant's sole communication into the forum state (a contractually required notice triggering plaintiff's right of first refusal) was false, misleading, or in any way tortious. *Shopf v. Griggers*, No. CV 17-10958, 2018 WL 1470607, at *1 (E.D. La. Jan. 4, 2018). In the court's reconsideration opinion, the court mentioned the plaintiffs' allegation that defendant had "[lied] to her about the price that [a buyer] was willing to pay to purchase the shares" to which she had a right of first refusal, but did not say that the notices mailed into Louisiana contained any false statements omissions or that the lies were directed into Louisiana, and in fact the court's ruling clearly implies that none were alleged. 2018 WL 1453214, *2. In sum, the case is entirely unhelpful here, where each of the communications into Texas themselves contained false or misleading statements and in other ways either facilitated or constituted breach of fiduciary duty.[33]

> iii) *Defendants' actions were "directed toward, and with foreseeable effects" in Texas.*

The degree of intentionality here in embezzling funds and intentionally inflicting fatal wounds to Cogent and doing so while McCoy and MEH knew they would be withdrawing from Cogent (and thereby terminating any conceivable non-Texas connection Cogent had) can and should be taken into account under the principles applied in *Grewal v. Defense Distributed* and *Wien Air*. The court in *Wien Air* reasoned that a person cannot "mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in

---

[33] It is also noteworthy that the plaintiff in *Shopf* was a passive investor in companies based entirely out of Indiana and Missouri and there was not a single connection between the case and Louisiana other than the notice that apparently itself did not contain any false statements or omissions.

Texas." *Wien Air*, 195 F.3d at 213. McCoy/MEH's actions taken in the last few months of their tenure with Cogent were akin to planting a series of ticking time-bombs specifically designed to explode in Texas once MEH and McCoy withdrew, which they did. More specifically, the debts McCoy left on Cogent's books doomed Cogent's ability to obtain financing or bonding, leading it to a series of defaults, and leaving it without the ability to bid any further projects. (Zarallo Decl. ¶8-17.) Those wrongfully encumbered books and records are in Texas, where Defendants obviously knew they would be after they withdrew. (*Id.* ¶ 7.) Moreover, McCoy/MEH's failure to pay vendors in Texas has damaged Cogent's reputation and goodwill specifically in Texas because Cogent's Texas-based relationships with their most important equipment vendors are ruined (Zarallo Decl. ¶¶ 12-15), which are Texas-based effects that can and must be taken into account in the analysis. *Cf. Defense Distributed*, 971 F.3d at 495 (defendant's conduct ultimately reduced "Texans' access to the materials the plaintiffs [sought] to publish").

Accordingly, the Court has specific personal jurisdiction over all of Plaintiffs' claims based on breach of fiduciary duty.[35]

### 2.    The Court has specific jurisdiction over Plaintiffs' fraud claims.

If a fraud claim is based on an out-of-state defendant's false representations or omissions directed into the forum state, the communications themselves are sufficient contacts to confer personal jurisdiction over the claim. *Trois v. Apple Tree Auction Ctr., Inc*., 882 F.3d 485, 491 (5th Cir. 2018); *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 689 (E.D. Tex. 2020). Even

---

[35] In an attempt to contain the size of this brief, Plaintiffs are not addressing aiding and abetting and conspiracy claims separately. In general, the plaintiff must demonstrate that each member of the conspiracy or the alleged aiders and abettors individually have minimum contacts. See *Delta Brands Inc. v. Danieli Corp*., 99 Fed App'x 1, 6 (5th Cir. 2004) (citations omitted). However, alter ego and single business enterprise theories establish that all defendants have minimum contacts.

if the defendant was not the initiator of a phone call but was a "willing participant" who "actively engaged" in the conversation, the defendant is considered "more akin to the initiator of a phone call." *Trois*, 882 F.3d at 491.

### i)    *Zarallo's claims related to unit transfer.*

The FAC's seventh and eighth causes of action are premised on the representations McCoy made to Zarallo prior to entering into any transaction with him (*see* pages 1 through 4, above), inducing Zarallo to part with 70 percent of Cogent and to execute the LLC Agreement. Defendants concede that someone "who makes affirmative representations over the phone to the Texas-based co-founder of a Texas company should reasonably anticipate facing suit in Texas based on claims arising out of those representations."[36] But they attempt to avoid the obvious applicability of this proposition here by again relying on the counterfactual that Cogent "had its principal office until July 2023 in Baton Rouge, Louisiana." (Mot. at 27.) As established, Cogent's principal office was never in Baton Rouge, Louisiana. But even if one were to accept that Cogent was moved to Baton Rouge *after* McCoy/MEH acquired their interests in Cogent, the acquisition itself was induced by McCoy's misrepresentations directed to the Texas-based co-founders of a Texas-based company *before* the acquisition.[37] Did Cogent transorm into a Baton Rouge-based company during McCoy's first conversations with Zarallo? Defendants' position is illogical.[38]

---

[36] Mot. at 27 (quoting *ESPOT*, 492 F. Supp. 3d at 690).

[37] That Cogent happened to choose Delaware as its state of formation, like so many companies do, is irrelevant for present purposes. The converse would also be true; if Cogent were a Texas limited liability company principally based in another state and with founders from that state, its formation in Texas would have no bearing on the "highly realistic" assessment required.

[38] Defendants' reliance on *Ice Melon, LLC v. Morgan*, No. 4:19-CV-1291, 2020 WL 12863808, at *1 (S.D. Tex. Jan. 14, 2020), *report and recommendation adopted*, No. CV H-19-1291, 2020 WL 12863809 (S.D. Tex. Jan. 29, 2020), is misplaced. As alleged, McCoy was informed and understood that Zarallo and Cogent were based out of Texas and were in Texas at the time of their conversations. (*E.g.*, FAC ¶ 22.) McCoy does not deny these allegations (and even

>
> ii) *Zarallo's claims based on McCoy/MEH misstatements and omissions during tenure as Member and Manager.*

The fourth cause of action is for fraud against McCoy and MEH arising out of the same communications that gave rise to Zarallo's breach of fiduciary duty claims.[39] Defendants incorrectly assert that "Zarallo has not alleged that MEH or McCoy made an affirmative representation to Zarallo." (Mot. at 27.) Not so. Zarallo has alleged numerous affirmative misrepresentations and omissions directed into the state. Defendants have failed to address these and cite no relevant caselaw in support of their motion.

### E. Plaintiff's contract-based claims arise from Defendants' minimum contacts with the State of Texas.

"The ultimate question" in assessing personal jurisdiction over a breach of contract claim "is whether the allegedly breached contract had a substantial relationship to the forum state, considering the totality of the circumstances." *Elevacity U.S., LLC v. Schweda*, No. 4:22-CV-00042, 2022 WL 3704537, at *8 (E.D. Tex. Aug. 26, 2022) (citation omitted). "[T]hose acts which relate to the formation of the contract and the subsequent breach are relevant," including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Trois*, 882 F.3d at 489.

Generally, parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473

---

if he did, the denial could not be credited in the current posture). This is very unlike *Ice Melon* where "evidence shows that [the defendant] though[t] he was doing business with a Mexican national" and the fact the plaintiff "fortuitously opened" emails in Texas was therefore insufficient to confer jurisdiction.

[39] The Fourth Cause of Action has a mislabeled subtitle which should have read "common law fraud" consistently with the allegations in paragraphs 377-381.

(1985); *see also Central Freight*, 322 F.3d at 382-83 (defendant's contacts with Texas could not be "characterized as random, fortuitous, or attenuated" where contract established long-term, interstate relationship under which the parties would use each other's services); *Mississippi Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1009 (5th Cir. 1982) (personal jurisdiction in Mississippi appropriate because the "relationship between the parties was sustained (not 'single' or 'fortuitous'), and the plaintiff performed its part of the undertaking at its sole place of business in Mississippi as was known to the California defendant at the outset of their relations").

> i)    *The Court has specific jurisdiction over the contracts governing the parties' agreements to co-manage and support a Texas-based company.*

McCoy and MEH have minimum contacts with Texas sufficient to confer personal jurisdiction over Plaintiffs' third cause of action for breach of the LLC Agreement, fifth cause of action for breach of an implied-in-fact agreement between Zarallo and McCoy, and their sixth cause of action premised on the same facts. Just as in *Mississippi Interstate* the "relationship between the parties was sustained (not 'single' or 'fortuitous')" and "the plaintiff[s] performed [their] part of the undertaking at [their] sole place of business in [Texas] as was known to the [Louisiana] defendant[s] at the outset of their relations." 681 F.2d at 1009. And even though Cogent performed services for third parties in various states, Cogent's operational "hub" at all times remained in Texas (*see id.*) and the parties' joint-operation of a Texas-based company also had the "foreseeable and intended result of causing economic activity within Texas" (*Central Freight*, 322 F.3d at 383). Indeed, it was intended that Cogent would oversee a substantial project in Texas and it was foreseeable that Cogent would employee dozens of Texas-based employees, and would develop Texas-centered supplier relationships, which it ultimately did.

Moreover, although Plaintiffs do not deny that Zarallo visited Baton Rouge in August 2021 to discuss the operating agreement (*see* McCoy Aff. ¶ 9), McCoy asked Zarallo to meet with his business partner in Austin, Texas, several times in June 2021, to discuss potential synergies with Cogent and McCoy's enterprise and these were a substantial part of the negotiations related to the unit transfer and the LLC Agreement. (Zarallo Decl. ¶ 1(a).)

Regarding the alleged breaches, many of the actions comprising breaches of fiduciary duty (and the related communications into Texas discussed above) also constitute breaches of Section 3.03 of the LLC Agreement. (*See* FAC ¶¶ 366-68.) MEH's breach of Section 3.08 was accomplished in substantial part by using the dozens of Cogent's Texas-based labor as a source of improper revenue from the Southland/MGS arrangement. (*See id.* ¶¶ 369-73.)

In sum, the "sustained" relationship between the parties of co-managing a business with its "hub" in Texas establishes personal jurisdiction over these breach of contract claims. *Wilson v. Kelso*, No. MO-11-CA-96-H, 2012 WL 13029489, at *3 (W.D. Tex. Feb. 17, 2012) ("Defendants actively sought a Texas partner for an ongoing business venture … Defendants should have reasonably anticipated being haled into court in Texas on claims relating to their partnership ….").

> ii)    The Court has specific jurisdiction over the contract-based claims relating to the Mulligan Project

Plaintiffs' ninth cause of action is against DSI for breach of an implied-in-fact contract under which Cogent provided services on the Mulligan Project. Plaintiffs' eleventh cause of action is for *quantum meruit* arises in part from Defendants' requesting, accepting and benefitting from Cogent's services on the Mulligan Project. The Mulligan Project was in Illinois, however, Defendants knew and intended that Cogent direct operations from Texas. (*See* Zarallo Decl. ¶ 1(d).) Payments that were made for Cogent's services were directed to Cogent's Texas bank

account. (FAC ¶ 57.) Moreover, specific personal jurisdiction is proper over these claims because they share a common nucleus of operative fact with the related breach of fiduciary duty claims. MEH/McCoy, as agents, sole-owners, alter egos, and part of a single-business enterprise with DSI caused Cogent to enter into the transaction with DSI, stated that "Dynamic and McCoy" were financially "backing" the invoices, and were responsible for failing to ensure that Cogent was paid. The Court should therefore assert supplemental personal jurisdiction over these claims should it hold that minimum contacts are otherwise lacking (*see* next section).

> **1.  The Court has specific personal jurisdiction over all other claims because they are either based on derivative theories or are properly subject to pendent personal jurisdiction.**

"When a court has personal jurisdiction over the defendant on one claim, the court can exercise pendent personal jurisdiction over the same defendant on all other claims arising out of the same nucleus of operative fact." *ESPOT*, 492 F. Supp. 3d at 700. All of the claims not already addressed (including that portion of the conversion claim that pertains to the embezzlement of the UCB loan proceeds) arise out of the same nucleus of operative fact and therefore Plaintiffs request that the Court exercise pendent personal jurisdiction over all other claims.[41]

## III.    VENUE IS APPROPRIATE IN THE EASTERN DISTRICT OF TEXAS

---

[41] Specific personal jurisdiction is also proper over conversion and CFAA claims as they relate to Defendants' access of Cogent's computer systems and deletion of data. On July 10, 2023, McCoy/MEH's agent accessed Cogent's computer system in the Eastern District of Texas and deleted various files, including Mitchell's email account. (FAC ¶¶ 24-25, 221; Zarallo Decl. ¶ 6.) These allegations support personal jurisdiction both for the conversion claim and a claim under CFFA since Cogent's computer system was in Texas when the files were accessed and destroyed. *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 672 (N.D. Cal. 2020), *aff'd on other grounds*, 17 F.4th 930 (9th Cir. 2021) (defendant's contact likened to "a breaking and entering of a server in California"); *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 229 (5th Cir. 2012) (holding that location where defendant converted the software determined the outcome in personal jurisdiction analysis). Defendants have not addressed these claims in their personal jurisdiction analysis and therefore should be deemed to concede that jurisdiction is proper.

Under 28 U.S.C. § 1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). A venue "does not have to be the place where the most relevant events took place," but "the selected district's contacts must still be substantial." *McClintock v. School Bd. East Feliciana Parish*, 299 F. App'x 363, 365 (5th Cir. 2008). "In determining where a substantial part of the events giving rise to a claim occurred, courts take a holistic view of the acts underlying a claim and look 'not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim.'" *Am. States Ins. Co. v. Andrews*, No. 6:13-CV-865-JDL, 2014 WL 12601031, at *3 (E.D. Tex. Aug. 15, 2014) (citation omitted). "Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Ware v. United Rentals (N. Am.), Inc*., No. 1:10-CV-13, 2010 WL 1374583, at *3 (E.D. Tex. Mar. 30, 2010).

As set forth below, and as already established, the Eastern District of Texas is by no means a "remote district having no real relationship to the dispute."

### 1.    Venue is proper over breach of fiduciary duty claims.

Where alleged communications have been directed into the forum state and federal district and are themselves a part of the sequence of events underlying the claim, the district into which those communications were directed is the proper venue for those claims. *See, e.g., Trois*, 882 F.3d at 494; *TransFirst Holdings, Inc. v. Phillips*, No. 3:06-CV-2303-P, 2007 WL 631276, at *8 (N.D. Tex. Mar. 1, 2007) ("A court may find venue is proper where a defendant directs communications toward a particular forum if the communications are sufficiently related to the cause of action."). Where a communication directed into the district helps facilitate a breach that occurred outside of the district, that communication is "part of the historical predicate of the claim." *Brunswick.* 2014

WL 1612668, at *2 (former-executive of Illinois-based fitness equipment company breached fiduciary duty by giving improper discount to Hawaii customer from his California office; held: venue proper in Northern District of Illinois, where company was headquartered, because the orders for the equipment were routed through the company's Chicago headquarters). Additionally, it is proper to consider where the harm was felt as part of the analysis. *E.g.*, *Dewolff, Boberg & Assocs., Inc. v. Pethick*, No. 4:20-CV-00556, 2020 WL 6822834, at *6 (E.D. Tex. Nov. 20, 2020) ("The Court also considers where the harms were felt. The alleged harms [from breach of fiduciary duty] were directed towards Plaintiff – a Dallas Company.").

Plaintiffs have already sufficiently delineated the substantiality of the communications and other relevant events and omissions in connection with the minimum contacts analysis above (pages 28 through 33). That discussion is incorporated by reference here in the interest of brevity. To briefly recap, Defendants sent numerous communications which are part of the "sequence of events" behind Plaintiffs' claims, including calls and emails into this district containing lies, concealments, omissions, distorted logic and gaslighting, all meant to advance disloyal and bad faith objectives, including appropriating Cogent's cash and receivables and burdening Cogent with debilitating and unfair debt.  Obviously, as established, Cogent's headquarters at all times has been in this district and it has been harmed here, further supporting this as a proper venue. *See Dewolff*, 2020 WL 6822834, at *6.

Additionally, the Fifth Circuit in *Trinity Industries*, in its assessment of whether the litigation "resulted from injuries arising out of or related to the defendants' forum contacts" considered relevant that a professional (in that case a lawyer) "is answerable not only where the alleged breach occurred but also where the professional obligations attached" and concluded that "[i]n this instance, that attaching was within the state of Texas." *Trinity Industries*, 41 F.3d at 231-

32 (citation omitted). Here as well, MEH's professional obligations (which included accounting obligations) attached within the state of Texas, and specifically in this district. It is clear that this district has a substantial relationship to this dispute. Nothing in the cases cited by Defendants changes the result. In *Russo*, *v. Barnard*, No. 3:21-CV-165, 2021 WL 5567380, at *1 (S.D. Tex. Nov. 29, 2021), not a single communication was alleged to have been directed into the Southern District of Texas, and the only theory for venue was that the plaintiff was a resident of the district when the wrongdoing occurred; that is a far cry from this case. And in *Key v. Pat Robertson*, No. CV H-07-4060, 2008 WL 11462865, at *1 (S.D. Tex. Apr. 7, 2008), the connection between the lawsuit and Texas was "very minimal" and regarding the single possible connection—the allegations that defendant communicated  misrepresentations  to plaintiff by mail and/or by phone—the court plainly made a mistake of law in its analysis. Specifically, the court reasoned that "[i]f [the defendant] did in fact make misrepresentations, they were made in Virginia, even though they were communicated to Plaintiff in Texas." *Id.* at *2. In support, the court cited the section of *Renoir v. Hantman's Assoc., Inc.*, Civ. A. No. H-05-4152, 2006 WL 1007481, *9 (S.D. Tex. April 18, 2006), where the court reasoned at length as to why a misrepresentation by telephone or email *cannot* be sufficient to sustain personal jurisdiction—reasoning that is very clearly no longer good law (if it ever was).[49]

---

[49] And the same is true regarding Ancel v. Rexford Rand Corp., No. CIV. 3:93-CV-2379-H, 1994 WL 539287, at *2 (N.D. Tex. Sept. 19, 1994), where all of the key misrepresentations occurred in-person in Illinois, and it appears letters and phone calls received in Dallas were not related to the underlying wrongdoing or, in any event, were not substantial. And, like the court in *Key*, the court in *Ancel* cited some decisions in support of its holding that make it highly questionable whether it is good law, including one that, according to the court's parenthetical, found "that mailings took place at their place of origin." 1994 WL 539287, at *3 (N.D. Tex. Sept. 19, 1994). If that were correct, then the many holdings that a single letter directed into the state conferred personal jurisdiction would not make sense, since, on this logic, the location where they were sent rather than received is determinative. The authorities Defendants rely on are therefore highly suspect.

### 2. Venue is proper over fraud claims.

Plaintiffs incorporate by reference the discussion related to fraud in the context of minimum contacts, as well as the analysis above regarding breach of fiduciary duty which is largely applicable. False and misleading statements were directed into this district that induced Zarallo's parting with his units. All of the fraudulent communications giving rise to Plaintiffs' breach of fiduciary claims also give rise to Plaintiffs' fourth cause of action. Venue is therefore proper. Defendants have not cited any valid authority that requires a different result.[50]

### 3. Venue is proper over breach of contract claims.

To determine where a substantial part of the events in a breach of contract case took place, courts have considered where the contract was executed, performed, and breached. *Trois*, 882 F.3d at 493. Much of the analysis relevant to personal jurisdiction is relevant and incorporated here. The LLC Agreement was executed electronically and Zarallo executed it from the Eastern District of Texas. (Zarallo Decl. ¶ 1(a).) The LLC Agreement was performed substantially in the Eastern District of Texas, because that is where Cogent operated out of at all relevant times, and Cogent's operation is the primary subject of Cogent's operating agreement. And the breaches of the LLC Agreement are unique in that they, in part, incorporate fiduciary duties applied to Cogent's Officers, meaning that McCoy's breaches of fiduciary duty directed into the Eastern District of Texas also constitute breaches of his obligation of discharge his duties in a manner he "reasonably believe[d] to be in the best interests" of Cogent. (FAC ¶ 366-68.) Moreover, the inflated invoices for MEH's services and for Southland/MGS were billed to Cogent at Gunter, Texas. And MEH

---

[50] Venue is also appropriate for the tort claims related to the destruction of Cogent's computer files, namely the CFAA claim and the conversion claim since in both cases the relevant events occurred in the Eastern District of Texas, where Cogent's computer system resides. (*See* Zarallo Decl. ¶ 6.)

ultimately turned over defective and fraudulent books and records to Cogent in the Eastern District of Texas after its withdrawal, a further breach of the LLC Agreement. (Zarallo Decl. ¶ 7.)

The same result obtains for the implied-in-fact contract with DSI. The services were performed by Cogent in significant part from this district. (Zarallo Decl. ¶ 1(d).) The invoices to DSI that are unpaid were payable in the Eastern District of Texas. Moreover, it is proper to hear this and all of the contract-based claims under the pendent venue doctrine, discussed below.

### 4.   Pendent venue is proper over all other claims.

Although the Fifth Circuit has not spoken authoritatively with regard to pendent venue, courts in this circuit routinely apply the doctrine. *E.g.*, *Andra Grp., LP v. BareWeb, Inc*., No. 4:17-CV-00815, 2018 WL 2848985, at *8 (E.D. Tex. June 11, 2018); *Shippitsa Ltd. v. Slack*, No. 3:18-CV-1036-D, 2019 WL 3304890, at *7 (N.D. Tex. July 23, 2019); *Halcyon Biomedical, Inc. v. Glatt Air Techniques, Inc*., 2019 WL 2420232, *8 (S.D. Tex. 2019). The court may exercise pendent venue over any claims that "derive from a common nucleus of operative facts, and [where] judicial economy is best served by adjudicating those claims in a single forum." *Shippitsa*, 2019 WL 3304890, at *7; *see also Halcyon,* 2019 WL 2420232, at *8 (because plaintiff's non-fraud claims arose from a common nucleus of operative fact—specifically, a course of dealing with the defendant on matters subject to their agreement—the court exercised pendent venue over breach of contract, conversion and other non-fraud claims).

All of the claims here are part of a common nucleus of operative fact with Plaintiffs' core breach of fiduciary duty and fraud claims, and the court should exercise pendent venue over all of them should it find that it could not do so otherwise.

### IV.   THE MIDDLE DISTRICT OF LOUISIANA IS NOT CLEARLY A MORE CONVENIENT AND JUST FORUM FOR THIS DISPUTE

A district court may transfer a civil action for the convenience of the parties and witnesses and in the interest of justice to other districts or divisions where the plaintiff could have properly brought the action. 28 U.S.C. § 1404(a). District courts have broad discretion in deciding whether to transfer a case under Section 1404(a), *In re Volkswagen of Am., Inc*. (*Volkswagen II*), 545 F.3d 304, 311 (5th Cir. 2008) (*en banc*), and Section 1404(a) motions are adjudicated on an "individualized, case-by-case consideration of convenience and fairness." *TravelPass Grp. v. Caesars Ent. Corp*., No. 5:18-CV-153, 2019 WL 3806056, at *11 (E.D. Tex. May 9, 2019) (internal quotation marks and citation omitted).

The party seeking a transfer under Section 1404(a) must show good cause, meaning the moving party must "clearly demonstrate that a transfer is for the convenience of parties and witnesses [and] in the interest of justice." *Volkswagen II*, 545 F.3d at 315 (citation omitted) (cleaned up) (quoting 28 U.S.C. § 1404(a)). When the movant fails to demonstrate that the proposed transferee venue is "clearly more convenient," "the plaintiff's choice should be respected." *Id*.

To determine whether a Section 1404(a) movant has demonstrated that the proposed transferee venue is "clearly more convenient," the Fifth Circuit employs four private-interest and four public-interest factors. *See Volkswagen II*, 545 F.3d at 315.[51] When applying these factors, "courts should be careful not to lose sight of the plaintiff's choice of forum and its historical

---

[51] The private-interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id*. (citation omitted). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen of Am., Inc*., 545 F.3d 304, 315 (5th Cir. 2008).

significance in our jurisprudence." *Quest NetTech*, 2019 WL 6344267, at \*7. With the plaintiff's choice firmly in view, courts must also "resolve all factual discrepancies in favor of the non-movant." *Vocalife LLC v. Amazon.com, Inc.*, No. 2:19-CV- 00123-JRG, 2019 WL 6345191, at \*3 (E.D. Tex. Nov. 27, 2019). Moreover, "[w]here the present and proposed forums are both roughly similar in terms of convenience, courts should not conclude that the proposed transferee forum is 'clearly more convenient.'" *Quest*, 2019 WL 6344267, at \*7.[52]

### A.    The Private Interest Factors Weigh Against Transfer.

####    1.    The Middle District of Louisiana does not have relatively easier access to source of proof than Eastern District of Texas.

"In considering the relative ease of access to proof, a court looks to where documentary evidence, such as documents and physical evidence, is stored." *Seven Networks*, 2018 WL 4026760, at \*2. A party seeking transfer "must identify sources of proof with enough specificity that a court can determine whether transfer will increase the convenience of the parties." *J2 Glob. Commc'ns, Inc. v. Protus IP Sols., Inc.*, 2009 WL 440525, at \*2 (E.D. Tex. 2009). "Speculative identification" of documentary evidence that "might exist" is insufficient to carry the burden. *Seven Networks*, 2018 WL 4026760, at \*4.

---

[52] Courts in this Circuit consistently decline to transfer cases even when several public or private interest factors weigh in favor of transfer. *See, e.g., Hammond Dev. Int'l, Inc. v. Google LLC*, No. 1:20-CV-00342-ADA, 2020 WL 3452987, at \*5 (W.D. Tex. June 24, 2020) (denying Google's motion to transfer to the Northern District of California, even where access to proof and local interests weighed in favor of transfer); *Seven Networks, LLC v. Google LLC*, No. 2:17-CV-00441-JRG, 2018 WL 4026760, at \*14 (E.D. Tex. Aug. 15, 2018) (denying Google's motion to transfer to the Northern District of California, even where the availability of compulsory process and cost of attendance to willing witnesses weighed in favor of transfer); *AGIS Software Dev. LLC v. Huawei Device USA Inc.*, No. 2:17-CV- 00513-JRG, 2018 WL 2329752, at \*9 (E.D. Tex. May 23, 2018) (denying motion to transfer, even where access to proof and availability of compulsory process weighed in favor of transfer); *Calypso Wireless, Inc. v. T-Mobile USA, Inc.*, No. 2:08-CV-441-TJW-CE, 2010 WL 11469012, at (E.D. Tex. Mar. 31, 2010) (denying motion to transfer, even where the availability of compulsory process, local interests, and cost of witness attendance weighed in favor of transfer.

Defendants fail to identify the sources of proof it references with enough specificity for the court to determine whether transfer will increase the convenience of the parties. Specifically, Defendants' vaguely state that "the documents and computer systems relating to" unspecified events at issue in this case "are located in Baton Rouge, Louisiana." (Mot. at 38.) But Zarallo is now in charge of Cogent and its computer systems and documents are in Gunter, Texas and Frisco, Texas. (Zarallo Decl. ¶¶ 6-7, 19.) These vague statements are insufficient to carry the burden.

Moreover, this factor weighs against transfer. Cogent and Zarallo maintain their electronic files on computers in Gunter, Texas, which is within the Eastern District of Texas. (*Id.* ¶ 19.) These electronic records include, among other relevant documents, accounting records, financial statements, tax-return information, copies of all of the contracts which McCoy led Cogent to breach, copies of the Statement of Qualification, bank account statements for all of Cogent's bank accounts, demand letters from contractual counterparties, and bid-package information for various missed opportunities. Moreover, original, physical copies of demand letters and notices of default that Cogent has received from customers, supplier liens, customer invoices that went unpaid, information about all hours worked and materials supplied on the Mulligan Project, and information regarding employees whose salary was used as a base for the Southland/MGS fees, are all present in this district and are all relevant to establishing liability and damages. (*Id.*)

Oliver Chua is in the Eastern District of Texas (Plano) and very likely has documents and communications related to the early negotiations with McCoy. (*See id.* ¶ 20.)

Collin County based CPA, Ronen Bass, performed a CPA-review of Cogent's 2023 financials from Collin County, Texas, and is expected to have relevant workpapers at that location. (*Id.* ¶ 21.)

In sum, this factor weighs against transfer.

47

### 2.    The Middle District of Louisiana is not a more convenient forum for willing witnesses.

As the Fifth Circuit has held, it is obviously more convenient for witnesses to testify closer to home, and additional distance means additional travel, meal, and lodging costs, as well as additional time away from the witnesses' regular employment. *Volkswagen*, 545 F.3d at 317. "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* (citation omitted). Significantly, this factor relates primarily to the inconvenience placed on willing nonparty witnesses, not party witnesses. See, e.g., *Seven Networks*, 2018 WL 4026760, at *9 (collecting cases); *Frederick v. Advanced Fin. Sols.*, Inc., 558 F.Supp.2d 699, 704 (E.D. Tex. 2007) ("The availability and convenience of party-witnesses is generally insignificant because a transfer based on this factor would only shift the inconvenience from movant to nonmovant.").

Defendants only specifically name two individuals who they speculate might be witnesses, and do not know whether they are willing or unwilling. (Mot. at 38).

By contrast, Plaintiffs have submitted declarations from four potential witnesses (former Cogent employees and a soon-to-be former Cogent employee) with personal knowledge on relevant issues who would be willing witnesses and for whom it would be substantially more convenient to attend trial in this district: Angela Zarallo, Mark A. Zarallo, Sr., Walter Kittrell, and Vincent Zarallo.

Other witnesses that may or may not be willing to testify include: Ronen Bass, Cogent's current CPA who lives in Collin County; Oliver Chua who He resides in Plano, Texas; Caleb Wade or other representatives of United Rentals' Irving, Texas office (Zarallo Decl. ¶ 15); Chris Stout

or other representatives of Lonestar Electric Supply's Texas office (*id.* ¶ 14); a corporate representative of Insperity, which is based out of Kingswood, Texas (*id.* ¶ 22); and a corporate representative of Gransolar Group based out of Irving, Texas (*id.* ¶ 23.).

Given that Plaintiffs have identified material, nonparty witnesses that would be willing to testify at trial and for whom travelling to Baton Rouge would be inconvenient, and Defendants have failed to do so, this factor weighs against transfer.

### 3. The Middle District of Louisiana does not have superior availability of compulsory process for unwilling witnesses.

This factor instructs the Court to consider the availability of compulsory process to secure the attendance of witnesses, particularly non-party witnesses whose attendance may need to be secured by a court order. *Volkswagen II*, 545 F.3d at 316. The compulsory-process factor weighs heaviest against or for transfer when either the transferor or transferee has "absolute subpoena power," meaning that "all relevant and material non-party witnesses reside within the subpoena power of a particular court." *Volkswagen*, 545 F.3d at 316. Because neither this district nor the Middle District of Louisiana has absolute subpoena power, the magnitude of this factor is diminished. *Texas v. Google LLC*, No. 4:20-CV-957-SDJ, 2021 WL 2043184, at \*4 (E.D. Tex. May 20, 2021).

Defendants have only identified three potential witnesses in Baton Rouge.

Plaintiffs have identified Oliver Chua; Cogent's CPA Ronen Bass; Caleb Wade or other representatives of United Rentals' Irving, Texas office (Zarallo Decl. ¶ 15); Chris Stout or other representatives of Lonestar Electric Supply's Texas office (*id.* ¶ 14); and a corporate representative of Insperity, which is based out of Kingswood, Texas (*id.* ¶ 22); and a corporate representative of Gransolar Group based out of Irving, Texas, as potential witnesses that may require a subpoena.

Vendors with whom Cogent previously had a strong relationship and who will no longer work with Cogent and have recorded liens on Cogent's projects may be material witnesses to prove damages. A representative of Insperity may be necessary to compare its fees and services to Southland/MGS. Gransolar Group will be needed to prove a clear lost profit opportunity.

All of the foregoing witnesses are within the subpoena power of this district. This factor weighs against transfer.

### 4.  Other Practical Problems Weigh Against Transfer.

The fourth private-interest factor includes "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen*, 545 F.3d at 315. "Practical problems" may include "the parties' relative financial ability to bear the expense of trial in either district." *TV-3, Inc. v. Royal Ins. Co. of Am.*, 28 F. Supp. 2d 407, 411 (E.D. Tex. 1998); *Seeberger Enterprises, Inc. v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp. 2d 531, 540 (W.D. Tex. 2007) (weighing the "relative financial strengths of the parties" within the "other practical problems" factor of the 1404(a) analysis).

Cogent can no longer operate as a going concern and will not generate revenue going forward. (Zarallo Decl. ¶ 8.) The Zarallos have put a significant portion of their savings into the company, which they no longer expect to recover. (*Id.* ¶ 25.) Their only way to afford the cost of this lawsuit is by way of an alternative fee arrangement with counsel. (*Id.*) They will not be able to afford pay fees for counsel in Baton Rouge. (*Id.*) The financial burden of transfer will therefore be substantially more significant for Plaintiffs than for Defendants.

This factor weighs against transfer.

### B.    The Public Interest Factors Weigh Against Transfer.

**1.    The Middle District of Louisiana has the slowest time to trial of any district in the Fifth Circuit.**

The first public-interest factor is the "speed with which a case can come to trial and be resolved." *Garrett v. Hanson*, 429 F.Supp.3d 311, 319 (E.D. Tex. 2019) (citation omitted). "Generally, this factor favors a district that can bring a case to trial faster." *Ho Keung Tse v. Blockbuster, LLC*, No. 4:12-CV-328, 2013 WL 949844, at *5 (E.D. Tex. Jan. 17, 2013), *report and recommendation adopted*, No. 4:12-CV-328, 2013 WL 942496 (E.D. Tex. Mar. 8, 2013).

This militates against transfer. Defendants only reference the time-to-disposition statistic (Mot. at 39) (which itself is longer in the Middle District of Texas) but conspicuously fail to reference the dramatic difference between the districts in their time from filing to trial.[53] The time from filing to trial in the Middle District of Louisiana is a remarkable 38.2 months—over three and a half years and by far the longest time to trial of any district in the Fifth Circuit. By stark contrast, the Eastern District of Texas has the fastest time to trial of any district in the Fifth Circuit, at just 16.7 months. Given the circumstances of this case, time is of the essence and Plaintiffs do not have the luxury to litigate for more than three years before they have a trial on the merits.

This factor weighs heavily against transfer. *TravelPass*, 2019 WL 4071784, at *10 ("[C]onsidering the statistics that show that a trial would occur significantly earlier if the case proceeds in the Eastern District of Texas, this factor weighs heavily against transfer."); *Seven Networks,* 2018 WL 4026760, at *14 (rejecting defendant's argument that this factor should be "given little weight given the speculative nature of this factor").

---

[53] *See* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0630.2023.pdf.

### 2.   The Middle District of Louisiana does not have a superior local interest in this dispute.

"A local interest is demonstrated by a relevant factual connection between the events and the venue." *Vasquez*, 912 F. Supp. 2d at 451. Important considerations include the location of the injury, witnesses, and the plaintiff's residence. *See Volkswagen*, 545 F.3d at 317–18. Indeed, "[t]he place of the alleged wrong is one of the most important factors in venue determinations." *Watson v. Fieldwood Energy Offshore, LLC*, 181 F. Supp. 3d 402, 412 (S.D. Tex. 2016).

As established in connection with the other motions, clearly the place of the wrong here is in this district, which is also the Plaintiffs' place of residence, and the place where the majority of witnesses reside. This factor also militates against transfer.

### 3.   Texas's state law claims are governed by Texas state law.

No substantive claims for damages are asserted under Louisiana law, and Defendants do not claim otherwise. There is nothing "exceptionally arcane" about the alter-ego and/or single-purpose entity factors under Louisiana law that "are like to defy comprehension by a federal judge sitting in Texas" especially since Texas law is very similar on these issues. *See Def. Distributed v. Bruck*, 30 F.4th 414, 436 (5th Cir. 2022) (citation omitted) (cleaned up).

By contrast, a Louisiana court, as the transferee court, would be bound to apply Texas law of statutory fraud, attorneys' fees for breach of contract, and exemplary damages for fraudulent, malicious or grossly negligent conduct, of which Louisiana has no equivalents.

This factor weighs against transfer.

In sum, all of the applicable private- and public-interest factors weigh solidly against transfer, and Defendants have failed to carry their burden.

## V.   ALL CLAIMS HAVE BEEN SUFFICIENTLY PLED

A.     **The Merger Clause in the LLC Agreement is not an Impediment to any of Plaintiffs' Claims.**

Plaintiffs' argue that Zarallo's fifth, sixth, seventh and eighth causes of action must all be dismissed because of the standard integration clause in the LLC Agreement. That clause provides as follows:

> Entire Agreement. This Agreement contains the entire understanding among the Members and supersedes any prior written or oral agreement between or among them respecting the subject matter of this Agreement. There are no representations, agreements, arrangements or understandings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed herein and in the Company's Articles.

(LLA Agr. § 11.12.)

There are two separate issues here—one is whether the merger clause precludes bringing a claim under a separate agreement between Zarallo and McCoy (causes of action five and six), and second is whether the merger clause precludes statutory fraud and fraudulent inducement causes of action.

1.     **The merger clause does not apply to agreements between Zarallo and non-party, McCoy.**

"It does not follow from the parol evidence rule that [a] written contract between two parties, which is conclusive as to them, must necessarily be conclusive as to the proof of any rights or claims either one of them may have against a third party merely because those claims grow out of the same transaction reflected in the written contract." 11 Williston on Contracts § 33:9 (4th ed.). McCoy insists that he is not a party to the LLC Agreement: "McCoy denies that he was a member of Cogent, [or] a signatory of the Operating Agreement …." (Mot. at 2, n. 2.) Zarallo agrees, except that Plaintiffs allege McCoy did agree personally to take on the obligations of "Officer" set forth in the LLC Agreement,. There is also no dispute that McCoy is personally not

one of the "Members" referenced in the Merger clause. Thus, on its face, the fact that Zarallo claims that McCoy—a nonparty to the LLC Agreement—promised separately that he would "fund" Cogent and provide bonding does not conflict with any provision regarding MEH's obligations as a member.

Nothing in the LLC Agreement precludes the existence of a separate agreement regarding McCoy's personal obligations. The LLC Agreement is **not** a unit transfer or purchase agreement. In fact, the LLC Agreement presupposes that the membership interests at the time of execution of the LLC Agreement were 70/30. *See* LLC Agreement § 4.01(c) (attaching a "Schedule of Members" that lists MEH and Zarallo as 70/30 members). Moreover, the integration clause plainly states it applies to agreements relating to its "subject matter." The subject matter of the LLC Agreement does not address the transfer or consideration for Zarallo's transfer of units, and does not state anything specific about McCoy, other than his general duties as an Officer of Cogent.

### 2. The merger clause does not preclude claims based on antecedent fraud.

Zarallo has also asserted fraud-based claims premised on the same promises and representations underpinning the implied-in-fact contract regarding funding and bonding. The merger clause—even assuming *arguendo* it precluded the existence of a separate agreement— would not preclude a fraudulent inducement or statutory fraud claim premised on Zarallo being fraudulently induced into the transaction that gave McCoy/MEH control of Cogent. For a contract to bar "claims for fraud based on representations outside the four corners of the agreement" requires that the agreement contain an "unambiguous anti-reliance disclaimer." *FdG Logistics LLC v. A&R Logistics Holdings, Inc*., 131 A.3d 842, 860 (Del. Ch.), *aff'd sub nom A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016); *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006) ("[M]urky integration clauses, or standard

integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."); *In re Med. Wind Down Hldgs. III, Inc*., 332 B.R. 98, 105-06 (Bankr. D. Del. 2005) (recognizing that a contract "need not necessarily contain the words ‘rely’ or ‘reliance;’ but such provisions must ‘clearly’ and ‘explicitly’ promise not to rely"); *Kronenberg v. Katz*, 872 A.2d 568, 591 (Del.Ch. 2004), *aff'd without op*., 867 A.2d 902 (Del.2005) (rejecting that a standard integration clause amounted to an "anti-reliance" provision where language failed to "forthrightly affirm" that the parties were not relying on any representation or statement not contained in the agreement).

The opinion in *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, No. CV N12C-09-094 JTV, 2013 WL 5210255, at *5 (Del. Super. Ct. Sept. 4, 2013), is on all fours with this case. The integration clause at issue was virtually identical to the one here:

> The Agreement sets forth the entire understanding between the Parties with respect to the subject matter herein, and supersedes and replaces the terms of any and all prior discussions, agreements or understanding between the parties. There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with regard to the subject matter herein other than as set forth in the agreement.

*Id.* at *5. Relying on a very similar integration clause in *Kronenberg v. Katz*, the court held that "the [agreement's] integration clause contains no explicit anti-reliance language, [and therefore] [the plaintiff] is not barred from bringing a claim for intentional misrepresentation against [the defendant]." *Id.* at *6. The same result must follow here. Given that the standard integration clause in the LLC Agreement is the only basis for the motion to dismiss in relation to these claims, the motion must be denied.

## B.    Zarallo's Individual Breach of Fiduciary Duty Claims Survive.

Although Defendants' arguments merge with discussions of personal jurisdiction at the end of the relevant 12(b)(6) section, it appears they are moving to dismiss Zarallo's individual breach of fiduciary duty claim (second cause of action). (*See* Mot. at 16-17). A fiduciary may not "disloyally interfere[] with" a member's or shareholder's specific rights including by failure to disclose "fully and fairly all material information" bearing on those rights. *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 713 (Del. Ch. 2023). If a a breach of a fiduciary duty of disclosure results in the "impairment of economic or voting rights" of the shareholder, the shareholder is entitled *per se* to nominal damages. *Dohmen v. Goodman*, 234 A.3d 1161, 1174 (Del. 2020). Claims that a shareholder has been wrongfully induced to continue holding shares are "direct claims because they belong to the holders and are ones that only the holders can assert, not claims that could plausibly belong to the issuer corporation. *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1138 (Del. 2016).

Zarallo's claim is based on individual rights he had a member, as specified in the LLC Agreement, specifically: (a) the right to vote his units on a list of specific actions set forth in Section 3.04(a) of the LLC Agreement; (b) a right of first refusal under Section 10.01(g); (c) a right to buy back 20 units from McCoy under Section 10.01(h) of the LLC Agreement; and (d) a right to withdraw and be paid a Purchase Price under Section 10.01(g) of the LLC Agreement. While Plaintiffs agree that Cogent is entitled to recover for most categories of compensatory damages, Zarallo may recover: (a) the value Cogent and/or McCoy would have needed to pay Zarallo in or around February 2023 under Section 10.01(g)(2) (FAC ¶¶ 187, 360-63); and (b) nominal damages related to their non-disclosures which impaired Zarallo's voting and economic rights.

Regarding Zarallo's claim related to Section 10.01(g)(2), that provision would have required that Cogent (or alternatively, McCoy) pay Zarallo a Purchase Price. Had McCoy/MEH disclosed to Zarallo that they were in the course of saddling Cogent with unserviceable debt and would be embezzling funds from Cogent and failing to ensure its vendors were paid, this would have been a way out for Zarallo. Zarallo alleges specifically that he would have done so in February 2023. (FAC ¶ 363.) That allegation is sufficient when coupled with the clear breach of fiduciary duty in the failures to disclose the nature of the transactions McCoy and MEH were causing Cogent to transact (and thus the question is not whether Zarallo has a direct claim for the harm, but instead what the amount of the harm is which is not a question for a motion to dismiss).

Moreover, many of the breaches deprived Zarallo of the ability to exercise his voting rights, which give rise to *per se* nominal damages. (*See* FAC ¶¶ 341, 344 and 352; *see also Dohmen,* 234 A.3d at 1174.)

Thus, Zarallo's claim for breach of fiduciary duty has been sufficiently pled.[55]

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion must be denied.

Dated:  November 27, 2023.

Respectfully submitted,

By:   /s/ *Eliyahu Ness*

---

[55] Plaintiffs' are willing to stipulate to the dismissal of the CFAA claim presently due to insufficient information yet discovered about the volume and quality of the documents that were deleted (other than Mitchell's emails that were deleted) and thus would benefit from discovery before re-pleading the claim. Accordingly, Plaintiffs ask that the dismissal of the claim be without prejudice, given that the only issue with the claim is the statutory damages threshold.

**NESS PLLC**

Eliyahu Ness (SBN 24119651) eness@nesslegal.com
5900 Balcones Drive, Suite 13460
Austin, Texas 78731
Telephone: (754) 241-3477

ATTORNEYS FOR PLAINTIFFS

**PROOF OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on all

counsel of record by filing a copy of the foregoing document electronically with the Clerk of

Court using the CM/ECF  system on November 27, 2023.


By:  _/s/ *Eliyahu Ness*_____